# UNITED STATES DISTRICT COURT

## DISTRICT OF COLUMBIA

| | |
|---|---|
| THE KOI NATION OF NORTHERN CALIFORNIA, | Case No.: |
| a federally recognized Indian tribe, | |
| Plaintiff, | |
| v. | **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |
| UNITED STATES DEPARTMENT OF THE INTERIOR, | |
| and | |
| RYAN ZINKE, in his official capacity as the United States Secretary of the Interior, | |
| and, | |
| MICHAEL BLACK, in his official capacity as the Acting Assistant Secretary of the Interior for Indian Affairs, | |
| Defendants. | |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiff Koi Nation of Northern California ("Koi" or the "Koi Nation") is a federally recognized Indian tribe headquartered in Santa Rosa, California, and brings this action for declaratory relief against the United Sates Department of the Interior (the "Department"), Secretary of the Interior Ryan Zinke in his official capacity (the "Secretary"), and Acting Assistant Secretary of the Interior for Indian Affairs Michael Black in his official capacity (the "ASIA"), and states:

## INTRODUCTION

The Koi Nation is a landless federally recognized Indian tribe based in northern California.  The Koi Nation enjoyed a government-to-government relationship with the United States until 1956, when Congress conveyed the Nation's lands for the construction of a municipal airport.  The Department of the Interior misconstrued the legislation as a termination of the Koi Nation, and the Tribe has been paying the price ever since.

For nearly a half century – from 1956 until 2000 – the Federal Government severed its government-to-government relationship with the Koi Nation, and simply treated the Tribe as though it did not exist as an Indian tribe.  Federal agencies denied services to the Koi Nation, and the Department of the Interior would not acquire land in trust for the Tribe.  In December 2000, the Department of the Interior acknowledged its wrongful treatment of the Koi Nation and restored the United States' government-to-government relationship with the Tribe.

The Indian Gaming Regulatory Act ("IGRA") generally prohibits Indian tribes from conducting gaming on lands acquired in trust after October 17, 1988.  But, IGRA does allow certain Indian tribes to conduct gaming on lands acquired after that date if they had their status as a federally recognized Indian tribe terminated prior to IGRA's enactment and were later restored to federal recognition.  At the time of IGRA's enactment, the Defendants treated the Koi Nation as though it had been terminated, and would not allow it to even have lands placed into trust status – let alone conduct gaming on tribal lands.  The Defendants later restored the Koi Nation's status as a federally recognized Indian tribe.

On January 19, 2017 (the "January 19th Decision")(attached as Exhibit 1), the Defendants issued a final determination that the Koi Nation was not restored to federal

recognition for purposes of IGRA.  According to the Defendants, federal regulations do not allow the Koi Nation to be considered as a restored Indian tribe because the Federal Government erred in the first place by treating the Koi Nation as though it had been terminated.  The January 19th Decision squarely conflicts with the Defendants' treatment of similarly situated tribes.

The Koi Nation is challenging the January 19th Decision as a violation of IGRA, the United States Constitution, and the Indian Reorganization Act's prohibition against federal agencies diminishing the privileges and immunities of one Indian tribe relative to other federally recognized Indian tribes.

## NATURE OF THE CASE

1. The Koi Nation is seeking a declaration that it qualifies as an Indian tribe "restored to federal recognition" under IGRA, pursuant to 25 U.S.C. § 2719.

2. The Koi Nation is seeking a declaration that the Department of the Interior's regulation at 25 C.F.R. § 292.10 is invalid on its face because it invalidly narrowed the statutory scope of the phrase "restored to federal recognition" under IGRA; and it diminishes the privileges and immunities of the Koi Nation relative to other federally recognized Indian tribes in violation of 25 U.S.C. § 5123(f) by excluding Indian tribes restored by administrative reaffirmation from classification as a "tribe restored to Federal recognition" under IGRA.

3. In the alternative, the Koi Nation is seeking a declaration that the Defendants' application of the regulation at 25 C.F.R. § 292.10 in the January 19, 2017 decision diminishes the privileges and immunities of the Koi Nation relative to other federally recognized Indian tribes in violation of 25 U.S.C. § 5123(f).

4. In the alternative, the Koi Nation is seeking an order to set aside the Defendants' January 19, 2017 decision because it was arbitrary, capricious, and not in accordance with the law pursuant to 5 U.S.C. § 706(2) and failed to recognize that the Koi Nation satisfied the requirements of 25 C.F.R. § 292.10 as a tribe reaffirmed and recognized under the ambit of 25 C.F.R. Part 83.

5. The Koi Nation is also seeking injunctive relief from the Defendants' January 19, 2017 determination that it does not constitute a tribe "restored to federal recognition" pursuant to 25 U.S.C. § 2719.

**PARTIES**

6. Plaintiff Koi Nation of Northern California is a federally recognized Indian tribe which is included in the Department of the Interior's annual listing of federally recognized tribes published in the Federal Register pursuant to the Federally Recognized Tribes List Act of 1994, Pub. L. No. 103-454 (Nov. 2, 1994), 25 U.S.C. § 5130-31. See, Bureau of Indian Affairs, Indian Entities Recognized and Eligible to Receive Services From the United States Bureau of Indian Affairs, 81 Fed. Reg. 26826 (May 4, 2016). The Koi Nation was previously named the "Lower Lake Rancheria," and is the successor in interest to the rights and obligations of the Lower Lake Rancheria. See 80 Fed. Reg. 45893 (August 3, 2015).

7. Defendant United States Department of the Interior is the federal agency statutorily charged with the primary administration of the Federal Government's trust responsibility to Indian tribes. See, 25 U.S.C. §§ 2 and 9.

8. Defendant Ryan Zinke is sued in his official capacity as the United States Secretary of the Interior, is vested with broad authority to carry out the United States' obligations

toward Indian tribes, and with the authority to execute various laws relating to Indian tribes.

9. Defendant Michael Black is sued in his official capacity as the Acting United States Assistant Secretary of the Interior for Indian Affairs, and has the authority to act on behalf of the Secretary of the Interior to deliver services to Indian tribes throughout the United States.

## JURISDICTION AND VENUE

10. This Court has jurisdiction over this matter under 28 U.S.C. §§ 1331 and 1362, as it is a claim brought by a federally recognized Indian tribe arising under federal law, including: IGRA, 25 U.S.C. §§ 2701, et seq.; the Indian Reorganization Act (the "IRA")(as amended) at 25 U.S.C. § 5101, et seq.; the Administrative Procedure Act, 5 U.S.C. §§ 701, et seq. (the "APA"); and, the Declaratory Judgment Act, 28 U.S.C. §§ 2201-02.

11. Venue is proper in this District pursuant to 28 U.S.C. § 1391 in that a substantial part of the events or omissions giving rise to the claim have occurred in this District, and the Defendants are officers or employees of the United States and may be found within the District.

12. There is an actual and immediate dispute between the Koi Nation and the Defendants regarding the Koi Nation's status as an Indian tribe "restored to federal recognition" under 25 U.S.C. § 2719.

## CITATION OF DOCUMENTS

13. This Complaint contains citations to statutes and federal regulations that are publicly available. A select number of documents cited in this Complaint are attached as

exhibits, but many more are government documents that will need to await the filing of the Administrative Record by the Department of the Interior for authentication and citation purposes.

## FACTUAL ALLEGATIONS: HISTORY OF THE KOI NATION'S STATUS

14. The Koi Nation is a federally recognized Indian tribe with its headquarters located in Santa Rosa, California.

15. The United States does not presently hold any lands in trust for the Koi Nation, and the Koi Nation does not have an Indian reservation.

16. The Koi Nation traces its origins to the Village of Koi, which was located on an island in Clear Lake in northern California. See January 19th Decision at 2 (Exhibit 1).

17. The members of the Koi Nation have continuously resided in northern California for more than 17,000 years, in territory ranging from the northern edge of the San Francisco Bay to Clear Lake.

18. The Koi Nation has engaged in nation-to-nation relations with Russia, Spain, Mexico, and the United States since time immemorial.

19. The Koi Nation was not a signatory to the (unratified) 1851 United States Treaty with the Cal-a-na-po; but, that treaty indicated that successors in interest, like the Koi Nation, would enjoy the same rights and benefits as the tribal signatories to the Treaty.

20. On January 25, 1916, the United States purchased a tract of approximately 141 acres in Lake County, California, which became the Tribe's Rancheria. January 19th Decision at 2 (Exhibit 1).

21. In 1935, the Bureau of Indian Affairs (the "BIA") certified a list of twenty Rancheria residents eligible to vote in elections conducted pursuant to the Indian Reorganization Act. *Id*. at 2. Records of the BIA also indicate that an IRA organizational vote for Lower Lake was held and the Tribe approved the IRA.

22. In early 1951, the Lake County, California ("Lake County") Board of Supervisors ("Board") contacted the BIA about the possibility of acquiring the Rancheria for use as a municipal airport. *Id*. at 2.

23. The BIA advised the Board that any purchase of the Rancheria, or of any part of the Rancheria, would require the approval of Congress. *Id*. at 2.

24. Legislation to effectuate the transfer was enacted on March 29, 1956 and July 20, 1956.  These Acts (together, the "Lower Lake Act") authorized the Secretary to complete the sale of the Rancheria to Lake County, but collectively were for sale of the Rancheria only and did not address or authorize termination of the tribe's status as a federally recognized Indian tribe.

25. The Koi Nation has been without a land base since that time. *Id*. at 3.

26. In 1958, Congress enacted "An Act to provide for the distribution of the land and assets of certain Rancherias and reservations in California, and for other purposes, better known as the "Rancheria Act." *Id*. at 3 citing Pub. L. 85-671 (72 Stat. 619).

27. The Rancheria Act authorized the Secretary to begin the process of terminating the government-to-government relationship between the United States and several named tribes, and of selling those tribes' lands and distributing the proceeds of those sales to the tribes' members. *Id*. at 3.

28. Following the Lower Lake Act and the Rancheria Act, the United States ceased government-to-government relations with the Koi Nation, and treated the Koi Nation as though Congress had terminated its status as a federally recognized Indian tribe.

29. From 1956 to 2000, the United States did not provide any services, and in fact denied services, to the Koi Nation that are typically provided to Indian tribes because of their status as Indians; nor did the United States perform any of the fiduciary duties for the Koi Nation which are typically performed for federally recognized Indian tribes.

30. Between 1958 and 2000, the United States consistently omitted the Koi Nation from published lists identifying Indian tribes recognized by the United States, including lists mandated by the Federally Recognized Tribes List Act of 1994.

31. The United States' *de facto* termination of the Koi Nation after the Lower Lake Act prevented the Tribe from establishing a reservation or acquiring lands in trust by the time Congress enacted IGRA in 1988.

32. A February 1, 1975 BIA Division of Law Enforcement publication listed the Koi Nation (at the time, the "Lower Lake Rancheria") as having been terminated in 1956.

33. A 1975 BIA publication identified the Koi Nation as among a number of Indian tribes that had been terminated.  January 19th Decision at 3 (Exhibit 1).

34. On October 21, 1980, an official in the BIA issued a letter to the Director of the BIA's Sacramento Area Office seeking approval to place the Koi Nation on the list of federally recognized Indian tribes, and added that such approval should "include [the] date restored." The BIA ultimately declined to include the Koi Nation on the list of federally recognized Indian tribes.  See, Internal Memorandum Bureau of Indian Affairs (Oct. 21, 1980)(Exhibit 2).

35. On November 20, 1995, the BIA issued a letter to the Koi Nation (the "Brafford Letter") denying a request for tribal government grant funding, and explaining that the Koi Nation was not a federally recognized Indian tribe. The "Brafford Letter" also recommended that the Koi Nation seek recognition under the BIA's regulatory process for federal acknowledgment of Indian tribes.  See, Letter to Chairman Beltran from Harold M. Brafford, Bureau of Indian Affairs (Nov. 20, 1995)(Exhibit 3).

36. On December 18, 1995, the United States Department of Housing and Urban Development issued a letter to the Koi Nation in which it stated that it could not provide services to the Koi Nation because it was "not recognized as an Indian tribe." See, Letter to Chairman Beltran from Robert G. Barth, U.S. Department of Housing and Urban Development (Dec. 18, 1995)(Exhibit 4).

37.  On June 21, 1995, the Advisory Council on California Indian Policy wrote to Interior Assistant Secretary Ada Deer stating that Koi Nation qualifies for administrative recognition under the criteria enumerated in 25 CFR § 83.8 – Previous Federal Acknowledgment.  See, Letter to Assistant Secretary Ada Deer from Polly Girvin, Advisory Council on California Indian Policy (June 21, 1995)(Exhibit 5).

38. On November 19, 1999, the Bureau of Indian Affairs convened a meeting in Healdsburg, California with Koi Nation officials including its Chairman. The meeting is summarized in a September 14, 2000 Memorandum from the Central California Agency to the Pacific Region. Among other BIA officials, the Chief, Branch of Acknowledgement and Research attended. The meeting resulted in an understanding among the attendees that should additional research suggest that Koi should not be considered as terminated, administrative reaffirmation of the Tribe's federal

recognition would be sought.

39. The United States Indian Health Service Manual also excluded the Koi Nation's tribal members from Indian Health Services programs on the grounds that Koi had been terminated.

40. On September 14, 2000, the Superintendent for the BIA's Central California Agency issued a memorandum to the Director of the BIA's Pacific Region (the "Superintendent's 2000 Memo") stating that "the Lower Lake Rancheria is presently considered terminated" by the BIA.  See, Memorandum Superintendent, Central California Agency, Bureau of Indian Affairs (Sept. 14, 2000)(Exhibit 6).

41. The Superintendent's 2000 Memo noted that "it would be unconscionable for the BIA to continue to consider the [Koi Nation] as terminated."  See, *Id*. (Exhibit 6).

42. On December 29, 2000, the ASIA issued a letter to the Koi Nation "reaffirming the Federal recognition of the Lower Lake Rancheria," and stating that the Koi Nation would be included on the BIA's annual list of federally recognized Indian tribes.  See, Letter to Chairman Beltran from Assistant Secretary Kevin Gover (Dec, 29, 2000)(Exhibit 7).

43. On that same day, December 29, 2000, the ASIA issued a memorandum to various officials within the BIA stating that the United States erred in refusing to provide services to the Koi Nation and not placing it on the list of federally recognized Indian tribes.  See, Memorandum from Assistant Secretary – Indian Affairs to BIA Regional Director (December 29, 2000)(Exhibit 8). The ASIA observed that the Tribe's "tribal status has been continuously maintained by the tribal members." *Id*. He added "for reasons not clearly understood, [the Tribe was] simply ignored as the BIA went

through fundamental and philosophical changes . . . ." *Id.* He described the Tribe's omission from the list of federally recognized tribes as "an unfortunate part of the Bureau's legacy," and he described his own action in reaffirming the Tribe as "correct[ing] this egregious oversight." *Id.*

44. On December 23, 2010, the Director of the BIA's Pacific Region issued a memorandum to the ASIA stating:

> Today, Lower Lake requests consideration as a restored tribe under [25 C.F.R.] Part 292 due to the unusual circumstances that brought them to this point in time. Consistent with case law and our relationship with the Lower Lake Rancheria we believe that they should be considered a "restored tribe" under Section 20 of the Indian Gaming Regulatory Act. Documentation shows that the United States for all intensive [sic] purposes considered Lower Lake terminated until they were restored to recognition.

See, Memorandum to Assistant Secretary – Indian Affairs from Pacific Region Director (Dec. 23, 2010)(Exhibit 9).

## FACTUAL ALLEGATIONS: THE INDIAN GAMING REGULATORY ACT AND THE PART 292 REGULATIONS

45. On October 17, 1988, Congress enacted the Indian Regulatory Gaming Act ("IGRA") for the purpose, *inter alia*, of providing statutory limitations on the operation of gaming facilities by Indian tribes on Indian lands by limiting the locations on which Indian tribes may conduct gaming.

46. IGRA defines "Indian lands" at IGRA Section 4(4), 25 U.S.C. § 2703(4), as those lands that as of October 17, 1988, were – (A). . . lands within the limits of any Indian reservation; and, (B) . . . lands title to which is either held in trust by the United States for the benefit of any Indian tribe or individual or held by any Indian tribe or individual subject to a restriction by the United States against alienation and over

which an Indian tribe exercises governmental power.

47. IGRA generally prohibits Indian gaming on lands acquired in trust after October 17, 1988. See, 25 U.S.C. § 2719.

48. IGRA permits Indian gaming on lands acquired in trust after October 17, 1988, which qualify for enumerated exceptions, including the "restored lands" exception established by IGRA Section 20(b)(1)(B)(iii), 25 U.S.C. § 2791(b)(1)(B)(iii), and defined as – "(B) lands . . . taken into trust as part of – (iii) the restoration of lands for an Indian tribe that is restored to Federal recognition."

49. In 2008, two decades after IGRA's enactment, the Department promulgated regulations to implement the exception to IGRA's prohibition against gaming on lands acquired in trust after October 17, 1988. Those regulations are codified at 25 C.F.R. Part 292 (the "Part 292 Regulations"). See 73 Fed. Reg. 29354 (May 20, 2008).

50. The Part 292 Regulations attempted to clarify which Indian tribes could be considered as "restored to Federal recognition" under IGRA.

51. 25 C.F.R. § 292.10 is titled "How does a tribe qualify as having been restored to Federal recognition," and states:

> For a tribe to qualify as having been restored to Federal recognition for purposes of § 292.7, the tribe must show at least one of the following:
>
> (a) Congressional enactment of legislation recognizing, acknowledging, affirming, reaffirming, or restoring the government-to-government relationship between the United States and the tribe (required for tribes terminated by Congressional action);
>
> (b) Recognition through the administrative Federal Acknowledgment Process under § 83.8 of this chapter; or
>
> (c) A Federal court determination in which the United States is a

party or court-approved settlement agreement entered into by the United States.

52. The Part 292 Regulations limited the scope of the term "Indian tribe that is restored to Federal recognition" in a narrower fashion than had previously been applied under IGRA. Specifically, the text of § 292.10 appears to exclude Indian tribes that were wrongfully treated by the United States as though they were lawfully terminated, and that were later restored to federal recognition by administrative action.

53. The preamble to the 25 CFR Part 292 regulations states, "Neither the express language of IGRA nor its legislative history defines restored tribe for the purposes of 2719(b)(1)(B)(iii). … We believe Congress intended restored tribes to be those tribes restored to Federal recognition by Congress or through the Part 83 regulations." 73 Fed. Reg. at 29363.

54. The Preamble also states: "The only acceptable means under the regulations for qualifying as a restored tribe under IGRA are by Congressional enactment, recognition through the Federal acknowledgment process under 25 C.F.R. § 83.8, or Federal court determination in which the United States is a party and concerning actions by the U.S. purporting to terminate the relationship or a court-approved settlement agreement entered into by the United States concerning the effect of purported termination actions." *Id.* at 29363.

55. The Part 292 Regulations included a "grandfather clause" for final agency actions issued prior to their promulgation, as well as "written opinion[s]" issued prior to the effective date of the regulations, but which do not constitute final agency actions. See, 25 C.F.R. § 292.26.

### FACTUAL ALLEGATIONS: THE DEFENDANTS' TREATMENT OF SIMILARLY SITUATED TRIBES

56. On March 22, 1994, Ada E. Deer, the Assistant Secretary of the Interior for Indian Affairs, issued a letter to Chairman of the Ione Band of Miwok Indians in California "reaffirming" the Ione Band's status as a federally recognized Indian tribe after several decades during which the United States treated it as though it were not a recognized tribe. Quoted in *No Casino in Plymouth, et al. v. Jewell*, 136 F. Supp. 3d 1166, 1176 (E.D. Cal. Sept. 30, 2015) appeal pending.

57. On September 19, 2006, an Associate Solicitor for the Department of the Interior concluded that the Ione Band of Miwok Indians constituted a tribe "restored to federal recognition" under IGRA, stating:

> The positions taken by the Department in Federal court and before [the] IBIA against the Band are wholly inconsistent with that position and as such manifest a termination of the recognized relationship. Assistant Secretary Deer's review of the matter and reaffirmation of Commissioner Bruce's position amounts to a restoration of the Band's status as a recognized Band. Under the unique history of its relationship with the United States, the Band should be considered a restored tribe within the meaning of IGRA.[1]

58. In his September 19, 2006 opinion, the Associate Solicitor noted that the Department was developing the Part 292 Regulations, which include 25 C.F.R. § 292.10, at the time it was considering the Ione Band of Miwok Indians' status under IGRA.

59. On May 24, 2012, the Department of the Interior issued a Record of Decision (ROD) indicating that it would acquire land in trust for the Ione Band of Miwok Indians, and that the Band could engage in gaming activities on those lands because it was a tribe

---

[1] Letter cited in *No Casino in Plymouth*, 136 F. Supp. 3d at 1177.

"restored to federal recognition" under IGRA. ROD cited in *No Casino in Plymouth,* 136 F. Supp. 3d at 1170.

60. In its May 24, 2012 decision, the Defendants noted that they were relying on the Associate Solicitor's 2006 opinion, pursuant to the "grandfather clause" contained in the Part 292 Regulations at 25 C.F.R. § 292.26.

## FACTUAL ALLEGATIONS: THE KOI NATION'S 2014 REQUEST

61. On April 28, 2014, the Koi Nation issued a letter to Assistant Secretary – Indian Affairs Kevin Washburn requesting a determination that the Koi Nation qualifies as a tribe "restored to Federal recognition" under IGRA and its implementing regulations at 25 C.F.R. § Part 292 (the "Koi Nation Request").  See, Letter to Assistant Secretary Kevin Washburn from Chairman Beltran (April 28, 2014)(Exhibit 10).

62. The Koi Nation specifically requested that the Defendants issue a decision that it met the criteria for a tribe restored to federal recognition under 25 C.F.R. Part 292 due to its being recognized through the administrative Federal Acknowledgement Process under 25 C.F.R. § 83.8 (previous federal acknowledgment).  *Id.*

63. The Koi Nation added that it had initiated its restoration process with the Department in 1995 by requesting previous acknowledgment status through 25 C.F.R. § 83.8.  *Id.*

64. The Koi Nation added that, while the Department ultimately recognized Koi Nation without requiring the Nation to complete the full petition process, it did so on the basis that DOI utilized an implied waiver of 25 C.F.R. Part 83.  *Id.*

65. The Koi Nation request also argued that, while not formally recognizing the Koi Nation through the acknowledgment process, the Department utilized its Part 83 regulations and supplemented it with a separate finding that Koi Nation's

government-to-government relationship was never legally terminated – even though BIA treated it as a terminated tribe. *Id*.

66. The Koi Nation further argued that the import of Assistant Secretary Gover's December 29, 2000 decision was to give final effect to the 1995 request filed on Koi's behalf by the California Advisory Council for a previous federal acknowledgment under 25 C.F.R. § 83.8. *Id*.

67. Moreover, the Koi Nation noted that the process by which it was restored to federal recognition was addressed by this Court in *Muwekma Ohlone Tribe v. Salazar*, 813 F. Supp. 2d 170 (D.D.C. 2011) and the D.C. Circuit Court of Appeals in *Muwekma Ohlone Tribe v. Salazar*, 708 F.3d 209 (D.C. Cir. 2013).

68. In discussing the Koi Nation, the D.C. Circuit explained that the Part 83 process allows the Department to "apply its expertise … and correct its own errors." *Muwekma Ohlone Tribe,* 708 F.3d 209, 218 (D.C. Cir. 2013).

69. "In the *Muwekma* litigation, [the D.C. Circuit] Court ordered the Secretary to supplement the Administrative Record with an explanation of the process by which the Koi Nation and the Ione Band of Miwoks were restored to federal recognition." *Muwekma Ohlone Tribe,* 708 F.3d at 214.

70. "The Secretary's supplemental submission to this Court in *Muwekma* explained that the Secretary may waive any of the Department's regulations relating to Indian tribes when he determines that it is in the "best interests of the Indians."[2] *Muwekma Ohlone Tribe,* 813 F. Supp. 2d 170 (D.D.C. 2011).

71. In *Muwekma*, the Secretary explained to this Court:

---

[2] Interior's "Explanation to Supplement the Administrative Record – Muwekma Ohlone Tribe" dated November 27, 2006 [Dkt. 55 to the *Muwekma Ohlone Tribe,* 813 F. Supp. 2d 170].

In the case of the Ione and the "reaffirmations" done at the end of 2000, the Assistant Secretary did not expressly waive the regulations nor expressly make an exception to them. Nor did the Assistant Secretary articulate a finding that a waiver or no exception was in the best interests of the Indians. The failure to make an express waiver or exception in the regulations in handling Ione and [the Koi Nation] and articulate a finding of the best interests of the Indians has caused some confusion. We believe, however that the underlying record implied that a waiver of regulations was made to grant the Ione Band and the [Koi Nation] community recognition and placement on the Federal Register list of Indian entities. The implied waivers of the regulations for Ione and [the Koi Nation] were much broader than other waivers but were justified by the course of dealings to acquire and hold land in trust for them.[3]

72. On December 18, 2014, the Koi Nation sent a letter to Secretary of the Interior Sally Jewell reinitiating its April 28, 2014 request, and noted that the Tribe had been waiting eight months for a reply.

73. On January 20, 2015, the Koi Nation supplemented its request in a letter from its attorneys, Wilmer Hale LLP, to Daniel D. Leweranz, Office of the Solicitor of the Department.

74. On July 15, 2016, the Koi Nation sent an additional letter to Acting Assistant Secretary – Indian Affairs Larry Roberts once again requesting a determination that Koi is a tribe that was "restored to Federal recognition" for purposes of IGRA.

75. On September 9, 2016, the Koi Nation's attorneys, Wilmer Hale LLP, sent an email communication to Eric Shepard, Associate Solicitor for Indian Affairs, summarizing a meeting held with Mr. Shepard and Acting Assistant Secretary Larry Roberts. The letter also summarized the pending issues raised at the meeting.

76. On December 20, 2016, the Koi Nation attorneys issued a letter to Acting Assistant

---

[3] *Id.*

Secretary Larry Roberts making the following five points: First, the plain language of the term "restored" in IGRA compels treating Koi Nation as a restored tribe; second, Congress in IGRA gave no indication that it intended to limit the universe of restored tribes to congressionally restored tribes as opposed to administratively recognized tribes; third, DOI's treatment as a restored tribe of another tribe recognized under an affirmative restoration process, the Ione Band of Miwok Indians, compels the same treatment for Koi Nation; fourth, it would be a violation of the Koi Nation's "privileges and immunities" under 25 U.S.C. § 476(f) if Koi was not determined to be restored as was the Ione Band of Miwoks and similarly situated tribes; and, fifth, the DC Circuit's decision in *Muwekma Ohlone Tribe v. Salazar*, 708 F.3d  209 (D.C. Cir. 2013) provides further support for treating Koi as a restored tribe under IGRA and for being subject to an implied waiver of 25 C.F.R. Part 83.

77. On January 19, 2017, the Defendants issued the January 19th Decision, which rejected the Koi Nation's 2014 request, as supplemented. See, January 19th Decision (Exhibit 1).

78. Specifically, the January 19th Decision found that while IGRA's restored lands exception does not define the term "restored tribe," and the Department has treated tribes who entered into court approved settlements as "restored," the Part 292 Regulations recognize only three ways that a tribe may qualify as "an Indian tribe that is restored to Federal recognition" – by Congress, by court order, or by Part 83 acknowledgement. It added the Koi Nation's reaffirmation does not fall into any of those three categories set forth in the regulation.  See, January 19th Decision at 6 (Exhibit 1).

79. Accordingly, the Defendants denied the Koi Nation's request for a determination that it is "an Indian tribe that is restored to Federal recognition" for purposes of IGRA and the Part 292 Regulations. *Id.* at 7.

80. The January 19th Decision was a collective response to the Koi Nation's submissions to the Defendants, which included correspondence dated April 28, 2014, December 18, 2014, January 20, 2015, July 15, 2016, September 9, 2016 and December 20, 2016.

81. The January 19th Decision also states, "This decision constitutes a final agency action under the Administrative Procedures Act." *Id.* at 2.

## COUNT I: THE KOI NATION CONSTITUTES AN INDIAN TRIBE "RESTORED TO FEDERAL RECOGNITION" UNDER IGRA

82. The Koi Nation adopts and realleges the allegations in paragraphs 1 through 81 as though fully set forth herein.

83. IGRA established a comprehensive scheme for the regulation of gaming activities on Indian land.

84. Among other things, section 2719 of IGRA generally prohibits gaming "conducted on lands acquired by the Secretary in trust for the benefit of an Indian tribe after October 17, 1988 …" § 2719(a).

85. The general prohibition of gaming on lands acquired post-October 17, 1988 is subject to several exceptions. One of these exceptions is at the core of this Complaint.

86. Under section 2719(b)(1)(B)(iii) of IGRA, Indian lands are exempt from the general prohibition if such "lands are taken in trust as part of…the restoration of lands for an Indian tribe that is restored to Federal recognition." § 2719(b)(1)(B)(iii).

87. Congress did not define the phrase "Indian tribe that is restored to Federal recognition," and interpretation of this phrase initially fell to the agencies that implement IGRA and to the courts.

88. The Department of the Interior has described this exception to IGRA's general prohibition against Indian gaming on lands acquired after 1988 as an "Equal Footing Exception" that allows Indian tribes restored to federal recognition after 1988 to be placed on "equal footing" with tribes that were federally recognized at the time of IGRA's enactment.[4]

89. The term "restored" in IGRA was considered in *Grand Traverse Band of Ottawa and Chippewa Indians v. U.S. Atty. for Western District of Michigan*, 46 F. Supp. 2d 689, 698 (W.D.Mich. 1999) as follows:

> Congress itself has used the words restore and restoration interchangeably with reaffirm and recognize in the course of its actions to restore recognition of previously recognized tribes. The government has pointed to no standard, accepted and exclusive Congressional use of the words restore and restoration. Instead, Congressional use of the words appears to have occurred in a descriptive sense only, in conjunction with action taken by Congress to accomplish a purpose consistent with the ordinary meaning of the words. In no sense has a proprietary use of restore and restoration been shown to have occurred.[5]

90. In the January 19th Letter, the Defendants recognized that, in the absence of Part 292.10(b), a reaffirmed tribe could be restored for purposes of IGRA. January 19th Decision at 6 (Exhibit 1).

---

[4] Memorandum from Secretary of the Interior Ken Salazar to Assistant Secretary Larry Echo Hawk re Decisions on Indian Gaming Applications (June 18, 2010) (publicly available at https://www.bia.gov/cs/groups/public/documents/text/idc009878.pdf) (last accessed on August 1, 2017).
[5] *Grand Traverse Band of Ottawa and Chippewa Indians,* 46 F. Supp. 2d at 698.

91. The Defendants are presently defending that position in a case involving the Ione Band of Miwok Indians of California. See, *County of Amador v. United States Department of the Interior*, 136 F. Supp.3d 1193 (appeal pending Ninth Circuit). January 19th Decision at 6 (Exhibit 1).

92. Statutes are to be construed liberally in favor of the Indians, with ambiguous provisions interpreted to their benefit. *Muscogee (Creek) Nation v. Hodel*, 851 F.2d 1439, 1444-45 (D.C. Cir. 1988).

93. The Koi Nation constitutes a tribe "restored to Federal recognition" under IGRA.

94. The Defendants in 25 C.F.R. § 292.10 invalidly narrowed the broad statutory term "restored to Federal recognition" by excluding American Indian and Alaska Native tribes recognized by the Defendants' reaffirmation process.

95. Section 292.10 is invalid and a violation of IGRA as a result of this exclusion.

96. Subsections (a), (b) and (c) in Section 292.10  are not the subject of this facial challenge, nor is the regulation as a whole,  rather this Count is limited to the invalid exclusion of a subsection permitting treatment as "restored" of those tribes that were reaffirmed in a similar manner to the Koi Nation.

97. Plaintiffs do not seek a new 25 CFR § 292.10 rulemaking but instead pray that the Court finds § 292.10 may not be applied to exclude tribes like Koi Nation who were reaffirmed by Defendants.

98. Section 292.10(c) provides authority for a tribe to be restored by a "Federal court determination in which the United States is a party or court-approved agreement entered into by the United States."

**COUNT II: THE PART 292 REGULATIONS DIMINISH THE KOI NATION'S PRIVILEGES AND IMMUNITIES RELATIVE TO OTHER INDIAN TRIBES IN VIOLATION OF FEDERAL LAW**

99. The Koi Nation adopts and realleges the allegations in paragraphs 1 through 98 as though fully set forth herein.

100. For nearly a half-century, the United States considered the Koi Nation to be terminated, and refused to engage in a government-to-government relationship with the Koi Nation.

101. The unilateral decision of the Executive Branch to cut-off relations with the Koi Nation is similar to the Federal Government's *de facto* termination of the Grand Traverse Band of Chippewa and Ottawa Indians, and the Ione Band of Miwok Indians.

102. The Grand Traverse Band and the Ione Band were restored to federal recognition by the Department of the Interior, and were later deemed to be tribes "restored to Federal recognition" under IGRA.

103. The Koi Nation was restored to federal recognition by the Department of the Interior in 2000.

104. The 25 C.F.R. Part 292 Regulations allow Indian tribes to be considered as "restored to Federal recognition" under IGRA if they are recognized through the Department's tribal acknowledgment regulations, an act of Congress, or a court order, while unlawfully preventing tribes like the Koi Nation from being considered as "restored to Federal recognition" simply because it was recognized through a separate legitimate process. 25 C.F.R. § 292.10.

105. The Indian Reorganization Act, as amended, prohibits the Defendants from promulgating "any regulation or mak[ing] any determination pursuant to...any other

Act of Congress, with respect to a federally recognized Indian tribe that classifies, enhances, or diminishes the privileges and immunities available to the Indian tribe relative to other federally recognized tribes by virtue of their status as Indian tribes." 25 U.S.C. § 5123(f).

106. The Part 292 Regulations unlawfully diminish the Koi Nation's privileges and immunities relative to other federally recognized Indian tribes by preventing the Department from concluding that the Koi Nation is a tribe that has been "restored to Federal recognition" under IGRA simply because of the method by which the Koi Nation was restored to Federal recognition.

107. Defendants admit in the preamble to Section 292.1 that neither the express language of IGRA nor its legislative history defines "restored tribe." 73 Fed. Reg. 29363.

108. Defendants' core rationale for excluding reaffirmed tribes is they did not got through the 25 C.F.R. Part 83 recognition process and that Congress dictated in the Federal List Act that 25 C.F.R. Part 83 is the sole mean of achieving administrative recognition since its passage in 1978.  The validity of the reaffirmations in Koi Nation (2000) and Ione's (1994) cases were defended by Defendants in the *Muwekma* case and the D.C. Circuit adopted their arguments in large part.

109. The diminishment of the Koi Nation's privileges and immunities and subordinate classification relative to other federally recognized Indian tribes under the 25 C.F.R. Part 292 violates the Indian Reorganization Act at 25 U.S.C. § 5123(f).

**COUNT III: THE DEFENDANTS' APPLICATION OF THE PART 292 REGULATIONS
DIMINISHES THE KOI NATION'S PRIVILEGES AND IMMUNITIES RELATIVE TO OTHER
INDIAN TRIBES IN VIOLATION OF FEDERAL LAW**

110. The Koi Nation adopts and re-alleges the allegations in paragraphs 1 through 109 as though fully set forth herein.

111. In the event that 25 C.F.R. § 292.10 is valid on its face, the Koi Nation asserts in the alternative that the Defendants' application of the Section 292.10 diminishes the Koi Nation's privileges and immunities relative to other Indian tribes in violation of federal law.

112. The United States acted unilaterally in abandoning the government-to-government relationship with the Koi Nation for nearly a half-century. As a result of this unilateral action, the Koi Nation was treated in the same manner as other Indian tribes whose federally recognized status had been terminated.

113. The United States restored its recognition of the Koi Nation in 2000 in precisely the same manner in which it restored its recognition of the Ione Band of Miwok Indians in 1994.

114. The Defendants' application of 25 C.F.R. § 292.10 to the Koi Nation draws an arbitrary distinction between the Koi Nation and similarly situated Indian tribes, which is not based on the factual circumstances surrounding the Koi Nation's relationship with the United States, but is instead based upon the date the Defendants promulgated the Part 292 Regulations.

115. The Defendants' discriminatory application of the standard at 25 C.F.R. § 292.10 to the Koi Nation violates the congressional prohibition against agencies making "any decision or determination pursuant to…any other Act of Congress, with respect to a

24

federally recognized Indian tribe that classifies, enhances, or diminishes the privileges and immunities available to the Indian tribe relative to other federally recognized tribes…." 25 U.S.C. § 5123(f).

116. Specifically, the Defendants' classification of the Koi Nation under IGRA unlawfully diminishes its privileges and immunities relative to other federally recognized Indian tribes that had their status as federally recognized Indian tribes unlawfully revoked by federal agencies and were later restored to federal recognition through administrative action.

## COUNT IV: THE JANUARY 19TH DECISION WAS ARBITRARY, CAPRICIOUS, AND NOT IN ACCORDANCE WITH THE LAW

117. The Koi Nation adopts and realleges the allegations in paragraphs 1 through 116 as though fully set forth herein.

118. The Department of the Interior's regulations governing the acknowledgment of Indian tribes are set forth at 25 C.F.R. Part 83.

119. The Part 292 Regulations clearly state that an Indian tribe can establish that it is a tribe "restored to Federal recognition" where it was recognized "through the administrative Federal Acknowledgment Process under § 83.8 of this chapter[.]" 25 C.F.R. § 292.10.

120. In *Muwekma*, the Defendants described the process by which it restored the Koi Nation's status as a federally recognized Indian tribe as an implied waiver of Part 83. *Muwekma Ohlone Tribe*, 708 F.3d 209 (D.C. Cir. 2013).

121. In its January 19, 2017 Decision letter, Defendants cite the D.C. Circuit in *Muwekma* that "Interior may waive the Part 83 process." The letter further states: "That court described the Tribe's reaffirmation as a waiver of Part 83." The letter fails to note that

Defendants' own position in the *Muwekma* case, with respect to Koi Nation, was that Koi received an implied waiver of Part 83.

122. The Department's restoration of the Koi Nation in 2000 was made under the framework for the Federal Government's process to acknowledge Indian tribes at 25 C.F.R. Part 83.

123. The fact that the Koi Nation was acknowledged under the framework of 25 C.F.R. Part 83 means that the Koi Nation satisfies the criteria at 25 C.F.R. § 292.10 to be considered as an Indian tribe "restored to Federal recognition" under IGRA.

124. The January 19th Decision's conclusion regarding the Koi Nation's status under § 292.10 was arbitrary, capricious, and not in accordance with the law.

## PRAYER FOR RELIEF

Based upon the foregoing, the Plaintiff Koi Nation respectfully requests that this Court grant the following relief:

1. Enter an order declaring the Koi Nation as "an Indian tribe that is restored to federal recognition" in accordance with 25 U.S.C. § 2719(b)(1)(B)(iii);

2. Enter an order declaring that the Department's regulation at 25 C.F.R. § 292.10 unlawfully narrows the scope of the meaning of a tribe restored to federal recognition under 25 U.S.C. § 2719(b)(1)(B)(iii);

3. Enter an order declaring that the Department's regulation at 25 C.F.R. § 292.10 unlawfully diminishes the privileges and immunities of Indian tribes relative to other federally recognized Indian tribes in violation of 25 U.S.C. § 5123(f), and permanently enjoining the Defendants from further application of 25 C.F.R. § 292.10;

4. In the alternative, enter an order declaring that the Defendant's January 19, 2017 decision unlawfully applied 25 C.F.R. § 292.10 in a manner that diminished the Koi Nation's privileges and immunities relative to other federally recognized Indian tribes in violation of 25 U.S.C. § 5123(f), and permanently enjoining the Defendants from applying 25 C.F.R. § 292.10 in a manner that diminishes the Koi Nation's privileges and immunities relative to other federally recognized Indian tribes;

5. In the alternative, enter an order declaring that the Defendant's January 19, 2017 decision was arbitrary, capricious, and not in accordance with the Indian Gaming Regulatory Act at 25 U.S.C. § 2719(b)(1)(B)(iii) and 25 C.F.R. § 292.10, and permanently enjoin the Defendants from taking any action in reliance upon the January 19, 2017 decision.

6. Any other relief the Court may deem just and proper.

Dated: August 23, 2017                    Respectfully Submitted By:


/s/ __Michael Anderson_____
Michael Anderson (D.C. Bar No. 417887)
Anderson Indian Law
**Attorney for Plaintiff**
1730 Rhode Island Avenue, Northwest
Suite 501
Washington, D.C.  20036
(202) 262-8856
manderson@andersonindianlaw.com

## INDEX OF EXHIBITS

**Exhibit**          **Document**

1.          Letter to Chairman Beltran from Lawrence S. Roberts, Principal Deputy
            Assistant Secretary – Indian Affairs (Jan. 19, 2007).

2.          Internal Memorandum Bureau of Indian Affairs (Oct. 21, 1980).

3.          Letter to Chairman Beltran from Harold M. Brafford, Bureau of Indian Affairs
            (Nov. 20, 1995).

4.          Letter to Chairman Beltran from Robert G. Barth, U.S. Department of Housing
            and Urban Development (Dec. 18, 1995).

5.          Letter to Assistant Secretary Ada Deer from Polly Girvin, Advisory Council on
            California Indian Policy (June 21, 1995).

6.          Memorandum Superintendent, Central California Agency, Bureau of Indian
            Affairs (Sept. 14, 2000).

7.          Letter to Chairman Beltran from Assistant Secretary Kevin Gover (Dec, 29,
            2000).

8.          Memorandum from Assistant Secretary – Indian Affairs to BIA Regional
            Director (December 29, 2000)

9.          Memorandum to Assistant Secretary – Indian Affairs from Pacific Region
            Director (Dec. 23, 2010).

10.         Letter to Assistant Secretary Kevin Washburn from Chairman Beltran (April
            28, 2014).

# EXHIBIT 1



# United States Department of the Interior

OFFICE OF THE SECRETARY
Washington, DC 20240

## JAN 1 9 2017

Hon. Darin Beltran
Chairman, Koi Nation of Northern California
P.O. Box 3162
Santa Rosa, CA 95402

Dear Chairman Beltran:

On April 28, 2014, the Koi Nation of Northern California ("Tribe"), previously known as the Lower Lake Rancheria,[1] submitted to the Assistant Secretary-Indian Affairs a request for a determination that the Tribe qualifies as a "restored tribe"[2] for purposes of the Indian Gaming Regulatory Act ("IGRA").[3] The application states that, by virtue of its reaffirmation in December 2000, the Tribe constitutes "an Indian tribe that is restored to Federal recognition" for purposes of IGRA and the regulations implementing the IGRA at 25 C.F.R. Part 292 ("Part 292).

We have completed our review of the Tribe's request and supporting documentation. I regret to inform you that in applying the regulations to your factual submission, I have determined that the Tribe doesn't satisfy the regulatory requirements to constitute a "restored tribe" pursuant to 292.10 (b) . While IGRA does not define "restored tribe" and the courts have ruled that IGRA's exceptions should be read broadly to ensure "that tribes lacking reservations when IGRA was enacted are not disadvantaged relative to more established ones,"[4] the Department's regulation on this particular point, as written, does not allow us to treat Koi similarly to tribes restored through, for example, a court approved settlement. 292.10(c). While the Tribe's unique and unfortunate history demonstrates that they were for an extended period of time treated as terminated by the Department, similar to tribes restored through a court approved settlement, the regulations leave me no choice but to conclude that the Tribe's reaffirmation by then-Assistant Secretary Kevin Gover in 2000 does not constitute "[r]ecognition through the administrative Federal Acknowledgment Process under § 83.8 of this chapter"[5] and, therefore, that the Tribe

---

[1] Historically, the term "Lower Lake Rancheria" has been used to refer to the Tribe, and to refer to those lands set aside for the use and occupancy of the Tribe. Here, I use "Tribe" to refer to the Tribe, and "Rancheria" to refer to those lands set aside for the use and occupancy of the Tribe.

[2] Letter from Darin Beltran, Chairman, Koi Nation of Northern California, to Kevin Washburn, Assistant Secretary-Indian Affairs, U.S. Department of the Interior (Apr. 28, 2014) ("2014 Beltran Letter"). The Tribe attached several supporting documents to that letter. In addition, since that initial submission, the Tribe provided the Department of the Interior ("Department") with further letters and/or supporting documents in December 2014, January 2016, July 2016, September 2016, and December 2016. In this letter, I refer to these materials collectively as the Tribe's "request."

[3] 25 U.S.C. § 2701 *et seq.*

[4] *See City of Roseville v. Norton,* 348 F.3d 1020, 1031 (D.C. Cir. 2003)

[5] 25 C.F.R. § 292.10(b).

does not qualify as having been "restored to Federal recognition" for purposes of Part 292 and IGRA.[6]

Although the Tribe has not submitted a fee-to-trust request for gaming purposes pursuant to IGRA's "restored lands" exception, based on my determination today if the Tribe did submit such an application I would have no alternative but to deny it. The Nation is not a "restored tribe" as that term is defined by the Department's regulations, and thus is not eligible to game under the restored lands exception in Part 292 and IGRA. This decision constitutes a final agency action under the Administrative Procedures Act.

## The Tribe

The Tribe traces its origins to the village of Koi, located on an island in Clear Lake in Northern California, and populated by Southeastern Pomo Indians.[7] On January 25, 1916, the United States acting through the Bureau of Indian Affairs ("BIA") purchased a tract of approximately 141 acres that became the Tribe's Rancheria.[8] In 1935, the BIA certified a list of twenty Rancheria residents eligible to vote in elections conducted pursuant to the Indian Reorganization Act.[9]

In early 1951, the Lake County, California ("Lake County"), Board of Supervisors ("Board") contacted the BIA about the possibility of acquiring the Rancheria for use as a municipal airport.[10] The BIA advised the Board that any purchase of the Rancheria, or of any part of the Rancheria, would require Congressional approval.[11] Legislation to effectuate the transfer was introduced in 1953, but technical problems prevented that bill from moving forward.[12] A substitute bill was introduced in 1955, and enacted on March 29, 1956.[13] When it was discovered that that act, too, had technical deficiencies, a bill amending the original was enacted

---

[6] The Department is aware of only one other tribe, the Ione Band of Miwok Indians, that has a similar history of the Department clearly stating that a tribe is terminated and reaffirmed through action by the Assistant Secretary. Prior to the promulgation of the Part 292 regulations, the Department concluded that the Ione Band of Miwok Indians was a restored tribe for purposes of IGRA. *See* Record of Decision, Acquisition of Plymouth Parcels in Trust for the Ione Band of Miwok Indians, Donald E. Laverdure, Acting Assistant Secretary-Indian Affairs (May 24, 2012)

[7] Letter from David W. Bowker, Counsel, Koi Nation, to Daniel D. Lewerenz, Attorney-Advisor, Office of the Solicitor, U.S. Department of the Interior, at 1 (January 20, 2016) ("2016 Bowker Letter") (although the letter is dated "2015," the letter was transmitted to Mr. Lewerenz via email on January 20, 2016; Letter from Polly Girvin, Coordinator, Advisory Council on California Indian Policy, to Ada Deer, Assistant Secretary-Indian Affairs, U.S. Department of the Interior, at 2 (June 21, 1995) ("1995 Girvin Letter").

[8] Memorandum from Superintendent, Central California Agency, BIA, to Regional Director, Pacific Region, BIA, at 2 (Sept. 14, 2000) ("2000 Superintendent's Memo").

[9] Letter from O.H. Lipps, Superintendent, Sacramento Agency, BIA, to Mrs. Rachel Patch, Lower Lake, California (June 5, 1935).

[10] *Id.*

[11] *Id.*

[12] *Id.* at 3.

[13] Pub. L. 84-443 (70 Stat. 58).

on July 20, 1956.[14]  These acts (together, "Lower Lake Act") authorized the Secretary of the Interior ("Secretary") to complete the sale of the Rancheria to Lake County.[15]  Since that time the Tribe has been without a land base.[16]

In 1958, a mere two years after enacting the Lower Lake Act, Congress enacted An Act To provide for the distribution of the land and assets of certain Rancherias and reservations in California, and for other purposes,[17] better known as the "Rancheria Act."  Reflecting Congress's termination era policy,[18] the Rancheria Act authorized the Secretary to begin the process of terminating the government-to-government relationship between the United States and several named tribes, and of selling those tribes' lands and distributing the proceeds of those sales to the tribes' members.[19]  The Department immediately set about effectuating the Rancheria Act, and published notices of termination in the Federal Register.[20]  Many of the Tribe's that were "terminated" pursuant to the Act filed litigation against the United States challenging the Department's compliance with the Act.  Many of those cases were resolved through a court approved settlement and the regulation includes those Tribes as restored tribes. See 25 C.F.R. 292.10(c).

The United States treated the Tribe as if it had been terminated from approximately the time of the Lower Lake Act's enactment.[21]  A 1975 BIA publication identified the Tribe as among those that had been terminated.[22]  In 1995, the BIA denied the Tribe a Tribal Government Planning Grant because the Tribe did not appear on the list of Indian entities eligible to receive services from the United States.[23]  This despite the fact that the Tribe was not among those named in the Rancheria Act, and that nothing in the Lower Lake Act effectuated – or even suggested – a termination of the Tribe.[24]  The Tribe's termination effectively occurred from 1956 until 2000 and prevented the tribe from acquiring or holding a reservation or trust land during this time.

---

[14] Pub. L. 84-751 (70 Stat. 595).

[15] 2000 Superintendent's Memo at 3-4.

[16] 2014 Beltran Letter at 1 (describing the Tribe as "a landless federally recognized band of Pomo Indians headquartered in Santa Rosa, California").

[17] Pub. L. 85-671, 72 Stat. 619.

[18] *See generally* COHEN'S HANDBOOK OF FEDERAL INDIAN LAW § 1.06 (2012).

[19] *Id.*

[20] Although the United States treated these tribes as terminated, in fact the Department had not complied with all of the requirements of the Rancheria Act. *See generally Hardwick v. United States*, No. C-79-1710 (N.D. Cal. 1979). In July 1983, the United States settled with the *Hardwick* plaintiff class and the court entered judgment requiring the United States to, among other things, include plaintiffs on the Secretary's published list of Federally recognized tribes.

[21] Memorandum from Amy Deutschke, Regional Director, Pacific Region, BIA, to Assistant Secretary-Indian Affairs (Dec. 23, 2010).

[22] DAVID ETHRIDGE, DIVISION OF LAW ENFORCEMENT SERVICES, BUREAU OF INDIAN AFFAIRS, INDIAN LAW ENFORCEMENT HISTORY at 61 (Feb. 1, 1975) (naming Lower Lake Act as a statute terminating an individual tribe).

[23] Letter from Harold M. Brafford, Central California Agency, BIA, to Dino Beltran, Chairman, Koi Nation of the Lower Lake Rancheria (Nov. 20, 1995).

[24] *See* Memorandum from Kevin Gover, Assistant Secretary-Indian Affairs, U.S. Department of the Interior, to Regional Directors, Alaska Region and Pacific Region, BIA, at 3 (Dec. 29, 2000) ("2000 Gover Memorandum") (explaining why the Lower Lake Act did not terminate the Tribe); *see also* 2000 Superintendent's Memo at 5-6 (contrasting the Lower Lake Act and the Rancheria Act); 1995 Girvin Letter at 5-6.

The Department sought to correct its error and place the Tribe back on equal footing with other federally recognized tribes. In 1995, the Advisory Council on California Indian Policy recommended that the Department acknowledge the Tribe as a Federally recognized tribe.[25]  In 2000, the BIA, through its Central California Agency, Pacific Region, and Office of Tribal Services, likewise recommended that the Department acknowledge the Tribe as a Federally recognized tribe.[26]  On December 29, 2000, then-Assistant Secretary Gover administratively reaffirmed the Tribe.[27]  In doing so, the Assistant Secretary observed that the Tribe's "tribal status has been continuously maintained by the tribal members."[28]  The Assistant Secretary further wrote that, "for reasons not clearly understood, [the Tribe was] simply ignored as the BIA went through fundamental and philosophical changes . . . ."[29]  He described the Tribe's omission from the list of Federally recognized tribes as "an unfortunate part of the Bureau's legacy," and he described his own action in reaffirming the Tribe as "correct[ing] this egregious oversight."[30]  By his Memorandum, the Assistant Secretary instructed the BIA's Office of Tribal Services to include the Tribe on the list of Federally recognized tribes,[31] and the Tribe remains so listed today.[32]

The Tribe's request is for a determination that its reaffirmation in December 2000 makes the Tribe "an Indian tribe that is restored to Federal recognition" for purposes of IGRA and Part 292 (a "restored tribe" determination).  Such a determination requires an analysis of the statute and the regulations.

## IGRA and Part 292

The primary purpose of IGRA is to provide a statutory basis for the operation of gaming by Indian tribes as a means of promoting tribal economic development, self-sufficiency, and strong tribal governments."[33]  While IGRA generally prohibits gaming on lands acquired after its enactment in 1988 ("after-acquired lands"),[34] it also contains exceptions to this general prohibition which were intended to provide equal footing for Tribes lacking reservations with

---

[25] See 1995 Girvin Letter.

[26] 2000 Gover Memorandum at 3; see also 2000 Superintendent Memo at 1 ("The purpose of this memorandum is to recommend that the Bureau of Indian Affairs administratively reaffirm that the Lower Lake Rancheria is a federally recognized tribe.").

[27] 2000 Gover Memorandum.  By this Memorandum, Assistant Secretary Gover also reaffirmed two Alaska tribes, the King Salmon Tribe and the Shoonaq' Tribe of Kodiak.

[28] Id. at 3

[29] Id. at 1.

[30] Id.

[31] Id. at 3.

[32] Bureau of Indian Affairs, Indian Entities Recognized and Eligible To Receive Services From the United States Bureau of Indian Affairs, 81 Fed. Reg. 26826, 26828 (May 4, 2016).

[33] Supra note 31.

[34] 25 U.S.C. § 2719(a).

more established Tribes. [35] One of those exceptions provides that gaming is allowed on "lands [that] are taken into trust as part of—(iii) the restoration of lands for an Indian tribe that is restored to Federal recognition" ("restored lands exception").[36] Congress in IGRA did not define the phrases "restoration of lands" or "Indian tribe that is restored to Federal recognition," and interpretation of these phrases initially fell to the agencies that implement IGRA and to the courts.[37]

In 2008 the Department promulgated Part 292 to "articulat[e] standards that the Department will follow in interpreting the various exceptions to the gaming prohibition on after-acquired trust lands contained in section 2719 of IGRA,"[38] including the restored lands exception. The Department's regulations constrain the restored tribe exception to those tribes which were acknowledged through the Part 83 process, a court, or by Congress only.

The relevant section of Part 292 provides:

> **292.10 How does a tribe qualify as having been restored to Federal recognition?**
> For a tribe to qualify as having been restored to Federal recognition for purposes of [Section] 292.7, the tribe must show at least one of the following:
>     (a) Congressional enactment of legislation recognizing, acknowledging, affirming, reaffirming, or restoring the government-to-government relationship between the United States and the tribe (required for tribes terminated by Congressional action);
>     (b) Recognition through the administrative Federal Acknowledgment Process under § 83.8 of this chapter; or
>     (c) A Federal court determination in which the United States is a party or court-approved settlement agreement entered into by the United States.

The Tribe was not acknowledged through an act of Congress nor by a court order; thus, Sections 292.10(a) and (c) do not apply despite the Tribe's similar history to those tribes restored through a court-approved settlement. The Tribe argues in its request that its reaffirmation by the Assistant Secretary in 2000 was "[r]ecognition through the administrative Federal Acknowledgment Process under § 83.8 of this chapter," as required by Section 292.10(b).[39]

---

[35] *Supra* note 31; *City of Roseville v. Norton*, 348 F.3d 1020, 1031 (D.C. Cir. 2003).

[36] 25 U.S.C. § 2719(b)(1)(B)(iii).

[37] *See, e.g., Grand Traverse Band of Ottawa and Chippewa Indians v. U.S. Att'y for the W.D. Mich.*, 363 F.3d 960, 967-71 (6th Cir. 2004) (restored lands analysis).

[38] Part 292, Preamble, 73 Fed. Reg. 29354, 29354 (May 20, 2008).

[39] In the alternative, the Tribe argues that it was "recognized in a manner consistent with Part 83, in the sense that they plainly satisfied the Part 83 criteria and were recognized by the Department through an administrative mechanism." 2016 Bowker Letter at 4. I cannot accept this argument. First, the plain language of Part 292 requires that, in order to qualify for the restored lands exception, a tribe must have been acknowledged *through* Part 83, not *in a manner consistent with* Part 83. 25 C.F.R. § 292.10(b).

Unfortunately, Section 292.10(b) does not allow me to adopt the Tribe's argument. It requires acknowledgment through the "administrative Federal Acknowledgment Process under 83.8 of this chapter." Section 83.8 refers to a section of the Department's 1994 Federal acknowledgment regulations titled "Procedures for Establishing That an American Indian Group Exists as an Indian Tribe," promulgated at 25 C.F.R. Part 83 ("Part 83").[40] Part 83 provides two avenues for acknowledgement: a general set of criteria at Section 83.7; and modified criteria at Section 83.8 for groups that can establish "[u]nambiguous previous Federal acknowledgment." [41]

The Tribe's reaffirmation was not "through the Federal Acknowledgment Process under § 83.8 of this chapter," as required by Section 292.10(b). The Department's 2000 reaffirmation decision was intended to rectify a past wrong, without litigation or utilizing the Part 83 acknowledgement process. Then-Assistant Secretary Gover acknowledged as much when he wrote that the Tribe "should not be required to go through the Federal acknowledgment process outlined in the Federal Register at 25 CFR Part 83."[42] Courts have recognized this approach. The U.S. Circuit Court for the District of Columbia Circuit, in setting forth the ways that a group may be administratively acknowledged, first described the two paths under Section 83.7 and Section 83.8, and then observed that "Interior may waive the Part 83 process."[43] That court described the Tribe's reaffirmation as a waiver of Part 83.[44] So while not within the confines of Part 83, the Tribe's reaffirmation was an established practice the Department used to resolve the other instance of administrative termination.[45]

While IGRA's restored lands exception does not define "restored tribe" and the Department has treated Ione and tribes who entered into court approved settlements as "restored" Part 292 recognizes only three ways that a tribe may qualify as "an Indian tribe that is restored to Federal recognition" – by Congress, by court order, or by Part 83 acknowledgment. The Tribe's reaffirmation does not fall into any of those three categories set forth in the regulation.[46]

---

[40] The rule governing the administrative Federal Acknowledgment Process initially was promulgated at 25 C.F.R. Part 54, 43 Fed. Reg. 39361 (Sept. 5, 1978), and was redesignated to Part 83 in 1982. 47 Fed. Reg. 13326 (Mar. 30, 1982). The rule was revised in 1994, 59 Fed. Reg. 13326 (Feb. 25, 1994), and again in 2015. 80 Fed. Reg. 37862 (July 1, 2015). For purposes of this Letter, all citations to Part 83 are to the 1994 version, which was in effect at the time the Tribe made its request.

[41] Some commenters, including the Tribe, suggested that Section 292.10(b) should include tribes administratively acknowledged outside of Part 83, including reaffirmed tribes such as the Tribe. 73 C.F.R. at 29363. The Department expressly rejected these suggestions, writing: "The only acceptable means under the regulations for qualifying as a restored tribe under IGRA are by Congressional enactment, recognition through the Federal acknowledgment process under 25 CFR 83.8, or Federal court determination . . . ." *Id.* The Department included a grandfather provision in the regulations for tribes that received Indian land opinions prior to the effective date of the Part 292 Regulations. 25 C.F.R. 292.26. The Ione Band of Miwok received an Indian land opinion prior to the effective date concluding that it was a restored tribe and was grandfathered pursuant to that 292.26.

[42] 2000 Gover Memo at 1.

[43] *Muwekma Ohlone Tribe v. Salazar*, 708 F.3d 209, 212 (2013) (*Muwekma II*).

[44] *Muwekma II*, 708 F.3d at 216; *see also Muwekma I*, 813 F. Supp. 2d at 174 n.3, 182-83.

[45] Requests for Administrative Acknowledgment of Federal Indian Tribes, 80 Fed. Reg. 37528 (July 1, 2015).

[46] As the Tribe notes, in the case of the Ione Band of Miwok Indians of California ("Ione") the Department has taken the position, and continues to defend it in litigation, that, in the absence of Part 292.10(b), a reaffirmed tribe could be restored for purposes of IGRA. *See County of Amador v. United States DOI*, 136 F. Supp.3d 1193 (2016)(appeal pending). The only distinction is that Ione received an Indian lands determination from the Department prior to the promulgation of Part 292, thus it was "grandfathered in" under 25 C.F.R. § 292.26.

Chairman Darin Beltran                                                              7

Accordingly, I must deny the Tribe's request for a determination that it is "an Indian tribe that is restored to Federal recognition" for purposes of IGRA and Part 292.

Sincerely,

Lawrence S. Roberts
Principal Deputy Assistant Secretary –
  Indian Affairs

# EXHIBIT 2



# United States Department of the Interior

BUREAU OF INDIAN AFFAIRS

WASHINGTON, D.C. 20245



IN REPLY REFER TO: Tribal Government Services

Acting Director, Office of Indian Services                    OCT 21 1980

Non-Terminated Rancherias

Sacramento Area Director

It is our intention to include in our listing of those Indian entities that have a
government-to-government relationship with the United States for publication in
the Federal Register in early 1981 the following named rancherias:

Big Sandy Rancheria of Mono Indians
Chicken Ranch Rancheria of Me-Wuk Indians
Cloverdale Rancheria of Pomo Indians
Greenville Rancheria of Maidu Indians
Lower Lake Rancheria of Pomo Indians
Lytton Rancheria of Pomo Indians
Picayune Rancheria of Chukchansi Indians
Redwood Valley Rancheria of Pomo Indians
Scotts Valley Rancheria of Pomo Indians
Smith River Rancheria
Strawberry Valley Rancheria of Maidu Indians

Unless we hear from you to the contrary, we will assume you concur with our
course of action. Please keep us advised as to the status of the remaining
"terminated" rancherias. We have found the checklist submitted with your
June 19 memorandum most helpful and would appreciate updated copies as
changes occur. It would be useful if you would include the date these rancherias
were restored to federal status.

Sgd. John Geary

cc: Supt., Central California Agency
    Supt., Hoopa Agency


XIII

# EXHIBIT 3



# United States Department of the Interior

**BUREAU OF INDIAN AFFAIRS**
Central California Agency
1824 Tribute Road, Suite J
Sacramento, CA 95815-4308

IN REPLY REFER TO:

NOV 20 1995

Dino Beltran
Tribal Chairman
KOI NATION OF THE LOWER LAKE RANCHERIA
605 University Street
Healdsburg, CA  95448

Dear Mr. Beltran:

We recently received your Application for Federal Assistance for a
Tribal Government Planning Grant in the amount of $20,000.00

Central California Agency is unable to consider the KOI Nation of
the Lower Lake Rancheria's request because the Tribe does not
appear in the February 16, 1995 Federal Register List of Indian
Entities recognized and eligible to receive services from the
United States Bureau of Indian Affairs.  This announcement is in
compliance with 25 Code of Federal Regulations, Part 83.

We are, therefore, returning your application for grant assistance.
Should you need information concerning the Federal Acknowledgement
Process, please contact Carol Rogers-Davis at (916) 566-7112.

Sincerely,

Harold M. Brafford

Enclosure

# EXHIBIT 4



**U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT**
**SOUTHWEST OFFICE OF NATIVE AMERICAN PROGRAMS**

DEC 1 8 1995

Mr. Dino Beltran
Tribal Chair
Lower Lake Rancheria
P.O. 9584
Santa Rosa, CA 95404

Dear Mr. Beltran:

This letter is sent in response to your November 20, 1995 correspondence in which you requested to have the Lower Lake Koi Tribe placed on our mailing list for NOFA distribution. It is our understanding that the Indian community which you represent is not recognized by the Federal government as an Indian tribe. Since such recognition has not been afforded, your community is not an eligible applicant for HUD funds earmarked or allocated for Indian communities.

Should you have any questions on this matter, please contact me at (415) 436-8121.

Sincerely,

Robert G. Barth
Director
San Francisco Team

17
18
19
20

Main Offices ♦ Two Arizona Center ♦ 400 N. 5th Street, Suite 1650 ♦ Phoenix, AZ 85004-2361 ♦ 602-379-4156 ♦ Fax 602-379-3101
Phillip Burton Federal Building ♦ 450 Golden Gate Ave., Box 36003 ♦ San Francisco, CA 94102-3448 ♦ 415-436-8121 ♦ Fax 415-436-8510
Albuquerque Plaza ♦ 201 Third St., NW, Suite 1630 ♦ Albuquerque, NM 87102-3360 ♦ 505-766-1372 ♦ Fax 505-766-1379

# EXHIBIT 5

Advisory Council on California Indian Policy
1771 Tribute Road, Suite B
Sacramento, CA 95815
Ph: 800-489-1994 or (916) 568-5196
Fax (916) 568-5230

June 21, 1995

Ada Deer
Assistant Secretary - Indian Affairs
Department of the Interior
Bureau of Indian Affairs
1849 C Street, N.W.
MS-4140
Washington, D.C. 20240

Dear Assistant Secretary Deer:

On behalf of the Advisory Council on California Indian Policy, I am writing to confirm
the federally recognized status of the Koi tribe of Lower Lake Indians. Referred to as the
"Lower Lake Rancheria of Pomo Indians," the Koi were described as having "a government-to-
government relationship with the United States," and were slated for publication in the early
1981 Federal Register as such.[1] Although we are unable to find a response by the Sacramento
Area Director objecting to such recognition, nevertheless publication appears to have not taken
place.

It is the position of the Council that regardless of the causes underlying this omission,
that the Koi tribe qualifies for administrative recognition under the criteria enumerated in §83.8 -
Previous Federal Acknowledgment. As you know, under the provisions of this section a tribe
which is the subject of "action by the Federal government clearly premised on identification of
a tribal political entity and indicating clearly the recognition of a relationship between that entity
and the United States"[2] need only prove identity[3], community[4], and political influence[5] from

---

[1]  Letter from John Geary, Acting Director, Office of Indian
Services, to Sacramento Area Director (Oct. 21, 1980)(such
publication as federally recognized was to take effect unless
affirmatively objected to by the Sacramento Director).

[2]  25 CFR Ch. 1, §83.1, 258 (Apr. 1, 1994 ed.).

[3]  Id. at §83.7(a), 261.

[4]  Id. at §83.1, 257; §83.7(b), 261.

[5]  Id. at §83.1, 258; §83.7(c) 262.

VI

Ada Deer
June 21, 1995
Page 2
----------------

the point of last recognition[6].

Identity/Community

The historical and modern-day existence of the Koi tribe of Pomo Indians has been well
documented by various studies performed under the auspices of state and federal agencies[7],
providing evidence of tribal existence of the sort contemplated under §83.7(a)(4).  Thus, the
Patterson report, Ethnohistorical Studies for the I-6 Project, notes that:

> although Native American consultants representing several tribal affiliations were
> contacted for information on the area [of the Cache Creek and Lower Lake settlements],
> the jurisdiction over Indian cultural resources is the right and prerogative of that
> community which aboriginally controlled the area in question.  In this case, the Koi
> subdivision of Southeastern Pomo have ultimate jurisdiction.  Descendants of the Koi
> Pomo still view themselves as a distinct tribal entity, separate from their Southeastern
> Pomo neighbors from Sulphur Bank Rancheria, formerly from Elem and Kamdot
> subdivisions."[8]

Similarly, the report states that "today, the descendants of the Koi Pomo continue to regard
[their aboriginal territory] in a special and intimate way and still derive their cultural identity
from the place."[9]

The Intensive Cultural Resources Survey and Evaluation of Cache Creek, Lake County
presented to the Sacramento District of the U.S. Army Corps of Engineers in 1991 states that
the Cache Creek area "is culturally affiliated with the Southeastern Pomo, specifically with the
people of the village of Koi, who apparently have inhabited the area for several thousands of
years."[10]

---

[6]  Id. at §§83.8(d)(1) through (d)(3), 263-64.

[7]   See S. Patterson, M. Praetzellis, & A. Praetzellis,
Ethnohistorical Studies for the I-6 Project (March 1987)(draft
available from Bennyhoff Library)(for State Water Resource Control
Board); H. McCarthy & R.I. Orlins, Intensive Cultural Resources
Survey and Evaluation: Cache Creek, Lake County (Sept. 1991)(for
U.S. Army Corps of Engineers, Sacramento District).

[8]  Patterson, supra note 7, at 7.

[9]  Id. at 41.

[10]  McCarthy & Orlins, supra note 7, at 124.

Ada Deer
June 21, 1995
Page 3
----------------

Evidence of tribal identity also exists in the format suggested by §83.7(a)(5). In a 1995 article, the Lake County Record-Bee reports: "[t]he Board of Supervisors Tuesday agreed to give the Lower Lake Koi Indian tribe until June to arrange purchase of Pearce Field in Clearlake for establishment of a rancheria."[11] The article continues, "[t]he Lower Lake Koi tribe is one of several bands of Pomo Indians that inhabited Lake County for more than 10,000 years."[12]

The evidence suggested under §83.7(6) is also present with respect to the Koi tribe. The Intensive Cultural Resources Survey referred to above documents local Native American support for and identification of the Koi as a distinct group: "[u]nanimous support for the Lower Lake people was voiced, and all expressed strong concern regarding the potential impact of the many sensitive areas along the banks of Cache Creek."[13]

Political Influence

Findings and conclusions expressed in the Intensive Cultural Resources Survey, supra, indicate that the group "is able to mobilize significant numbers of members and significant resources from its members for group purposes."[14] McCarthy and Orlins report:

[a]n informal discussion [with Koi members] took place at the Elem Tribal Office following the visit to the rancheria with the Smith's and other descendants of the settlement. They are all deeply concerned about the potential disturbance of their traditional home at the rancheria as well as about other traditionally used areas along the creek. They feel that their people's graves, within or beyond the boundaries of the cemetery, should not be disturbed. They would also like to find a means of legally recovering the home they lost to developers in the early 1960s.[15]

----------------

[11]   Lake County Record-Bee Mar 15. 1995, at 1, col. 1.

[12]   Id. at 1, col. 2. Lack of other published material, such as books or periodical articles, stems not from tribal nonexistence but from the lumping of distinct tribes by past historians. See Patterson, supra note 7, at 18 ("...few published ethnographic works deal specifically with the Southeastern Pomo; most sources integrate data on the group with data on the Eastern, Central, and Northern Pomo...").

[13]   McCarthy & Orlins, supra note 7, at 23.

[14]   25 CFR Ch. 1 §83.7(c)(1)(i), 262 (4-1-94 ed.).

[15]   McCarthy & Orlins, supra note 7, at 23. See id., "It is clear that the traditional values, resources, and burials along Cache Creek are well known throughout the local community, and

Ada Deer
June 21, 1995
Page 4
----------------

Indeed, the significant force with which the Koi people were able to assert their position is reflected in the report's final conclusions, which state:

> [b]ased particularly on the high sensitivity of these sites to the local Native American community...the avoidance or no action option is the most highly recommended measure for all sites...The Native American community is emphatically opposed to the disturbance of these graves and has expressed strong concern regarding the effects of this project on these sites. Additionally, they have concern for the destruction of sites even without the presence of burials, since, as the repositories of cultural traditions, these locations should be respected.[16]

In the period since the October 21, 1980 date of previous Federal recognition, the Koi Tribal Council has made decisions substantially effecting tribe members and has represented the tribe in important dealings with outsiders. In November 1994, the interim Koi Tribal Council, upon learning that the airfield occupying the tribe's former rancheria was slated for closure by the Lake County Board of Supervisors, began asserting the tribe's rights to land. The tribal council contacted and retained California Indian Legal Services to assist in this process. In addition, Tribal Council members have appeared before the Lake County Board of Supervisors as representatives of the tribe with respect to this matter and have obtained favorable action effecting the members of the tribe as a whole.[17] In addition, the Koi Tribal Council has begun the process of nonprofit incorporation, for the primary purpose of obtaining funding for tribal programs which will benefit the membership as a whole.[18] The Koi tribe thus demonstrates political influence as described in §83.7(c)(1)(ii), whereby "[m]ost of the membership considers

_____

there is great concern regarding the potential disturbance of them."

[16] McCarthy & Orlins, supra note 7, at 135-36. See id. at 141, "[c]onsultation with the local Native American community revealed strong sentiments regarding the protection of this cemetery, concern for the site of Bedai, and opposition to the disturbance of other burials which are known to exist in a number of locations along Cache Creek."

[17] As a result of their lobbying activity and presence at Board meetings the Tribal Council obtained a stay on solicited bids for the Pearce Airfield property, preserving in effect an exclusive purchase option for the land constituting the tribe's former rancheria. See Lake County Record-Bee, Mar. 15, 1995, at 1.

[18] See Articles of Incorporation of Lower Lake Koi Cultural Protective Association (Apr. 25, 1995); Bylaws of Lower Lake Koi Cultural Protective Association (May 31, 1995).

Ada Deer
June 21, 1995
Page 5
----------------

issues acted upon or actions taken by group leaders to be of importance."[19]

Internal conflicts of the type described in §83.7(c)(1)(v) are recorded in the Patterson report, Ethnohistorical Studies for the I-6 Project. The authors note that:

> [a] great deal of controversy and misunderstanding surrounds the final episode in which the lands [at Cache Creek], thought to belong to Clifford Salvador, were sold. Division and animosity between different members still exists over this issue and the problem surfaced again and again. The Koi people today are distressed that the community cemetery, where all have relatives buried, came to be the legal property of a single individual, with others had [sic] little or no control over the land.[20]

### §83.7(g): Nontermination

In accordance with §83.7(g), neither the Koi tribe of Pomo Indians nor its members have been the subject of Congressional legislation that expressly terminates or forbids the Federal relationship. In 1917, with funds appropriated by the Act of August 1, 1914 for the purchase of land for the homeless Indians of California[21], the Federal government bought a 140.46-acre parcel known as the "Purvis Tract," known thereafter as the "Lower Lake Rancheria" for the use and enjoyment of the Koi Pomo.[22] In 1956, the 84th Congress passed Public Law 443,

----------------

[19] 25 CFR Ch. 1, §83.7(c), 262 (Apr.1, 1994 ed.).

[20] Patterson, supra note 7, at 10.

[21] Act of August 1, 1914, 38 Stat. 582, 589. See Patterson, supra note 7, at 87.

[22] See letter from Superintendent to County Surveyor (Jan. 26, 1922)("In 1917 the United States purchased a tract of land known as the 'Purvis' tract near Lower Lake."); letter from John J. Terrell, Special Indian Agent, to Commissioner of Indian Affairs (Feb. 9, 1916)("...progress being made by the Purves [sic] brothers in efforts to convey their 140.46 acres of land in Lake County, California, desired for the above named Indians [Lower Lake and Sulphur Bank Indians]."); letter from Special Indian Agent to Thomas Purvis (Jan. 19, 1916)("...sale to the United States of America of your tract of land above and just to the east of Lower Lake in Lake County, California, desired as a permanent home for the above named Indians [Lower Lake and Sulphur Bank Indians].").

Ada Deer
June 21, 1995
Page 6
--------------

"Conveyance to Lake County, California, of Lower Lake Rancheria,"[23] selling all but a forty-one acre allotment of the Lower Lake Rancheria to the County of Lake for the purpose of establishing an airport. Nowhere in the language of these Acts is the tribe or tribes for whom the rancheria was established terminated, nor is any federal relationship to such tribe(s) forbidden.[24] This interpretation is consistent with the Bureau of Indian Affairs' 1980 statement of recognition.[25] Moreover, it is the policy of the Bureau of Indian Affairs that, "under the FAP there is no requirement that a petitioner for Federal acknowledgement have a land base, nor does the absence of a land base have a negative impact upon a petitioner's case.[26]

In addition to the foregoing, the Koi tribe is able to document compliance with the remaining criteria enumerated in §§83.7(d) through (f), as required by §83.8(d)(4). As a result, the Advisory Council requests written confirmation of the Federal government's recognition of the Koi tribe of Lower Lake Indians as contemplated by the Department of the Interior, Bureau of Indian Affairs in its letter of October 21, 1981.

---

[23]   Conveyance to Lake County, California, of Lower Lake Rancheria, Pub. L. No. 84-443, ch. 100, 70 Stat. 58, 58-9 (1956), amended by Act of July 20, 1956, Pub. L. No. 84-751, ch. 660, 70 Stat. 595, 595-96.

[24]   In this sense the Koi tribe's situation is analogous to that of the Coyote Valley Band of Pomo Indians: "[t]he Act of July 10, 1957 (71 Stat. 283) which transferred the lands of the Coyote Valley Rancheria from the Secretary of the Interior to the Secretary of the Army for use in connection with the Coyote Valley Dam of the Russian River Basin Project, did not terminate the Coyote Valley Band for purposes of eligibility of Bureau Services." See letter from Acting Deputy Commissioner of Indian Affairs to Chairman of the Coyote Valley Tribal Council (Aug. 18, 1937)(providing written confirmation of tribe's federally recognized status).

[25]   Letter, supra note 1.

[26]   Letter from Michael J. Anderson, Acting Deputy Assistant Secretary - Indian Affairs, to Russell Peters (Mar. 2, 1995).

Ada Deer
June 21, 1995
Page 7
----------------

Thank you for your attention to this matter.

Sincerely,

Polly Girvin, Coordinator
Advisory Council on California Indian Policy

# EXHIBIT 6

UNITED STATES GOVERNMENT

# memorandum

DATE: SEP 1 4 2000

REPLY TO
ATTN OF: Superintendent, Central California Agency

SUBJECT: Administrative Reaffirmation of Federal Recognition - Lower Lake Rancheria

TO: Regional Director, Pacific Region
Attention:  Branch of Tribal Operations

Reg Dir
Dep Reg Dir ✓ _ald_
Reg Adm Ofcr _____
Route _10n_.
Response Required _____
Due Date _____
Memo _____ Ltr _____
Tele _____

The purpose of this memorandum is to recommend that the Bureau of Indian Affairs administratively reaffirm that the Lower Lake Rancheria is a federally recognized tribe.  The Central California Agency (Agency) researched the history of federal relations between the Tribe and the Bureau of Indian Affairs (BIA) and legislative history of the congressional act authorizing the disposition of the Lower Lake Rancheria, in order to ascertain whether the Tribe may be improperly considered terminated.  As a result of this research and analysis, the Agency strongly recommends administrative reaffirmation of the Lower Lake Rancheria.

The issue of whether the Lower Lake Rancheria may be properly considered terminated arose as a result of a continuing initiative of the Assistant Secretary - Indian Affairs to pursue the legislative restoration of a number of tribes presently viewed as terminated.  In October 1999, Loretta Tuell, Acting Director, Office of Tribal Services, BIA, met with staff of the Pacific Region and its agencies, describing the purpose of the initiative.  Ms. Tuell requested a review of the present situation of the remaining terminated tribes and recommend whether or not to include a given tribe in the initiative.

However, upon review of the list of the remaining terminated tribes, the Lower Lake Rancheria was identified as a special situation.  All of the other tribes on the list are considered terminated under the terms of P.L. 85-671 (72 Stat. 619), as amended by P.L. 88-419 (78 Stat. 390), commonly referred to as the Rancheria Act.  But the Lower Lake Rancheria was sold pursuant to P.L. 84-443 (70 Stat. 58), as amended by P.L. 84-751 (70 Stat. 595).  Both P.L. 84-443 and P.L. 84-751 predate the passage of the Rancheria Act.  This special situation, Ms. Tuell agreed, would require additional investigation.

In early September 1999, elected officials of the Lower Lake Rancheria requested a meeting with Ms. Tuell.  On November 19, 1999, such a meeting was convened in Healdsburg, California.  The following persons were present at the meeting:

For the Bureau of Indian Affairs:
Loretta Tuell, Acting Director, Office of Tribal Services
Lee Fleming, Chief, Branch of Acknowledgement and Research
Brian Golding, Sr., Tribal Operations Specialist, Central California Agency

For the Lower Lake Rancheria:
Dino Beltran, Chairperson
Dan Beltran, Vice-Chairperson
Lester J. Marsten, Attorney at Law, Rapport & Marsten

OPTIONAL FORM NO. 10
GSA
(REV. 1-94)
5010-118
NSN 7540-00-656-0924
FPI-SST

As a result of the meeting, the following understanding was achieved:

1.  Preliminary research suggests that, although portions of the Lower Lake Rancheria were sold and fee patented, the effect of those conveyances should not be presently considered as termination of the Lower Lake Rancheria;

2.  Additional research would be conducted, with the Lower Lake Rancheria submitting enrollment and genealogical information to Mr. Fleming for his review and recommendation, and Mr. Golding would compile his research into a memorandum to be forwarded through the Regional Director, Pacific Region, to the Central Office for action;

3.  Should additional research strongly suggest that the Lower Lake Rancheria should not be presently considered as terminated, administrative reaffirmation of the Tribe's federal recognition would be sought.

## The Purchase, Use, and Transfer of the Lower Lake Rancheria:

The Lower Lake Rancheria, containing approximately 141 acres, was purchased by the United States on January 25, 1916, with funds appropriated by the Act of August 1, 1914 (38 Stat. 582, 589), for the purchase of land for the homeless Indians of California. A plat prepared by Inspector J.J. Terrell in July 1917 shows the tract subdivided into assignments as he contemplated them (see Appendix 1).

Records of the Bureau of Indian Affairs (BIA) indicate that the land was uninhabited between 1916 and 1947 (see Appendices 2, 3, and 4). However, documents regarding plans for elections to be held pursuant to the Indian Reorganization Act suggest that there were at least 20 Indians residing on the Lower Lake Rancheria (see Appendix 5). The Superintendent of the Sacramento Indian Agency considered the land as uninhabitable, describing in one memorandum that the Lower Lake Rancheria was "a rock pile without any water for domestic use" (see Appendix 6). This view of the land appears to be the basis for a failed attempt in 1935 to acquire a nearby parcel of land for the use of the Lower Lake, Cache Creek, and Sulphur Banks people (see Appendix 6). On October 9, 1947, the Acting Superintendent, California Indian Agency, granted an assignment of the entire Lower Lake Rancheria to Mr. and Mrs. Louis Johnson, and Mr. and Mrs. Harry Johnson (see Appendix 7). A memorandum from Mildred E. Van Every to Mr. Douglas Clark, dated April 11, 1950, indicates that the population of the Lower Lake Rancheria was comprised of seven persons, "full blood Indian, Pomo Tribe" (see Appendix 8). Also, a list of 36 names includes the following notation: "Stella Johnson says all these Indians intend to make their homes on Lower Lake Rancheria sometime. M.A.L., 2-28-52" (see Appendix 9).

On March 7, 1951, the Lake County Board of Supervisors sought information from the BIA regarding the possible acquisition of the Lower Lake Rancheria for an airport (see Appendix 10). On March 14, 1951, the BIA advised the Lake County Board of Supervisors that "(a)n act of Congress will be necessary to grant authority to convey any portion of (the Lower Lake Rancheria) or lease the land for a period exceeding five years," and suggested a procedure for the possible acquisition (see Appendix 11). Additional correspondence on the subject followed (see Appendix 11).

At this stage of the transaction is the first mention of termination.  An attorney from the Sacramento Indian Agency, by memorandum dated January 5, 1953, states, "I explained the reason for the delay (apparently in arranging a meeting) was for the purpose of determining whether this transaction would have any effect on our overall program" (see Appendix 12).

Eventually a meeting was convened where the BIA and County officials approached the Johnsons and informed them of the County of Lake's desire to purchase the Rancheria for use as an airport.  A memorandum to the files by Douglas Clark, dated May 5, 1953, indicates that the Indians were consulted as to whether they consented to the sale of the entire Rancheria to the County of Lake, which would in turn gift deed to Harry Johnson a 41-acre parcel (see Appendix 13).  A resolution by the Johnsons expressed their consent to the plan (see Appendix 14).  However, there is no indication within Mr. Clark's memorandum of whether the issue of termination was discussed or consented to.  Further, the resolution by the Johnsons does not address the issue of termination.  Additional correspondence regarding the terms of the exchange followed (see Appendix 14).

A bill, H.R. 6105, was introduced on July 6, 1953 (see Appendix 15).  The proposed legislation would authorize the Secretary of the Interior to convey the Lower Lake Rancheria to the County of Lake.  In a letter to the Chairman of the House Committee on Interior and Insular Affairs, dated July 28, 1954, the Assistant Secretary of the Interior reported favorably on H.R. 6105 (see Appendix 16).  In that letter, the Assistant Secretary states that:

> "(t)he proposed sale of land in excess of the needs of the Indian occupants and the vesting of title to the 41-acre tract in Mr. Johnson, the present Indian assignee, is in line with the **proposed plan** for termination of Federal supervision over the property and activities of the Indians of the State of California, as embodied in H.R. 7322, now pending in the Congress." (emphasis added)

However, soon after the introduction of this bill, the County of Lake learned that the proposed gift deed to Mr. Johnson was prohibited under the California Constitution (see Appendix 17).  Since the County of Lake agreed to give fee title to Harry Johnson as part of the agreement with the Secretary of the Interior, but such a gift was prohibited under state law, the bill as drafted would be ineffective.  Thus, it was now necessary to recommend a substitute bill, authorizing the Secretary of the Interior to directly convey the 41-acre tract to Harry Johnson in fee.

The substitute bill containing the amended language was introduced as H.R. 585 in early 1955.  The report by the House Committee on Interior and Insular Affairs contained a letter dated June 30, 1955, by the Assistant Secretary of the Interior (see Appendix 18) stating in part that:

> "(t)he proposed sale of land in excess of the needs of the Indian occupant and the vesting of title to the 41-acre tract in Mr. Johnson, the present Indian assignee, is in line with the **present policy** of termination of Federal supervision over the property and activities of the Indians of the State of California." (emphasis added)

The Assistant Secretary also suggested an amendment to the bill which would require that the proceeds of the sale be deposited in the United States Treasury to the credit of the Indians of California in their four percent judgment fund established under the Act of May 18, 1928 (45 Stat. 601). The legislation was approved, with the suggested amendment, on March 29, 1956 as P.L. 84-443 (70 Stat. 58) (see Appendix 19).

Soon it was discovered that P.L. 84-443 (Lower Lake Act) was technically deficient, in that an incorrect land description was given for the 41-acre parcel to be conveyed to the Johnsons (see Appendix 20). A bill to amend the Lower Lake Act, H.R. 11163, was introduced and was reported favorably (see Appendix 21). H.R. 11163 was approved on July 20, 1956, as P.L. 84-751 (70 Stat. 595) (see Appendix 22).

With the correct land description, the Secretary was now prepared complete the sale to the County of Lake (see Appendix 23). The Secretary was also prepared to issue a fee patent to the Johnsons. The patent was issued by the Secretary on November 9, 1956, and mailed to Harry Johnson (see Appendix 24). The funds received by the Secretary from the County of Lake were deposited in the manner required by the Lower Lake Act (see Appendix 25). Perhaps indicative of a possible misunderstanding about the terms of the transaction, Harry Johnson later inquired about monies yet to be paid to him from the sale of land to the County of Lake (see Appendix 26).

Limited research was conducted at the Recorder's Officer, County of Lake, on November 30, 1999, to ascertain the present status of the 41-acre parcel. For the 6-year period immediately following the issuance and recordation of Mr. Johnson's fee patent, research indicates that Mr. Johnson sold at least some of the 41-acre parcel (see Appendix 27).

## Tribal Government Status of the Lower Lake Rancheria:

Records of the BIA demonstrate that the Lower Lake Rancheria is presently considered terminated (see Appendix 28).

Despite this categorization of the Lower Lake Rancheria as presently considered terminated, Indian persons lineally descended from those having at one time a connection to the Lower Lake Rancheria have continued to assert their identity as a tribe. The group successfully obtained funding from the Administration for Native Americans, U.S. Department of Health and Human Services, to conduct research into their present status, to develop a tribal constitution and other primary laws, and to prepare a roll of tribal members. The group adopted a tribal constitution for tribal purposes on March 11, 1995, drafted enrollment and election ordinances, and an enrollment manual (see Appendices 29 and 30).

Representatives of the group provided copies of the roll of tribal members and other documents supporting the preparation of the roll to Mr. Fleming for his review. Although Mr. Fleming contacted representatives of the group earlier this year and made general comments regarding the documents, as of this date Mr. Fleming has not responded directly in writing.

## Analysis:

The purpose of P.L. 84-443 (Lower Lake Act), as ascertained by a plain reading of the text, was twofold. First, the Lower Lake Act authorized the Secretary of the Interior (Secretary) "to sell to the County of Lake, California, for the purpose of establishing an airport" approximately 99 acres comprising a majority portion of the Lower Lake Rancheria. Second, the Lower Lake Act "authorized and directed" the Secretary "to issue a patent in fee or an unrestricted deed of conveyance to Harry Johnson" for the balance of the Lower Lake Rancheria, or approximately 41 acres. The Lower Lake Act contains no words either expressly terminating, or expressing the intent to terminate, the legal status of either the Johnsons or the Tribe. Certainly, these fee conveyances of the lands comprising the Lower Lake Rancheria relieved the Secretary of the Interior of any further responsibility for the land. However, the Lower Lake Act simply did not terminate the legal status of either the Johnsons or the Tribe.

Compare the language of the Lower Lake Act with that of §10(b) of the Rancheria Act (P.L. 85-671), as amended:

> "After the assets of a rancheria or reservation have been distributed pursuant to this Act, the Indians who receive any part of such assets, and the dependent members of their immediate families who are not members of any other tribe or band of Indians, shall not be entitled to any of the services performed by the United States for Indians because of their status as Indians..." (Language added by P.L. 88-419, 78 Stat. 390, at 391, is underscored).

The language of the Rancheria Act expressly terminates the legal status of each Indian who receives any part of the assets of a rancheria. No such language appears in the text of the Lower Lake Act.

The only indication that Congress may have viewed the Lower Lake Act as a termination act may be found in two letters by the Assistant Secretary of the Interior (Assistant Secretary) (see Appendices 14 and 17). These letters were incorporated into the reports of the Committee on Interior and Insular Affairs regarding H.R. 6105 and H.R. 585, the latter bill becoming the Lower Lake Act. These letters state that the sale and conveyance of the Lower Lake Rancheria are "in line with" the "proposed plan" or "present policy" of termination. However, such phrases do not clearly evince an express intent to terminate. Rather, such phrases indicate congressional recognition that no other law in effect at that time had been passed.

Although there was a concerted effort in Congress to pass such a law, at the time Lower Lake Act was passed, the bills which would eventually become the Rancheria Act were still being considered and amended by Congress. Thus, Congress was aware of the "present policy" but had not as that time yet exercised the power of termination. If Congress desired to terminate the Tribe, then it should be expressly stated so within the text of the Lower Lake Act. The reference by the Assistant Secretary to the "proposed plan" or "present policy" of termination cannot be read as decreeing whatever is necessary to achieve the termination of the Lower Lake Rancheria. Rather, the Lower Lake Act can only sustain its specific working provisions, as those provisions are in fact what Congress decreed in the Lower Lake Act.

The records of the BIA suggest that the Johnsons were never advised that their acceptance of a fee patent would be the basis of future refusals by the United States to provide services and benefits to them or other tribal members. It does not appear that the Johnsons consented to the loss of their legal status as Indians as a consequence of their acceptance of the title to the 41-acre parcel. If their consent to the sale and conveyance of the Lower Lake Rancheria were obtained without such disclosure, and this were the basis for considering the tribe as terminated, it would be unconscionable for the BIA to continue to consider the Tribe as terminated.

Conclusion:

As a result of the foregoing discussion and analysis, the Agency believes that the effect of the Lower Lake Act was not to terminate the Lower Lake Rancheria. Rather, the Lower Lake Act simply authorized two conveyances of titles to the land comprising the Lower Lake Rancheria. Unlike the Rancheria Act, the Lower Lake Act contains no express language to cause the loss of an Indian's legal status as an Indian as a result of his/her acceptance of any of the assets of the Lower Lake Rancheria. Further, the Indian people of the Lower Lake Rancheria appear not to have been informed that their consent to the sale would result in the loss of legal status or be equated with the termination of their Tribe. Therefore, we recommend that the Bureau of Indian Affairs administratively reaffirm that the Lower Lake Rancheria is a federally recognized tribe, contingent upon Mr. Fleming's favorable recommendation concerning enrollment and genealogical information submitted by the elected officials of the Lower Lake Rancheria.

As for the specifics of the recommended administrative reaffirmation, we also recommend that reference be made within any document developed to effect administrative reaffirmation to the Constitution of the Lower Lake Rancheria being the initial governing document of the Lower Lake Rancheria. We also recommend that all other laws enacted by the governing body established by the Constitution prior to the effective date of an administrative reaffirmation remain in effect unless superceded by subsequent Tribal law or otherwise inconsistent with Federal law.

Please contact Mr. Raymond Fry, Tribal Operations Officer, at (916) 566-7124 should you require additional information with regard to this matter.

Attachments

cc:    Director, Office of American Indian Trust

# EXHIBIT 7



# United States Department of the Interior

OFFICE OF THE SECRETARY
WASHINGTON, D.C.  20240

Honorable Daniel D. Beltran                                    DEC 2 9 ⁻⁻:.
Chairman, Lower Lake Rancheria
131 Lincoln Street
Healdsburg, California 95448

Dear Chairman Beltran:

I am writing to follow up on your meeting with members of my staff on October 1999, regarding official reaffirmation of the special relationship between the United States and the Lower Lake Rancheria of California.

Upon careful review of the matter of the long-standing and unfortunate omission of the Lower Lake Rancheria from recognition and services by the Bureau of Indian Affairs (BIA) following the adoption of the Indian Reorganization Act of 1934, as amended, 25 U.S.Code §463 et seq., the Lower Lake Act, and the Rancheria Act, and having been advised in the premises by the Office of Tribal Services, BIA, as well as the BIA Pacific Regional Director and Central California Agency Superintendent, that a reaffirmation of recognition would be prudent and proper,  by this letter and on behalf of the United States Department of the Interior and BIA, I am hereby reaffirming the Federal recognition of the Lower Lake Rancheria.

Henceforth, the Lower Lake Rancheria will be included on the list of "Indian Entities Recognized and Eligible to Receive Services from the United States Bureau of Indian Affairs," last published in the Federal Register, Vol 65, No. 49, pp. 13298-13303, on March 13, 2000.

By copy of this letter, I am directing the BIA and specifically the Pacific Regional Office in Sacramento, California, to take appropriate action to deal with the Lower Lake Rancheria in accordance with this action today.  The BIA will maintain contact with the Rancheria to address relevant matters pertaining to the government-to-government relationship and coordination between the Band and the BIA.  On behalf of Secretary Babbitt, let me be among the first among many to extend my personal congratulations to you and other hardworking, dedicated members of your staff for your patience and perseverance.  We look forward to working with you and the people of the Lower Lake Rancheria.

Sincerely,

Assistant Secretary  Indian Affairs

cc:    Director, Office of American Indian Trust
       Regional Director, Pacific Region
       Office of the Special Trustee
       Director, Office of Indian Education Programs

# EXHIBIT 8



# United States Department of the Interior

OFFICE OF THE SECRETARY
WASHINGTON, D.C. 20240

DEC 29 2000

Memorandum

To:          Regional Director, Alaska Region
             Regional Director, Pacific Region

Through:     Deputy Commissioner of Indian Affairs

From:        Assistant Secretary - Indian Affairs

Subject:     Reaffirmation of Federal Recognition of Indian Tribes

I have received information from you that the King Salmon Tribe, the Shoonaq' Tribe of Kodiak, and the Lower Lake Rancheria have been officially overlooked for many years by the Bureau of Indian Affairs ("Bureau" or "BIA") even though their government-to-government relationship with the United States was never terminated. I have been requested to review these cases and take action, if warranted.

At one time, each of these groups was recognized by the Bureau. However, for reasons not clearly understood, they were simply ignored as the BIA went through fundamental organization and philosophical changes following landmark legislation such as the 1934 Indian Reorganization Act and other federal policy shifts. It is an unfortunate part of the Bureau's legacy that I spoke of during our reconciliation event several months ago, and I am pleased today, and on behalf of the Department of the Interior and the BIA, to correct this egregious oversight.

The Indian tribes mentioned above should not be required to go through the Federal acknowledgment process outlined in the Federal Register at 25 CFR Part 83 ("acknowledgment regulation") because their government-to-government relationship continued. The acknowledgment regulation does not apply to Indian tribes whose government-to-government relationship was never severed. Rather, the acknowledgment regulation provides a process for tribes to seek recognition when the tribe has yet to establish such a government-to-government relationship, when a previously existing government-to-government relationship has lapsed, or when the government-to-government relationship was terminated through an administrative process. Here, the Tribes were never administratively terminated nor were their relations with the United States broken. Instead, an administrative error by the Bureau of Indian Affairs occurred in the initial failure to place the tribes on the Federal Register list of entities recognized and eligible to receive services from the United States Bureau of Indian Affairs. The administrative oversight, having now been identified, must be corrected and the Tribes' rightful existence must now be reaffirmed.

With respect to the King Salmon Tribe, the Alaska Regional Director advises me that the King Salmon Tribe has provided documentation that supports its position that it has existed and maintained a continuous Indian community from historic times. In addition, these documents support my finding of a long-standing governmental relationship with the United States. In 1994, the Department re-established governmental relationships with 224 Alaska Native governments under similar circumstances. Documents supporting the King Salmon Tribe's request were forwarded by the Bristol Bay Native Association. The original village site of Old Savonoski was destroyed when a volcano, Mount Katmai, erupted and buried it. Members traveled downstream on the Naknek River from the original site and settled in King Salmon, New Savonoski, Naknek and South Naknek. Although scattered, the people of King Salmon did not abandon their traditional tribal identity. Ethnographic records confirm that the people of King Salmon today are descendants of the indigenous people from the King Salmon area.

The BIA's West Central Alaska Field Office and the Alaska Regional Office support the Tribe's request that their status be reaffirmed and authorized to conduct a Secretarial election under provisions of the Indian Reorganization Act, 25 U.S.Code Section 476. The Acting Director, Office of Tribal Services, also recommends that Federal recognition of the King Salmon Tribe be reaffirmed.

With respect to the Shoonaq' Tribe of Kodiak, the Alaska Regional Director advises me that the Shoonaq' Tribe has provided documentation that supports its position that it has maintained a continuous political organization since European contact. In addition, these documents support my finding of a long-standing relationship with the United States. As with King Salmon, the Department's 1994 re-establishment of governmental relationships with 224 Alaska Native governments was under similar circumstances.

Members of the Shoonaq' Tribe are descendants of a consortium of Koniagmiut from Kodiak Island (known to the Russians as St. Paul or St. Paul's Harbor) who settled in the locale of the contemporary city of Kodiak. The Council of the Shoonaq' Tribe of Kodiak governs the historical Native community in and around the contemporary community of Kodiak, Alaska. No other tribe claims this territory or membership. The Tribe has entered into numerous federal contracts through which it provides the same federally funded services and benefits to its members as are provided by other federally recognized tribes in Alaska. Congress acknowledged Kodiak as a historic Native village possessing claims to aboriginal title in the Alaska Native Claims Settlement Act (ANCSA). Consequently, Kodiak was declared eligible and received land and other benefits under ANCSA.

In 1987, the Kodiak Tribal Council, upon learning that they were not included in the Federal Register listing of federally recognized Indian tribes, requested that the Secretary of the Interior correct the list. By letter dated August 12, 1987, they submitted arguments that they had been federally recognized prior to 1931 and they should have been included in the Secretary's published list. In an August 25, 1987, letter the Anchorage Agency Superintendent, after reviewing the matter, concurred with the Tribe's request and recommended that the Shoonaq'

Tribe be reaffirmed and added to the Federal Register listing. Today, the West Central Alaska Field Office and the Alaska Regional Office, as well as the Acting Director, Office of Tribal Services, recommend that the Shoonaq' Tribe of Kodiak be included on the list of federally recognized Indian tribes.

With respect to the Lower Lake Rancheria, the documentation shows that it should be treated differently than other California tribes that were terminated during the termination era. The California Indian tribes considered terminated during this era were those subject to the terms of Pub. L. 85-671, 72 Stat. 619, as amended by Pub. L. 88-419, 78 Stat. 390, commonly referred to as the Rancheria Act. The Rancheria Act specifically provided, in §10b, that when assets were accepted, the affected tribe was terminated. In contrast, the Lower Lake Rancheria lost its land pursuant to the Lower Lake Act, Pub. L. 84-443, 70 Stat. 58, as amended by Pub. L. 84-751, 70 Stat. 595, which sold its land for the purpose of establishing a local airport. This Act predated the Rancheria Act and did not contain a provision to cause the loss of an Indian's legal status as an Indian as a result of his (or her) acceptance of any of the assets of the Lower Lake Rancheria. Thus, the Lower Lake Act did not terminate the Lower Lake Rancheria.

The Lower Lake Rancheria's tribal status has been continuously maintained by the tribal members. The Lower Lake Rancheria successfully obtained funding from the Administration of Native Americans, U. S. Department of Health and Human Services, to strengthen their tribal government structure. Both the BIA's Agency Superintendent, Central California Agency, and the Regional Director, Pacific Region, as well as the Acting Director, Office of Tribal Services, recommend administrative reaffirmation of the status of the Lower Lake Rancheria.

Therefore, by action today, I am reaffirming formal recognition of the following Indian tribes:

King Salmon Tribe in Alaska;

Shoonaq' Tribe of Kodiak in Alaska; and

Lower Lake Rancheria in California

The Federal recognition of the Tribes and the trust relationship between the United States and the Indian Tribes are hereby reaffirmed, subject to further discussion and negotiation between the tribes and the BIA with respect to respective tribal membership lists, if necessary. All laws and rules of law of the United States of general application to Indians, Indian tribes, or Indian reservations which are not inconsistent with the 1934 Indian Reorganization Act, the Rancheria Act, or the 1971 Alaska Native Claims Settlement Act, as amended, shall apply to the respective Alaskan tribes and Lower Lake Rancheria, and their respective members. Each of the Tribes listed above is recognized as an independent tribal governmental entity, separate from any other nation, band, village, rancheria or Indian tribe.

By this memorandum, I am directing that the Bureau of Indian Affairs, specifically the Alaska Region, and Pacific Region officials deal with the respective tribes accordingly. Further, I direct that the Office of Tribal Services include the Tribes mentioned above in the "Indian Entities Recognized and Eligible to Receive Services from the United States Bureau of Indian Affairs," a

list published in the Federal Register most recently on March 13, 2000 (Vol. 65, No. 49), pp. 13298-13303, pursuant to Section 104 of the Act of November 2, 1994, Pub. L. 103-454, 108 Stat. 4791, 4792.

The Bureau of Indian Affairs will maintain contact with the respective tribes to address the relevant details in maintaining a government-to-government relationship in accordance with Executive Orders 13084 and 13175 as well as the Executive Memorandum of April 29, 1994, on Government-To-Government Relations with Native American Tribal Governments.

Please contact the Director, Office of Tribal Services, at (202) 208-3463, if you have any questions regarding this matter.


cc:     Office of the Special Trustee
        Office of American Indian Trust
        Director, Office of Indian Education Programs
        Director, Office of Trust Responsibility

# EXHIBIT 9



# United States Department of the Interior

BUREAU OF INDIAN AFFAIRS
Pacific Regional Office
2800 Cottage Way
Sacramento, California 95825

IN REPLY REFER TO:

DEC 2 3 2010

Memorandum

TO:          Assistant Secretary – Indian Affairs

FROM:        Regional Director, Pacific Region

SUBJECT:     Lower Lake Rancheria

This memo will serve as a request to consider Lower Lake Rancheria as a "restored tribe" for the purpose of implementing Section 20 of the Indian Gaming Regulatory Act.

Lower Lake was reaffirmed as a Federally Recognized tribe in 2000, by then Assistant Secretary – Indian Affairs, Kevin Gover. The reaffirmation was based on documentation, provided by the Central California Agency and is contained as part of this submittal. Research concerning the history of the Lower Lake Rancheria concludes that Public Law 443 intended to allow the sale of lands known as Lower Lake Rancheria to the county of Lake for the purpose of development of an airport. Nothing in the Act indicated that the intent was to terminate the relationship of individuals with the United States, but to only terminate the status of certain lands. Between 1956 and 2000 the Indians of Lower Lake Rancheria were erroneously treated as "terminated", although the language contained in the Lower Lake Act was different than the language contain in the Rancheria Act. Lower Lake has remained landless since its trust status was terminated in 1956.

Today, Lower Lake requests consideration as a restored tribe under Part 292 due to the unusual circumstances that brought them to this point in time. Consistent with case law and our relationship with the Lower Lake Rancheria we believe that they should be considered a "restored tribe" under Section 20 of the Indian Gaming Regulatory Act. Documentation shows that the United States for all intensive purposes considered Lower Lake terminated until they were restored to recognition.

If you have any questions or additional information is needed, please feel free to contact me at your convenience. Your prompt attention to this matter is appreciated.

*Amy L Dutschke*

Attachments

cc: Paula Hart, Indian Gaming Office
    Chairman, Lower Lake Rancheria



TAKE PRIDE
IN AMERICA

# EXHIBIT 10



# KOI NATION OF NORTHERN CALIFORNIA

April 28, 2014

Kevin Washburn
Assistant Secretary-Indian Affairs
U.S. Department of the Interior
1849 C Street, N.W.
Washington, D.C. 20240

### Re: Request for DOI Determination that Koi Nation is a Restored Tribe Pursuant to IGRA and 25 C.F.R. § 292

Dear Assistant Secretary Washburn:

This is a request for a decision on behalf of the Koi Nation of Northern California ("Koi Nation" or "Nation," and sometimes referred to as "Lower Lake," as the context may require).[1] As you know, the Koi Nation is a landless federally recognized band of Pomo Indians headquartered in Santa Rosa, California. The Nation's tribal citizens mostly reside within the Nation's aboriginal homelands in central and northern California. As detailed herein, Koi Nation requests that the Department of the Interior ("DOI" or the "Department") issue a determination that Koi Nation qualifies as a "restored" tribe under the Indian Gaming Regulatory Act ("IGRA") and its implementing regulations at 25 C.F.R. Part 292.

## INTRODUCTION AND SUMMARY OF REQUEST

### 1. Scope of this Submission

As you know from our February 5, 2014 meeting with you, the Koi Nation has pursued many avenues with the Department to exercise its rights under the Indian Gaming Regulatory Act. We have submitted a request for a restored tribe opinion[2], a request for a waiver of the 25 C.F.R. Part 292 regulations,[3] and a Petition for Rulemaking on May 31, 2013. At our February 5,

---

[1] Koi Nation of Northern California was formerly known as the Lower Lake Rancheria and changed its governmental name in 2012.

[2] *See* Request for a "Restored Tribe" Determination for Purposes of Section 20 of the Indian Gaming Regulatory Act, Submitted to AS-IA Larry Echo Hawk, Solicitor Hilary Tompkins, and Deputy Solicitor Indian Affairs Pilar Thomas (Oct. 7, 2009); See also Meeting Request to Solicitor Tompkins (July 1, 2010).

[3] *See* Request for Secretarial Waiver, Submitted to Bryan Newland (Oct. 14, 2011).

P.O. Box 3162, Santa Rosa, California 95402 • Office 707.575.5586 • Fax 707.575.5506

2014 meeting, we raised the prospect that we would submit a request that the Koi Nation qualifies as a "restored" tribe under 25 C.F.R. Part 292. This submission incorporates details from each of our prior submissions, but is a stand alone request for a ruling on Koi Nation's eligibility for consideration as a "restored" tribe pursuant to IGRA and its regulations at 25 C.F.R. Part 292.

## 2. Summary of Request

As more fully described herein, Koi Nation requests that the Department issue a clarification that Koi meets the definition of "restored" tribe under 23 C.F.R. Part 292 due to its being recognized through the administrative Federal Acknowledgement Process under 25 C.F.R. §83.8 (previous federal acknowledgement).

Koi Nation initiated its restoration process with DOI in 1995 by requesting previous acknowledgement status through 25 C.F.R. §83.8. While DOI ultimately recognized Koi Nation without requiring the Nation to complete the full petition process, it did so as the DC Circuit noted in Muwekma Ohlone v. Salazar, _ F.3rd _ (DC Cir. 2013) on the basis that DOI utilized an implied waiver of 25 C.F.R. Part 83 for Koi Nation. Moreover, the preamble to the 25 C.F.R. Part 292 regulations makes clear that Koi Nation was acknowledged through 25 C.F.R. Part 83.8, since, in DOI's view, that is the only way a tribe can be recognized, apart from congressional legislation and court settlements.

## BACKGROUND AND HISTORY OF TERMINATION

### 1. Brief History of Koi Nation

In the early 20th Century, the Federal Government purchased lands for the Koi Nation near the town of Lower Lake under a congressional appropriation. Koi Nation's history of governmental recognition is well documented, including negotiation of a treaty with the United States in 1851 and with the United States' purchase of Lower Lake Rancheria in 1917. The Nation continued to enjoy a relationship with the United States for several more decades, including before and after the passage of the Indian Reorganization Act of 1934.

In 1956, Congress enacted the Lower Lake Rancheria Act (the "Act") to terminate the trust status of some of the Nation's lands in Lake County and transfer those lands for use for a municipal airport. The Act did not, however, terminate the government-to-government relationship between the United States and the Nation.

The Act legally only terminated the Nation's right to the land where a proposed airport was to be located, rather than terminating the status of the Nation. The Act's effect, however, was to also cause the Bureau of Indian Affairs ("BIA") to mistakenly cease providing all federal services to Lower Lake, which, in effect, terminated the Nation administratively.

### 2. 1958-2000 Treatment as Terminated Tribe

The Bureau's denial of governmental services is detailed in Lower Lake's submission to Solicitor Tompkins of July 1, 2011, which includes the following: consistent omission from the list of federally recognized tribes, denial of services from the Indian Health Service, denial of BIA Tribal Planning Grants, denial of funding through the Department of Housing and Urban Development, the legislative history of the Lower Lake Rancheria Act, an Indian Health Services Manual listing Lower Lake as terminated, and a BIA Law Enforcement publication listing Lower Lake as terminated. A September 14, 2000 Memorandum from the BIA Superintendent, Central California Agency, to the BIA Pacific Region Regional Director states that, "Records of the BIA demonstrate that Lower Lake is presently considered terminated."[4]

### 3. Commencement of Federal Recognition Process under 25 C.F.R. Part 83

On June 21, 1995, Polly Girvin, Coordinator of the Advisory Council of California Indian Policy wrote to Assistant Secretary Ada Deer on behalf of the Koi Nation seeking to confirm the federally recognized status of the "Koi tribe of Lower Lake Indians."[5] The Council wrote that "the Koi tribe qualifies for administrative recognition under the criteria enumerated in §83.8— Previous Federal Acknowledgement." The letter detailed how Koi met the standards including the 25 Part 83 regulatory criteria for "identity," community and "political §83.8 influence." Following the submission of the June 21, 1995 request for Previous Federal Acknowledgment, the Department began to engage Koi Nation in a process for federal recognition.

A September 14, 2000 Memorandum from the BIA Superintendent, Central California Agency, to the BIA Pacific Region Regional Director details the activity leading up to the final recognition decision on December 29, 2000. The Memorandum discusses the history of the Act, how it was misinterpreted to treat the Nation as a terminated tribe, and recommended administrative reaffirmation of Koi, "contingent upon [the BIA Director of the Branch of Acknowledgment's] favorable recommendation concerning enrollment and genealogical information submitted by the elected officials of the Lower Lake Rancheria."

### KOI NATION IS RESTORED TO FEDERAL RECOGNITION

The Department ultimately restored Koi Nation to recognition on December 29, 2000, when Assistant Secretary-Indian Affairs Kevin Gover acknowledged the Department's error and

---

[4] Attachment 1 (September 14, 2000 BIA Memorandum).

[5] Attachment 2 (Letter of June 21, 1995 from Polly Girvin to Assistant Secretary Ada Deer). The Advisory Council on California Indian Policy (ACCIP) was created by an act of the United State Congress on October 14, 1992. It provided for the creation of a special advisory council with the purpose of studying the unique problems that California Native Americans face in receiving federal acknowledgment. Under the act, the Advisory Council was to make recommendations regarding California Indian policy to the Congress and the Departments of the Interior and of Health and Human Services.

reaffirmed the recognized status of the Nation.  The Department's restoration of the Koi Nation involved two important directives from Assistant Secretary Gover.

### 1. AS-IA Gover's Letter to Koi Nation

The first directive was a letter to Chairman Beltran, "reaffirming the Federal recognition of the Lower Lake Rancheria" and "directing the BIA and specifically the Pacific Regional Office in Sacramento, California to take appropriate action to deal with the Lower Lake Rancheria in accordance with this action today."[7]  ASIA Gover's decision noted that, because Congress had not legally terminated Lower Lake as a sovereign entity, ASIA Gover could not use the word "terminated," even though the BIA had effectively terminated the federal relationship with Lower Lake. Instead, he noted the Tribe's "unfortunate omission...from recognition and services by the [BIA]" and called his action toward the Tribe an "official reaffirmation."  In addition, Lower Lake Rancheria (now Koi Nation) was to be placed on the list of "Indian Entities Recognized and Eligible to Receive Services from the United States Bureau of Indian Affairs," last published[6] in the Federal Register, Vol 65, No.49, pp. 13298-13303, on March 13, 2000.  Subsequently, the Tribe's federal relationship was restored and the Tribe was placed and remains on the list of federally recognized Tribes.

### 2. AS-IA Gover's Directives to the Pacific Region

The second decision document issued on December 29, 2000 was a memorandum from AS-IA Gover to the Pacific Regional Director.[7]  In that letter, the Department acknowledged that the Federal Government erred in treating the Nation as terminated, and reaffirmed the Nation's status as a federally recognized tribe.  It also stated:

- The Indian Tribes mentioned above should not be required to go through the Federal acknowledgement process outlined in the Federal Register at 25 C.F.R. Part 83 ("acknowledgement regulation") because their government-to-government relationship was never severed.  Rather, the acknowledgment regulation provides a process for tribes to seek recognition when the tribe has yet to establish such a government-to-government relationship, when a previously existing government-to-government relationship has lapsed, or when the government-to-government relationship was terminated through an administrative process.  Here, the Tribes were never administratively terminated nor were their relations with the United States broken.  Instead, an administrative error by the [BIA] occurred in the initial failure to place the tribes on the Federal Register list of entities recognized and

---

[6] Attachment 3 (Letter from Assistant Secretary Kevin Gover to Chairman Beltran).

[7] As of the date of Gover's letter.

[8] Attachment 4 (December 29, 2000) Memorandum from Assistant Secretary to Pacific Regional Director.

eligible to receive services from the United States Bureau of Indian Affairs. The administrative oversight, having now been identified, must be corrected and the Tribes' rightful existence must now be reaffirmed[8].

- The Federal recognition of the Tribes and the trust relationship between the United States and the Indian Tribes are hereby reaffirmed, subject to further discussion and negotiation between the tribes and the BIA with respect to respective tribal membership lists, if necessary. All laws and rules of law of the United States to general application to Indians, Indian tribes, or Indian reservations which are not inconsistent with the 1934 Indian Reorganization Act, the Rancheria Act, or the 1971 Alaska Native Claims Settlement Acts, as amended, shall apply to the respective Alaskan tribes and Lower Lake Rancheria, and their respective members. Each of the Tribes listed above is recognized as an independent tribal governmental entity, separate from any other nation, band, village, rancheria or Indian tribe.

## THE DEPARTMENT UTILIZED THE PREVIOUS ACKNOWLEDGEMENT STANDARDS IN PART TO RECOGNIZE KOI

### 1. Koi was Recognized in Part Pursuant to 25 C.F.R. 83.8

The import of Assistant Secretary Gover's decision was to give final effect to the 1995 request filed on Koi's behalf (by the Advisory Council) for a previous federal acknowledgment decision under 25 CFR § 83.8. In effect, while not formally going through the acknowledgment process, DOI utilized the previous federal acknowledgment standard contained in 25 CFR § 83.8 and supplemented it with a separate finding that Koi's government-to-government relationship was never legally terminated – even though BIA had treated Koi as a terminated tribe.

### 2. The Muwekma Cases Demonstrate that Koi's Decision was under the Framework of 25 C.F.R. Part 83.8

The circumstances of Koi Nation's reaffirmation by DOI were extensively discussed by the District Court in Muwekma Ohlone Tribe v. Salazar, 813 F. Supp. 2d 170 (D.D.C. 2011) and the DC Circuit in Muwekma Ohlone Tribe v. Salazar, _ F.3rd _ (DC Cir. 2013). The D.C. Circuit Court in its Muwekma decision noted that on November 27, 2006, the Department filed a Supplemental Explanation with the District Court below. The Department explained that its decisions to summarily recognize Ione and Lower Lake "were not based merely on a finding that those groups were previously recognized by the Federal Government at some time in the past."

JA 106.[9] Rather, unlike Muwekma, Lower Lake had government-to-government interactions with the federal government for decades. For example, the government held land in trust for Lower Lake until 1956, having surveyed Lower Lake's population in 1950 and consulted with Indians living on the land about selling it in 1953. Additionally, in 1980, the Department considered including Lower Lake on the list of federally recognized tribes. Thus, while the previous federal recognition was one basis of recognizing Koi, it was not the only basis.

The D.C. Circuit Court noted the Department's emphasis on government-to-government interaction as a distinguishing characteristic for Koi was not arbitrary, but a rational interpretation of this factor in light of 25 C.F.R. Part 83. As the court noted:

> Government-to-government interaction is a common characteristic of a recognized tribe. See, e.g., 25 C.F.R. § 83.1 (defining federal acknowledgement of tribe as "action by the Federal government … indicating clearly the recognition of a relationship between that entity and the United States"); id. § 83.2 (federally recognized tribes obtain immunities and privileges "by virtue of their government-to-government relationship with the United States"); id. § 83.7(c) (group seeking tribal recognition must have "maintained political influence or authority over its members as an autonomous entity").

> [The Department] therefore exercised its broad authority properly by making exceptions for Ione and Lower Lake but not for Muwekma on this basis. See 25 C.F.R. § 1.2 (authorizing exception to Part 83 process "in all cases where permitted by law and the Secretary finds that such waiver or exception is in the best interest of the Indians"). As the DC Circuit notes, the Department did not rely solely on a finding of previous acknowledgment of Koi but also on their government to government interactions.

The D.C. Circuit explained the connection between the "error correction" process and 25 C.F.R. Part 83 when it reviewed Muwekma's claim that the Department had unlawfully acted to terminate the group. The District Court held that Muwekma's termination of recognition claim was distinct from a claim under the Part 83 process and therefore was not subject to administrative exhaustion. The D.C. Circuit overruled the District Court, stating, "[i]n fact, the Part 83 process applies to a petition of a previously recognized tribe that seeks current recognition on that basis." Citing prior case law, the Court explained that the Part 83 process allows the Department "to apply its expertise…*and correct its own errors*." (emphasis added).

---

[9] In Muwekma, the DC Circuit rejected a claim by the Muwekma Tribe that it should not have to go through the federal acknowledgment process in 25 CFR Part 83.

In addition, the Court explained "The Part 83 process allowed Interior to engage in fact finding bearing on Muwekma's termination of recognition claim, provided Interior an opportunity to correct any error…." Likewise, the Department's correction of its earlier treatment of the Koi Nation occurred within the framework of the Part 83 process since Interior engaged in a Part 83 fact-finding process.

DOI also highlighted the connection between Koi's recognition process and the waiver of Part 83 when it stated in its supplemental submission to the District Court as follows:

> We believe, however, that the underlying record implied that a waiver of the regulations was made to grant the Ione Band and the Lower Lake community recognition and placement on the Federal Register list of Indian entities. The implied waivers of the regulations for Ione and Lower Lake were much broader than other waivers but were justified by the course of dealings to acquire and hold land in trust for them.

### KOI NATION QUALIFIES AS A RESTORED TRIBE UNDER 25 C.F.R. 292.10 (6)

#### 1. The current Part 292 Regulations & their Preamble

The specific request of Koi Nation under this submission is to seek clarification that it qualifies as a "restored" tribe under 25 C.F.R. Part 292. The Department published the Part 292 Regulations in May 2008 to implement the exceptions to IGRA's general prohibition against gaming on lands acquired after its enactment. The Part 292 Regulations guide the Department's determinations regarding restored tribe determinations.

Under the Part 292 Regulations, a tribe may only demonstrate that it has been restored to Federal recognition by one of three methods:

1. Congressional legislation recognizing, acknowledging, affirming, reaffirming, or restoring the relationship between the tribe and the United States;
2. Recognition through the Federal Acknowledgment Process under 25 C.F.R. Part 83; or,
3. Federal court determination, in which the United States is a party, or a court-approved settlement agreement entered into by the United States.

25 C.F.R. § 292.10.

The Preamble explained recognition through the Federal Acknowledgment Process as follows:

> We can safely infer that Congress understood that a list of
> federally recognized tribes existed and authorized on-reservation,
> or on former reservation, gaming for those tribes. We must,
> therefore, provide meaning to Congress's creation of an exception
> for gaming on lands acquired into trust ''as part of the restoration
> of lands for an Indian tribe restored to Federal recognition.'' We
> believe Congress intended restored tribes to be those tribes
> restored to Federal recognition by Congress or through the part 83
> regulations. We do not believe that Congress intended restored
> tribes to include tribes that arguably may have been
> administratively restored prior to the part 83 regulations.

Preamble to 25 C.F.R. Part 292 at p. 29,363.

### 2.    Restored Tribe Elements

To qualify as a restored tribe under the Department's Part 292 Regulations, a tribe must demonstrate that:

1. It was federally recognized at one point in history;
2. It lost its government-to-government relationship with the United States at a later point in history; and,
3. It later had its government-to-government relationship with the United States, and federally-recognized status, restored.

25 C.F.R. § 292.7.  The Part 292 Regulations include separate criteria necessary to demonstrate each of these factors.  The Koi Nation satisfy each of those criteria.

### A. Koi Nation was previously federally recognized pursuant to 25 C.F.R. § 292.8

A tribe can demonstrate that it was previously recognized by the federal government by several means, including a showing that Congress enacted legislation specific to, or naming, the tribe indicating that a government-to-government relationship existed.  25 C.F.R. § 292.8(c).

In the early 20th Century, the Federal Government purchased lands for the Nation near the town of Lower Lake under a congressional appropriation.  The Nation continued to enjoy a relationship with the United States for several more decades, including before and after the passage of the Indian Reorganization Act of 1934.  In 1956, Congress enacted the Lower Lake Rancheria Act to terminate the trust status of some of the Nation's lands in Lake County and transfer those lands for use for a municipal airport.  The Lower Lake Rancheria Act did not, however, terminate the government-to-government relationship between the United States and

the Nation. The 1956 legislation constitutes an express acknowledgment of the Nation's government-to-government relationship with the United States, pursuant to 25 C.F.R. § 292.8(c).

### B. The Nation lost its government-to-government relationship with the United States, as evidenced by consistent historical documentation pursuant to 25 C.F.R. § 292.9.

In order to demonstrate that a tribe lost its government-to-government relationship with the United States, a tribe must show that its relationship was terminated by one of the following means:

1. Congressional legislation;
2. Consistent historical written documentation from the Federal Government effectively stating that it no longer recognized a government-to-government relationship with the tribe, or taking action to end the relationship; or,
3. Congressional legislation that restores the tribe and recognizes the existence of a previous government-to-government relationship.

25 C.F.R. § 292.9.

As noted above, the Bureau's denial of governmental services is explained more fully in Lower Lake's submission to Solicitor Tompkins of July 1, 2011. From 1956 until 2000, the federal government consistently treated the Nation as though it were not federally recognized, as evidenced by numerous documents over the years. A September 14, 2000 Memorandum from the BIA Superintendent, Central California Agency, to the BIA Pacific Region Regional Director sums this treatment up clearly, stating, "[r]ecords of the BIA demonstrate that Lower Lake is presently considered terminated." The federal government's consistent, and documented, treatment of the Nation from 1956 until 2000 demonstrates that the United States did not recognize a government-to-government relationship with the Nation, consistent with the requirements of 25 C.F.R. § 292.9.

### C. Koi Nation was Recognized under 25 C.F.R. Part 83.8, as required by 25 C.F.R. § 292.10.

As a final element of demonstrating that it qualifies as a "restored tribe" under the Department's regulations, the Nation must show that has been restored to federal recognition by one of the means described in 25 C.F.R. § 292.10, which include: "(b) Recognition through the administrative Federal Acknowledgment Process under § 83.8 of this chapter[.]"

The Department's characterization of Koi's reaffirmation in the Preamble to 25 C.F.R. Part 292 is consistent with a finding that Koi was recognized under the authority and process of 25 CFR Part 83, even though that process was ultimately waived by AS-IA Gover. The Preamble to Part 292 notes that, in enacting the Federally Recognized Indian Tribe List Act of

1994, Congress identified only the Part 83 procedures as the process for administrative recognition. 73 FR 29653. In the Department's view, the only way Koi could be published pursuant to the List Act was if it was recognized under the Part 83 process.[10] The Department then says past affirmations were "administered" under "this section" – obviously referring to the 83.8 previous federal acknowledgment criterion. In other words, Koi was recognized under the broad framework of the Department's regulatory regime at 25 C.F.R. Part 83, even if it did not go through the full petition process.

While Koi was not formally processed through the complete petition process, the element of its request for previous federal acknowledgment, coupled with its government-to-government relationship, and the broad waiver discretion of the Department ultimately made this a decision administered under the federal acknowledgment process.[11]   As a result, Koi qualifies as a restored tribe pursuant to Section 292.10(b), which includes "Recognition through the administrative Federal Acknowledgment Process under Section 83.8" under the various methods by which a tribe is "restored to federal recognition." Koi seeks the Department's confirmation of this fact.

Indeed on December 12, 2010, the Pacific Region Director made this same conclusion. In her memorandum to the Assistant Secretary of Indian Affairs, the Director stated:

> Today, Lower Lake requests consideration as a restored tribe under
> Part 292 due to the unusual circumstances that brought them to this
> point in time. Consistent with case law and our relationship with
> the Lower Lake Rancheria we believe that they should be
> considered a "restored tribe" under Section 20 of the Indian
> Gaming Regulatory Act. Documentation shows that the United
> States for all intensive purposes considered Lower Lake terminated
> until they were restored to recognition.[12]

## CONCLUSION

The Koi Nation is seeking a determination that it qualifies as a "restored tribe" pursuant to 25 C.F.R. § 292.7. The Nation was previously recognized by the federal government, lost its

---

[10] While Koi believes an equally compelling authority is the Snyder Act, 25 U.S.C. §13 (providing appropriations for the benefit, care, and assistance of Indians throughout the United States) that is not how the Department explained Koi's recognition.

[11] See, *Muwekma Ohlone Tribe v. Salazar*, No. , 813 F. Supp. 2d at 170 (D.D.C. 2011) (explaining that the tribal recognition process at 25 C.F.R. Part 83 is part of the regulatory scheme under the Department's statutory authority).

[12] Attachment 5 (December 23, 2010 Memorandum from Regional Director, Pacific Region to Assistant Secretary of Indian Affairs).

government-to-government relationship with the federal government, and was ultimately restored to federal recognition under the authority of 25 C.F.R. § 83.8. On behalf of the Nation, I respectfully request your confirmation of these facts. Thank you.

Respectfully Submitted,

Darin Beltran, Chairman
Koi Nation

4/28/14

Date