| | |
|---|---|
| THE KOI NATION OF NORTHERN CALIFORNIA,<br><br>     Plaintiff,<br><br>     v.<br><br>UNITED STATES DEPARTMENT OF THE INTERIOR, *et al.*,<br><br>     Defendants. | Civil Action No. 17-1718 (BAH)<br><br>Chief Judge Beryl A. Howell |

## <u>MEMORANDUM OPINION</u>

The federal government's treatment of the plaintiff, the Koi Nation of Northern California ("Koi Nation"), a landless federally recognized Indian tribe, has been marked by decades of mistreatment, including terminating and selling the tribe's reservation in 1956 and denying the tribe the special programs and services provided only to those tribes with federally recognized status. Finally, in 2000, after persistent efforts by the Koi Nation, the defendant, the United States Department of the Interior ("DOI"), acknowledged the "egregious" administrative mistake and reaffirmed the Koi Nation's status as a federally recognized tribe, without requiring the tribe to undergo a formal regulatory process to obtain the same result. In a stark example of the government giving with one hand and taking away with the other, DOI's correction of its own long-standing error is now being used by DOI as the basis to deny the Koi Nation's eligibility for an exception to a statutory prohibition on gaming on Indian land, set out in the Indian Gaming Regulatory Act ("IGRA"), 25 U.S.C. §§ 2701 *et seq.*, the law that "prescribes the conditions under which Indian tribes may engage in commercial gaming on their reservations," *City of Roseville v. Norton*, 348 F.3d 1020, 1021 (D.C. Cir. 2003).

1

The Koi Nation initiated this lawsuit to challenge DOI's decision, on January 19, 2017, to deny the tribe's eligibility for the IGRA exception, known as the "restored lands exception," 25 U.S.C. § 2719(b)(1)(B)(iii), as violative of the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701 *et seq.*, IGRA, and the Indian Reorganization Act ("IRA"), 25 U.S.C. §§ 5101 *et seq.* *See* Compl. ¶¶ 10, 82–124, ECF No. 1. Pending before the Court are the parties' cross-motions for summary judgment. *See* Pl.'s Mot. Summ. J. ("Pl.'s Mot."), ECF No. 14; Defs.' Cross-Mot. Summ. J. ("Defs.' Cross-Mot."), ECF No. 15. For the reasons explained below, the Koi Nation's motion is granted, and the defendants' motion is denied.

## I.     BACKGROUND

The Koi Nation, known until a name change in 2012 as the "Lower Lake Rancheria," is a landless, federally recognized Indian tribe headquartered in Santa Rosa, California. Administrative Record ("AR") at 1, 3, 4 (Decision Letter (Jan. 19, 2017) ("DOI 2017 Decision") at 1, 3, 4); AR at 326 n.1 (Letter from Koi Nation to DOI's Assistant Secretary of Indian Affairs (Apr. 28, 2014) ("Koi 2014 Request Letter") at 1 n.1).[1] Starting in approximately 1956, the United States improperly ignored and mistakenly treated as terminated the Koi Nation's status as a federally recognized tribe. AR at 3–4 (DOI 2017 Decision at 3–4). The Koi Nation has been without a land base or reservation since that time. AR at 3 (DOI 2017 Decision at 3).

After decades of improperly denying the Koi Nation's status as a federally recognized tribe, DOI "sought to correct its error," AR at 4 (DOI 2017 Decision at 4), and, on December 29, 2000, DOI's Assistant Secretary of Indian Affairs reaffirmed the tribe's status as a federally

---

[1]     The AR totals over 500 pages. *See generally* AR. The portions of the AR cited or otherwise relied upon in the parties' briefing have been docketed in a four-part Joint Appendix, *see* J.A., ECF Nos. 21-1–21-4, but the full AR has also been submitted to the Court, *see* Min. Order (Dec. 17, 2018) (directing submission of full AR). For clarity, AR citations are to the AR, rather than the Joint Appendix. The portions of the full AR not cited herein have been reviewed in resolving the pending motions.

recognized tribe, *id.*; *see also* AR at 291 (Letter from DOI's Assistant Secretary of Indian Affairs

Kevin Gover to Daniel Beltran, Chairman, Lower Lake Rancheria (Dec. 29, 2000) ("DOI 2000

Recognition Letter")); AR at 293 (Memorandum from DOI's Assistant Secretary of Indian

Affairs Kevin Gover to Bureau of Indian Affairs ("BIA") Regional Directors of Pacific and

Alaska Regions (Dec. 29, 2000) ("DOI 2000 Recognition Memo") at 4)*.* After reaffirmation in

2000 of the tribe's status, however, the tribe has not generated the revenues necessary to acquire

lands in California. *See* Pl.'s Mem. Supp. Mot. Summ. J. ("Pl.'s Mem.") at 5, ECF No. 14-1; *see*

*also, e.g.*, AR at 500–01 (Letter from Koi Nation to DOI's Secretary (Mar. 29, 2006) ("Koi Mar.

29, 2006 Request Letter") at 1–2). As a result, for almost fifteen years, the Koi Nation has

sought to improve the economic viability of the tribe by conducting gaming activities under

IGRA and, as a first step in this process, requesting from DOI on at least three occasions, in

2006, 2009 and 2014, a determination that the tribe qualifies for the restored lands exception,

under which certain gaming is permitted on lands taken into trust as part of "the restoration of

lands for an Indian tribe that is restored to Federal recognition." 25 U.S.C. § 2719(b)(1)(B)(iii);

*see also* AR at 500–01 (Koi Mar. 29, 2006 Request Letter at 1–2); AR at 492 (Koi Nation's 2009

Request to DOI for Restored Tribe Determination (Oct. 7, 2009) ("Koi 2009 Request") at 1); AR

at 326 (Koi 2014 Request Letter at 1).

The Koi Nation finally received a response to the tribe's multiple requests for a

determination on January 19, 2017, when DOI issued the decision challenged in this lawsuit,

concluding that the tribe is not eligible to game on lands under IGRA's restored lands exception,

in reliance on DOI's implementing regulation, codified at 25 C.F.R. § 292.10. AR at 1–2 (DOI

2017 Decision at 1–2). The Koi Nation now challenges the validity of DOI's 2017 Decision, *id.*,

and the subsection of the regulation, 25 C.F.R. § 292.10(b), on which that agency decision relies.

The Koi Nation's claims involve a complex statutory and administrative framework, as well as a lengthy history of interactions between DOI and the tribe. This context is summarized below.

## A.    STATUTORY AND REGULATORY FRAMEWORK

The parties' dispute over DOI's 2017 Decision implicates several statutes, including IGRA, the IRA, and the Federally Recognized Indian Tribe List Act of 1994 ("List Act"), and various implementing regulations, all of which are reviewed below.

### 1.    The Indian Gaming Regulatory Act (IGRA)

IGRA, 25 U.S.C. §§ 2701 *et seq.*, was enacted in 1988 "to provide a statutory basis for the operation of gaming by Indian tribes as a means of promoting tribal economic development, self-sufficiency, and strong tribal governments," *id.* § 2702(1), and, at the same time, "to shield [Indian tribes] from organized crime and other corrupting influences, to ensure that the Indian tribe is the primary beneficiary of the gaming operation, and to assure that gaming is conducted fairly and honestly by both the operator and players," *id.* § 2702(2). To these ends, IGRA established the National Indian Gaming Commission ("NIGC"), with certain enumerated powers and responsibilities. *Id.* §§ 2704–2706.

IGRA provides that Indian tribes may conduct "Class II" and "Class III" gaming activities only on eligible "Indian lands." *Id.* §§ 2710(b)(1), (d)(1). Section 20(a) of IGRA, *id.* § 2719(a), specifically makes ineligible for such activities "Indian land taken into trust by the Secretary after IGRA's effective date, October 17, 1988, unless the land borders an existing reservation or is within the last recognized reservation of a tribe that was landless at the time IGRA was enacted (unless the tribe is in Oklahoma, in which case lands bordering its former reservation are exempted as well)," *City of Roseville*, 348 F.3d at 1024 (summarizing 25 U.S.C. § 2719(a)).

This gaming prohibition in § 20(a) is subject to two categories of exceptions in § 20(b) ("Section 20 exceptions"). "The first, § 20(b)(1)(A), allows the Secretary of the Interior to override § 20(a) and permit gaming on a newly acquired parcel when, 'after consultation with the Indian tribe and appropriate State and local officials' the Secretary 'determines that a gaming establishment . . . would be in the best interest of the Indian tribe and its members, and would not be detrimental to the surrounding community, but only if the Governor of the State . . . concurs . . . .' *Id.* (quoting 25 U.S.C. § 2719(b)(1)(A)). Alternatively, "[t]he second, § 20(b)(1)(B), exempts lands taken into trust as part of the 'settlement of a land claim,' 'the initial reservation of an Indian tribe acknowledged by the Secretary,'" *id.* (quoting 25 U.S.C. §§ 2719(b)(1)(B)(i), (b)(1)(B)(ii)), or, as relevant here, "the 'restoration of lands for an Indian tribe that is restored to federal recognition,'" *id.* (quoting 25 U.S.C. § 2719(b)(1)(B)(iii)). This final exception, known as the "restored lands" exception, *see* 25 C.F.R. § 292.7, "helps ensure 'that tribes lacking reservations when [the statute] was enacted are not disadvantaged relative to more established ones,'" *Butte Cty. v. Chaudhuri* ("*Chaudhuri*"), 887 F.3d 501, 503 (D.C. Cir. 2018) (quoting *City of Roseville*, 348 F.3d at 1030).

### 2.     Relevant IGRA Implementing Regulations, 25 C.F.R. Part 292

In 2008, DOI promulgated regulations, at 25 C.F.R. § 292, to "implement section 2719 of IGRA by articulating standards that the Department will follow in interpreting the various exceptions" to IGRA's general prohibition on gaming on after-acquired lands. Final Rule, Gaming on Trust Lands Acquired After October 17, 1988, 73 Fed. Reg. 29354, 29354 (May 20, 2008) ("Section 20 Final Rule"); *see also* 25 C.F.R. § 292.1 ("This part contains procedures that the Department of the Interior will use to determine whether [IGRA's Section 20] exceptions apply."). The Part 292 regulations included implementation of IGRA's restored lands exception.

*See* 25 C.F.R. §§ 292.7–292.12 (providing DOI's procedures for implementing the restored lands exception).

Qualification for the restored lands exception involves a multi-part analysis, focusing on whether a tribe is one that is "restored to Federal recognition," and whether newly acquired lands on which that tribe seeks to conduct gaming are "restored" lands. *See* 25 C.F.R. § 292.7. Under 25 C.F.R. § 292.7, a tribe must meet four conditions to qualify for the restored lands exception: (1) "[t]he tribe at one time was federally recognized, as evidenced by its meeting the criteria in § 292.8," *id.* § 292.7(a); (2) "[t]he tribe at some later time lost its government-to-government relationship by one of the means specified in § 292.9," *id.* § 292.7(b); (3) "[a]t a time after the tribe lost its government-to-government relationship, the tribe was restored to Federal recognition by one of the means specified in § 292.10," *id.* § 292.7(c); and (4) "[t]he newly acquired lands meet the criteria of 'restored lands' in § 292.11," *id.* § 292.7(d). The defendants do not address or otherwise dispute that the Koi Nation meets the first and second conditions, and the fourth condition is not yet met because the tribe remains landless.[2] Thus, the only disputed regulatory condition at issue here is whether the Koi Nation "was restored to Federal recognition" through one of three means specified in 25 C.F.R. § 292.10. *Id.* § 292.7(c).

---

[2] Indeed, the first two requirements appear met. As to the first requirement, showing that the tribe was at one time federally recognized may be met if the "United States at one time acquired land for the tribe's benefit," or with "other evidence" demonstrating "the existence of a government-to-government relationship between the tribe and the United States." 25 C.F.R. § 292.8. The defendants concede that the United States acquired land for the Koi Nation's benefit in 1916, *see* AR at 2 (DOI 2017 Decision at 2) ("On January 25, 1916, the United States acting through [BIA] purchased a tract of approximately 141 acres that became the Tribe's Rancheria."), and further admit that the Koi Nation had a government-to-government relationship with the United States, *see, e.g.*, Defs.' Mem. Supp. Cross-Mot. Summ. J. & Opp'n Pl.'s Mot. Summ. J. ("Defs.' Opp'n") at 25, ECF No. 15-1 (referring to the Koi Nation's government-to-government relationship with the United States). As to the second requirement, a tribe may show loss of the government-to-government relationship through "[c]onsistent historical written documentation" from the United States "effectively stating that it no longer recognized a government-to-government relationship with the tribe . . . or taking action to end the government-to-government relationship." 25 C.F.R. § 292.9(b). The defendants do not contest that the federal government treated the tribe as terminated for decades and, thus, that the tribe effectively "lost its government-to-government relationship," as defined in 25 C.F.R. § 292.9(b). *See* Pl.'s Mem. at 39 (summarizing how 25 C.F.R. § 292.9 applies to the Koi Nation); *see also generally* Defs.' Opp'n.; Defs.' Reply Supp. Cross-Mot. Summ. J. ("Defs.' Reply"), ECF No. 20.

The three methods for an Indian tribe to be restored to federally recognized status to qualify for the restored lands exception in IGRA's § 20(b), are set out in 25 C.F.R. § 292.10, which provides in full:

> For a tribe to qualify as having been restored to Federal recognition for purposes of §292.7, the tribe must show at least one of the following:
> (a) Congressional enactment of legislation recognizing, acknowledging, affirming, reaffirming, or restoring the government-to-government relationship between the United States and the tribe (required for tribes terminated by Congressional action);
> (b) Recognition through the administrative Federal Acknowledgment Process under §83.8 of this chapter; or
> (c) A Federal court determination in which the United States is a party or court-approved settlement agreement entered into by the United States.

*Id.* § 292.10. These three methods of tribal recognition reflected the same methods expressly identified in "Congressional Findings" for the List Act, enacted almost fifteen years earlier. *See* 25 U.S.C. § 5130 notes (Congressional Findings ¶ 3) (providing that "Indian tribes presently may be recognized by Act of Congress; by the administrative procedures set forth in part 83 of the Code of Federal Regulations denominated 'Procedures for Establishing that an American Indian Group Exists as an Indian Tribe;' or by a decision of a United States court"). The Koi Nation challenges only the scope of the regulation's subsection (b) here.

In addition to these three methods to be "restored to Federal recognition" under § 292.10, a separate regulation, codified at § 292.26, exempts from the Part 292 regulations, which were promulgated in 2008, any earlier final agency decisions or opinions regarding the applicability of IGRA's Section 20 exceptions. *See* 25 C.F.R. § 292.26(a) (stating that the Part 292 regulations "do not alter final agency decisions made pursuant to [Section 20 of IGRA] before" the Part 292 regulations were enacted); *id.* § 292.26(b) (stating that the Part 292 regulations "shall not apply" when, before these regulations became effective, DOI or the NIGC "issued a written opinion regarding the applicability of [Section 20] for land to be used for a particular gaming

7

establishment, provided that the Department or the NIGC retains full discretion to qualify, withdraw or modify such opinions").  In other words, § 292.26 provides a "grandfather clause" for such earlier decisions or opinions and protects tribes, for which federally recognized status has been gained prior to 2008 by means other than the three methods outlined in § 292.10, from having to re-litigate their eligibility for Section 20 exceptions.

### 3.  Process for Federal Acknowledgment of Indian Tribes, 25 C.F.R. Part 83

Until 1978, the federal government's recognition of Indian tribes "proceeded in an ad hoc manner . . . with [BIA] . . . reviewing petitions for federal recognition on a case-by-case basis." *Mackinac Tribe v. Jewell*, 829 F.3d 754, 756 (D.C. Cir. 2016).  An "increase" in the number of groups requesting tribal recognition in the 1970s "necessitat[ed]" a "uniform approach."  Final Rule, Procedures for Establishing That an American Indian Group Exists as an Indian Tribe, 43 Fed. Reg. 39361, 39361 (Aug. 24, 1978).  To this end, DOI promulgated the Procedures for Federal Acknowledgment of Indian Tribes, now codified at 25 C.F.R. § 83, which provided a "Process for Federal Acknowledgment," including "procedures through which Indian groups could seek formal recognition."  *Mackinac Tribe*, 829 F.3d at 756.[3]  A positive determination under Part 83 "will result in Federal recognition status and the petitioner's addition to the Department's list of federally recognized Indian tribes."  25 C.F.R. § 83.2.  Once on that list, the tribe is "eligible for the special programs and services provided by the United States to Indians because of their status as Indians."  List Act, 25 U.S.C. § 5131(a); *see also id.* § 5130 notes (Congressional Findings ¶ 3).

---

[3]　　The Procedures for Federal Acknowledgment of Indian Tribes, currently codified at 25 C.F.R. § 83, were initially codified at 25 C.F.R. § 54, 43 Fed. Reg. 39361 (Sept. 5, 1978), and revised in 1994, 59 Fed. Reg. 9280 (Feb. 25, 1994), and again in 2015, 80 Fed. Reg. 37862 (July l, 2015).

As the D.C. Circuit has summarized, "[a] group seeking recognition under Part 83 must submit a petition to Interior documenting certain criteria, including whether it has been identified as an American Indian entity on a 'substantially continuous basis' since 1900; whether it comprises a 'distinct community;' whether it has historically maintained 'political influence or authority over its members;' and whether its membership 'consists of individuals who descend from a historical Indian tribe.'" *Mackinac Tribe*, 829 F.3d at 756 (quoting 25 C.F.R. § 83.11(a)–(c), (e)).  A tribe, for which federal recognition has been terminated that seeks to regain federally recognized status administratively, must follow the Part 83 Federal acknowledgment process to obtain recognition, *id.* at 757, but is entitled to "separate fast tracking provisions," with relaxed requirements for obtaining federal recognition, *Burt Lake Band of Ottawa & Chippewa Indians v. Norton*, 217 F. Supp. 2d 76, 79 (D.D.C. 2002); *see also* 25 C.F.R. § 83.12 (previously codified at 25 C.F.R. § 83.8).

For eligibility under IGRA's restored lands exception, as implemented in 25 C.F.R. § 292.10(b), a previously terminated tribe may seek recognition administratively, using the Federal acknowledgment process provided under 25 C.F.R. § 83, to satisfy the third condition, under *id.* § 292.7, that the tribe "was restored to Federal recognition by one of the means specified in § 292.10."

### 4. Federally Recognized Indian Tribe List Act of 1994 (List Act)

The List Act requires the Secretary to publish annually in the Federal Register a list of federally recognized Indian tribes.  *See* 25 U.S.C. §§ 5130, 5131.[4]  As noted, a congressional finding accompanying the List Act describes three avenues for inclusion on the list of federally recognized tribes, *id.* § 5130 notes (Congressional Findings ¶ 3), which methods of federal

---

[4] The List Act's requirement that the Secretary annually publish a list of federally recognized tribes was originally codified at 25 U.S.C. § 479a-1(a), and subsequently re-codified at 25 U.S.C. § 5131(a).

recognition are the same three routes included in the regulatory definition for "restored to Federal recognition," in 25 C.F.R. § 292.10.

These same congressional findings further state that "Congress has expressly repudiated the policy of terminating recognized Indian tribes," 25 U.S.C. § 5130 notes (Congressional Findings ¶ 5), and task the Secretary "with the responsibility of keeping a list of all federally recognized tribes," *id*. (Congressional Findings ¶ 6), which list "should be accurate, regularly updated, and regularly published," *id*. (Congressional Findings ¶ 7). Congress stressed the need for accuracy in the Federal Register list of federally recognized tribes "since it is used by the various departments and agencies of the United States to determine the eligibility of certain groups to receive services from the United States." *Id*.; *see also id*. (Congressional Findings ¶ 8) (finding that the list "should reflect all of the federally recognized Indian tribes in the United States which are eligible for the special programs and services provided by the United States to Indians because of their status as Indians").

The Secretary's list failed to include the Koi Nation as a federally recognized tribe until 2000, with issuance by DOI's Assistant Secretary of Indian Affairs of the DOI 2000 Recognition Memo. AR at 4 (DOI 2017 Decision at 4).

### 5. The Indian Reorganization Act (IRA)

The IRA, enacted in 1934, "marked a shift away 'from assimilation policies and toward more tolerance and respect for traditional aspects of Indian culture,'" *United States v. Jicarilla Apache Nation*, 564 U.S. 162, 180 n.8 (2011) (citation omitted), and a return to "principles of tribal self-determination and self-governance" for Indian tribes, *Cty. of Yakima v. Confederated Tribes & Bands of the Yakima Indian Nation*, 502 U.S. 251, 255 (1992). To further these goals, Congress authorized DOI to purchase land to take into trust for tribes, 25 U.S.C. § 5108, and for

tribes to reorganize, *id.* § 5123, and even form corporate entities in certain circumstances, *id.* § 5124.

The IRA was amended in 1994, the same year as enactment of the List Act. In recognition of the sovereignty of federally recognized tribes, the IRA amendments expressly granted federally recognized tribes privileges and immunities, including from application of certain administrative regulations and decisions. *See* Act to Make Certain Technical Corrections, Pub. L. No. 103-263, § 5(b), 108 Stat. 707, 709 (1994) (now codified at 25 U.S.C. § 5123(f)–(g)).[5] As relevant here, the Koi Nation invokes the provision, set out in 25 U.S.C. § 5123(f), that prohibits the issuance of any federal administrative regulations, decisions, or determinations after May 31, 1994 "with respect to a federally recognized Indian tribe that classifies, enhances, or diminishes the privileges and immunities available to the Indian tribe relative to other federally recognized tribes by virtue of their status as Indian tribes."

### B.    FACTUAL BACKGROUND

The Koi Nation is a federally recognized Indian tribe with origins tracing back to the Village of Koi, located on an island in Clear Lake, California. AR at 1–2, 4 (DOI 2017 Decision at 1–2, 4). On January 25, 1916, the United States, acting through BIA, purchased an approximately 141-acre tract of land in Lake County, California, which became the Koi Nation's Rancheria. AR at 2 (DOI 2017 Decision at 2). Subsequently, on June 5, 1935, BIA "certified a list of twenty Rancheria residents eligible to vote in elections conducted pursuant to the Indian Reorganization Act." *Id.* Despite this federal recognition of the tribe, over the next sixty-five years, the federal government sold off the Koi Nation's land and treated the tribe as if it no longer existed, as described in more detail below.

---

[5]    25 U.S.C. § 5123 was previously codified at 25 U.S.C. § 476.

### 1. The Sale of the Koi Nation's Rancheria

In 1951, the Lake County, California Board of Supervisors "contacted . . . BIA about the possibility of acquiring the Rancheria for use as a municipal airport." *Id.* BIA advised the Board of Supervisors that any purchase of the Rancheria, in whole or in part, required Congress's approval. *Id.* Thereafter, on March 29, 1956, Congress enacted legislation to authorize the transfer of the Rancheria to Lake County, with certain amendments enacted on July 20, 1956. AR at 2–3 (DOI 2017 Decision at 2–3). These acts, which together are known as the "Lower Lake Act," authorized the Secretary to "complete the sale of the Rancheria to Lake County" and, ever since, the Koi Nation "has been without a land base." AR at 3 (DOI 2017 Decision at 3).

Two years later, in 1958, Congress passed the Rancheria Act, authorizing "the Secretary to begin the process of terminating the government-to-government relationship between the United States and several named tribes, and of selling those tribes' lands and distributing the proceeds of those sales to the tribes' members." *Id.* DOI immediately began publishing notices of termination in the Federal Register, and many terminated tribes filed lawsuits against the United States challenging DOI's compliance with the Rancheria Act. *Id.* Many of those cases were resolved through court-approved settlements. *Id.*

### 2. The Koi Nation's Treatment as a Terminated Tribe

Neither the Lower Lake Act nor the Rancheria Act addressed or authorized termination of the Koi Nation's status as a federally recognized Indian tribe. *See id.* ("[T]he Tribe was not among those named in the Rancheria Act, and . . . nothing in the Lower Lake Act effectuated – or even suggested – a termination of the Tribe."). The United States, however, treated the Koi Nation "as if it had been terminated from approximately the time of the Lower Lake Act's enactment" in 1956. AR at 2–3 (DOI 2017 Decision at 2–3).

Indeed, BIA repeatedly referred to the Koi Nation's status as a tribe whose federal recognition had been terminated. For example, in a February 1, 1975 publication, BIA's Division of Law Enforcement Services listed the Koi Nation, then known as the Lower Lake Rancheria, as "terminated" pursuant to the Lower Lake Act. *See* AR at 89–90, 93–94 (Indian Law Enforcement History, BIA Division of Law Enforcement Services (Feb. 1, 1975) ("BIA 1975 Law Enforcement Manual") at 1–2, 60–61) (listing "Lower Lake" as a tribe terminated in 1956 under the Lower Lake Act); *see also* AR at 3 & n.22 (DOI 2017 Decision at 3 & n.22). Similarly, on October 21, 1980, a BIA official sought approval from the Acting Director of BIA's Sacramento Area Office to place the Koi Nation on the Federal Register list of federally recognized tribes and added that such approval should "include [the] date restored." AR at 377 (Memorandum from BIA Sacramento Area Office (Oct. 31, 1980) ("BIA 1980 Memo")); AR at 396 (NIGC Decision and Order (Oct. 7, 2008) ("NIGC 2008 Decision") at 3). BIA, however, declined to include the Koi Nation on the Federal Register list of federally recognized tribes. *See* AR at 377–79 (BIA 1980 Memo).[6] Additionally, BIA, on November 20, 1995, denied the Koi Nation's application for tribal government grant funding because the Koi Nation did "not appear in the February 16, 1995 Federal Register List of Indian entities recognized and eligible to receive services from" BIA. AR at 95 (Letter from DOI to Dino Beltran, Chairman, Koi Nation of the Lower Lake Rancheria (Nov. 20, 1995) ("DOI 1995 Letter")); *see also* AR at 3 (DOI 2017 Decision at 3). Likewise, the United States Department of Housing and Urban Development, on December 18, 1995, declined to provide services to the Koi Nation because it was "not

---

[6]     DOI began publishing a list of federally recognized Indian tribes approximately every three years beginning in 1979, *see, e.g.*, Indian Tribal Entities That Have a Government-to-Government Relationship with the United States, 44 Fed. Reg. 7235 (Feb. 6, 1979), and has published the list annually since enactment of the List Act in 1994. *See Muwekma Ohlone Tribe v. Salazar* ("*Muwekma*"), 708 F.3d 209, 212 (D.C. Cir. 2013).

recognized as an Indian tribe." *See* AR at 398 (NIGC 2008 Decision at 5). The United States'

treatment of the Koi Nation as a terminated tribe for nearly five decades meant that the tribe

could not establish a reservation or ask for lands to be acquired in trust by the time Congress

enacted IGRA in 1988. *See* AR at 3 (DOI 2017 Decision at 3).

### 3. The Koi Nation's Reaffirmation as a Federally Recognized Tribe

The Advisory Council on California Indian Policy, on behalf of the Koi Nation, wrote to

the Assistant Secretary of Indian Affairs, on June 21, 1995, to "confirm the federally recognized

status" of the Koi Nation. AR at 313 (Letter from Advisory Council on California Indian Policy

to DOI's Assistant Secretary of Indian Affairs, Ada Deer (June 21, 1995) ("California Council

1995 Letter") at 1). In this letter**,** the Advisory Council explained that the Koi Nation qualified

for administrative recognition, under 25 C.F.R. § 83's Federal acknowledgment process for

tribes with previous federal recognition. AR at 313–19 (California Council 1995 Letter at 1–7);

*see also* AR at 4 (DOI 2017 Decision at 4).

In October and, again, in November 1999, BIA representatives met with the Koi Nation

regarding an initiative by DOI's Assistant Secretary of Indian Affairs "to pursue the legislative

restoration of a number of tribes presently viewed as terminated." AR at 82 (Memorandum from

Superintendent, BIA's Central California Agency, to BIA's Regional Director, Pacific Region

(Sept. 14, 2000) ("BIA 2000 Recommendation Memo")); AR at 291 (DOI 2000 Recognition

Letter). In BIA's view, these meetings resulted in an "understanding" among the attendees that

if additional research "suggest[ed]" the Koi Nation "should not be presently considered as

terminated, administrative reaffirmation of the Tribe's federal recognition would be sought." AR

at 83 (BIA 2000 Recommendation Memo). Just under a year later, on September 14, 2000,

BIA's Central California Agency analyzed the Koi Nation's history, questioned the Koi Nation's

treatment as a terminated tribe since "the effect of the Lower Lake Act was not to terminate" the

Koi Nation, and recommended reaffirmation of the tribe's recognized status, which had been improperly ignored. *See* AR at 82–88 (BIA 2000 Recommendation Memo).

On December 29, 2000, DOI's Assistant Secretary of Indian Affairs, Kevin Gover, issued a letter to the Koi Nation, which "follow[ed] up" on the Fall 1999 meetings. *See* AR at 291 (DOI 2000 Recognition Letter). After acknowledging "the long-standing and unfortunate omission" of the Koi Nation "from recognition and services" by BIA following the Lower Lake Act and Rancheria Act, DOI's Assistant Secretary of Indian Affairs "reaffirm[ed] the Federal recognition" of the Koi Nation and directed that the Koi Nation be included on the Secretary's list of federally recognized tribes. *Id.*

On the same day, DOI's Assistant Secretary of Indian Affairs also issued an internal memorandum discussing reaffirmation of the federally recognized status of the Koi Nation and two other Indian tribes. AR at 293 (DOI 2000 Recognition Memo at 4). This memorandum explained that the three tribes were not "required to go through the Federal acknowledgment process outlined in" 25 C.F.R. § 83 "because their government-to-government relationship continued." *Id.* Specifically, the memorandum pointed out that the "acknowledgment regulation does not apply to Indian tribes whose government-to-government relationship was never severed." *Id.* Rather, the Part 83 regulation "provides a process for tribes to seek recognition when the tribe has yet to establish such a government-to-government relationship, when a previously existing government-to-government relationship has lapsed, or when the government-to-government relationship was terminated through an administrative process." *Id.* In the Koi Nation's case, the tribe was "never administratively terminated nor were [its] relations with the United States broken." *Id.* DOI has characterized this agency finding, in December 2000, that the Part 83 Federal acknowledgment process is not available or applicable to the Koi Nation, as

an "implicit waiver" of the Part 83 regulations as to this tribe. *See* Defs.' Opp'n at 23 (stating "Interior does not dispute that it impliedly waived the Part 83 regulations for Plaintiff in 2000 for the purposes of putting Koi on the list of federally recognized tribes," and asserting the Part 83 regulations therefore "did not apply" to the Koi Nation); Defs.' Reply at 13–14 (conceding that "Interior waived the Part 83 regulations for Plaintiff" and agency's view that the Part 83 process is not available to the Koi Nation); *accord Muwekma*, 708 F.3d at 216 (explaining DOI "exercised its broad authority" to reaffirm the Koi Nation, quoting 25 C.F.R. § 1.2, which "authoriz[es] exception to Part 83 process 'in all cases where permitted by law and the Secretary finds that such waiver or exception is in the best interest of the Indians'").

The memorandum conceded that, even though the Koi Nation's "tribal status [has] been continuously maintained by the tribal members," AR at 295 (DOI 2000 Recognition Memo at 6), "for reasons not clearly understood, [the Tribe was] simply ignored as the BIA went through fundamental organization and philosophical changes," and "an administrative error by the [BIA] occurred in the initial failure to place the tribe[] on the Federal Register List of entities recognized and eligible to receive services from the [BIA]," AR at 293 (DOI 2000 Recognition Memo at 4). Having identified the "egregious oversight" and "unfortunate part of the Bureau's legacy," the memorandum concluded that the error "must be corrected" and the tribe's "rightful existence must now be reaffirmed." *Id*. Thus, the "Department's 2000 reaffirmation decision was intended to rectify a past wrong, without litigation or utilizing the Part 83 acknowledgement process." AR at 6 (DOI 2017 Decision at 6).

### 4. The Koi Nation's 2006 and 2008 Unsuccessful Requests for a "Restored Tribe" Determination

After achieving formal recognition again in 2000, almost eight years prior to the promulgation in 2008 of the challenged regulation, 25 C.F.R. § 292.10(b), the Koi Nation

requested in 2006 that the Secretary make a determination that the tribe was "restored to Federal recognition," under 25 U.S.C. § 2719(b)(1)(B)(iii), and therefore eligible for IGRA's restored lands exception to engage in gaming activities on lands that could be put in trust by the United States for the tribe. AR at 500–01 (Koi Mar. 29, 2006 Request Letter at 1–2). The defendants do not dispute that the Koi Nation received no response from DOI about this request. *See* Pl.'s Mem. at 18 (stating "[t]he record does not contain a response by DOI"); Pl.'s Reply Supp. Pl.'s Mot. Summ. J. & Opp'n Defs.' Cross-Mot. Summ. J. ("Pl.'s Opp'n") at 6, ECF No. 18 ("Defendants have not provided any evidence in the [AR] that this 2006 request was answered in a timely manner or at all."); Defs.' Reply at 2 (leaving uncontested that DOI never responded to the tribe's 2006 request). Apparently, the agency simply ignored this request for a determination of the tribe's eligibility under IGRA's Section 20 exceptions. Such a determination would likely have protected the tribe under the "grandfather" clause of 25 C.F.R. § 292.26, from application of the challenged regulation, *id*. § 292.10(b), altogether.

While the 2006 request was pending before the Secretary, on March 17, 2008, the Koi Nation sought approval from NIGC for a gaming ordinance, AR at 394 (NIGC 2008 Decision at 1), which is a necessary approval before a tribe may open a gaming operation on land regulated under IGRA, *see* 25 U.S.C. §§ 2710(b)(1)(B), (d)(1)(A)(iii). The Koi Nation based the request for a gaming ordinance on the tribe being "a *restored tribe* within the meaning of 25 U.S.C. § 2719(b)(1)(B)(iii)," AR at 394 (NIGC 2008 Decision at 1) (emphasis in original), "[a]s a precautionary measure against" publication of a rule that might exclude the tribe from qualifying as a restored tribe, AR at 493 (Koi 2009 Request at 2). NIGC's chairman disapproved the ordinance on June 13, 2008. AR at 414 (NIGC 2008 Decision at 21).

The Koi Nation administratively appealed that disapproval, AR at 394 (NIGC 2008 Decision at 1), but on October 7, 2008, the full Commission affirmed the Chairman's disapproval, AR at 414 (NIGC 2008 Decision at 21). Although the Koi Nation's "case arouse[d] the Commission's sympathy," NIGC rejected the Koi Nation's gaming ordinance both because the tribe was landless and because DOI's December 2000 finding that the tribe was not terminated meant the tribe was not "restored within the meaning of IGRA because it was never terminated." AR at 395, 401–02, 405–14 (NIGC 2008 Decision at 2, 8–9, 12–21).

### 5. DOI's 2008 Promulgation of IGRA Part 292 Regulations

BIA published a notice of proposed rulemaking, on October 5, 2006, "to establish procedures that an Indian tribe must follow in seeking to conduct gaming on lands acquired after October 17, 1988." Notice of Proposed Rulemaking, 71 Fed. Reg. 58769, 58769 (Oct. 5, 2006) ("BIA NPRM").[7] The proposed new rule was intended to "address not only the exception contained in [§ 2719(b)(1)(A) of IGRA], but also the other exceptions contained in [Section 20], in order to explain to the public how the Department interprets these exceptions." 73 Fed. Reg. at 29354 (Section 20 Final Rule). After extensions, the comment period closed on February 1, 2007. *See* 71 Fed. Reg. at 58769 (BIA NPRM) (ending initial comment period on December 4, 2006); Extension of Comment Period and Correction for Proposed Rule, 71 Fed. Reg. 70335, 70335 (Dec. 4, 2006) (extending comment period until December 19, 2006); Reopening of Comment Period for Proposed Rule, 72 Fed. Reg. 1954, 1954 (Jan. 17, 2007) (reopening comment period until February 1, 2007).

---

[7] BIA had made an earlier effort, in 2000, with a proposed rule to establish "procedures that an Indian tribe must follow in seeking a Secretarial determination [under [§ 2719(b)(1)(A) of IGRA] that a gaming establishment would be in the best interest of the Indian tribe and its members and would not be detrimental to the surrounding community," Notice of Proposed Rulemaking, 65 Fed. Reg. 55471 (Sept. 14, 2000), but no final rule resulted.

The Koi Nation timely provided comments, criticizing the description of how tribes

"qualify as having been restored to Federal recognition," in the proposed 25 C.F.R. § 292.10, as

"unfairly limiting the tribes to whom this exception is available."  AR at 451 (Letter from Koi

Nation's counsel to BIA Office of Indian Gaming Management (Feb. 1, 2007) ("Koi 2007

Comments") at 7).  Although the proposed regulation provided for "'restoration' through the

legislative process, the judicial process and through the executive branch," the Koi Nation

pointed out that the regulation "unfairly limits executive action to recognition gained through the

Federal Acknowledgement Process."  *Id*.  To address this deficiency, the Koi Nation proposed

that the regulation "should also include Executive Branch action to restore tribes to recognition

by means other than the Federal Acknowledgment Process," specifying "restoration by the

Secretary of the Interior or his/her designees."  *Id*.  The tribe emphasized that "[w]hile the

number of tribes who have been restored to recognition in this manner is very small . . . , they

should not be penalized because the Secretary used his/her discretion to recognize them by

means other than the procedures."  *Id*.

DOI rejected the Koi Nation's proposal to expand the methods of administrative

recognition for a tribe to qualify for the restored lands exception for two reasons.  *See* 73 Fed.

Reg. at 29363 (Section 20 Final Rule).  Noting that "[n]either the express language of IGRA nor

its legislative history defines restored tribe," DOI stated its view that, first, "Congress did not

intend to include" in IGRA's restored lands exception tribes that received administrative

recognition based on "pre-1979 ad hoc determination[s]," because when enacting IGRA in 1988,

"Congress clearly understood the part 83 process."  *Id*.  Congress, in fact, referenced tribes

"acknowledged through the part 83 process," *id*., in a Section 20 exception, albeit a different one

than the restored lands exception, *see* 25 U.S.C. § 2719(b)(1)(B)(ii) (providing exception to

IGRA's prohibition of gaming on after-acquired lands when lands are taken into trust as part of "the initial reservation of an Indian tribe acknowledged by the Secretary under the Federal acknowledgment process"). Further, DOI noted that "[t]he part 83 regulations were adopted in 1978," prior to IGRA's enactment in 1988, to end DOI's "ad hoc determinations of tribal status" and to create "a uniform process for making such determinations in the future." 73 Fed. Reg. at 29363 (Section 20 Final Rule). In view of Congress's understanding of the Part 83 Federal acknowledgment process and the purpose behind it, DOI reached the conclusion that Congress sought to make that process the exclusive avenue for administrative recognition that could qualify a tribe for IGRA's restored lands exception. *Id.*

Second, DOI found confirmation of this conclusion in the List Act, which was enacted in 1994 and "identified only the part 83 procedures as the process for administrative recognition." *Id.* With respect to "past reaffirmations," these reaffirmations "were done to correct particular errors," and "[o]mitting any other avenues of administrative acknowledgment is consistent with the notes accompanying the List Act that reference only the part 83 regulatory process as the applicable administrative process." *Id.* Thus, DOI reiterated the conclusion that "[t]he only acceptable means under the regulations for qualifying as a restored tribe under IGRA are by Congressional enactment, recognition through the Federal acknowledgment process under 25 CFR 83.8, or Federal court determination in which the United States is a party and concerning actions by the U.S. purporting to terminate the relationship or a court-approved settlement agreement entered into by the United States concerning the effect of purported termination actions." *Id.*

On May 20, 2008, BIA published the Final Rule implementing IGRA's Section 20 exceptions to the statutory prohibition on Indian tribe gaming activities on lands acquired after

October 17, 1988. 73 Fed. Reg. at 29354. These regulations, codified at 25 C.F.R. § 292, became effective on August 25, 2008. Correction to and Stay of Effective Date, 73 Fed. Reg. 35579, 35579–80 (June 24, 2008) (staying effective date of Section 20 Final Rule until August 25, 2008).

> **6.** **Koi Nation's Efforts for Formal Determination As Restored Tribe Under the Part 292 Regulations, Leading to Challenged DOI 2017 Decision**

After promulgation of the 2008 regulations at 25 C.F.R. § 292, the Koi Nation continued its efforts to obtain a formal determination to be a restored tribe. *See* AR at 491–99 (Koi 2009 Request at 1–8). For example, in 2009, the Koi Nation submitted to DOI a "request for restored tribe determination" that would provide a "formal determination" that the tribe was restored to federal recognition for purposes of IGRA's restored lands exception, AR at 492 (Koi 2009 Request at 1) (capitalization omitted), based on DOI's reaffirmation of the tribe's recognition in 2000, *id.*; *see also* AR at 291 (DOI 2000 Recognition Letter). The Koi Nation's efforts produced a positive recommendation from a BIA Regional Office on December 23, 2010, when the Director of BIA's Pacific Region issued a memorandum to DOI's Assistant Secretary of Indian Affairs, with a "request" to consider the Koi Nation a restored tribe. AR at 386 (Memorandum from BIA Regional Director to DOI's Assistant Secretary (Dec. 23, 2010)). The basis for the recommendation was explained as follows: "Consistent with case law and our relationship with the [Koi Nation] we believe that they should be considered a 'restored tribe' under Section 20 of [IGRA]. Documentation shows that the United States for all intensive [sic] purposes considered [the Koi Nation] terminated until they were restored to recognition." *Id.* The Regional Director's request and recommendation, however, was never ratified. *See* Pl.'s Mem. at 20; Defs.' Reply at 15.

On April 28, 2014, the Koi Nation submitted another request, this time to the Assistant Secretary of Indian Affairs, for a determination that the tribe qualified as a "restored tribe" for purposes of IGRA and this statute's implementing Part 292 regulations. AR at 326–36 (Koi 2014 Request Letter at 1–11). The Koi Nation supplemented this request with additional letters and supporting documents in December 2014, January 2016, July 2016, September 2016, and December 2016, all of which DOI treated as part of the Koi Nation's initial April 2014 request. *See* AR at 1 n.2 (DOI 2017 Decision at 1 n.2).

On January 19, 2017, DOI issued the challenged decision denying the Koi Nation's April 2014 request for a determination that it is "an Indian tribe that is restored to Federal recognition" for purposes of IGRA, as that exception is defined by the Part 292 regulations, 25 C.F.R. § 292. AR at 1–7 (DOI 2017 Decision at 1–7). DOI reasoned that "[t]he Department's regulations constrain the restored tribe exception to those tribes which were acknowledged through the part 83 process, a court, or by Congress only," and the Koi Nation was not acknowledged in any of those three ways. AR at 5–6 (DOI 2017 Decision at 5–6). Thus, DOI concluded that the Koi Nation's reaffirmation in 2000 did not satisfy 25 C.F.R. § 292.10(b), which regulation defines how a tribe may become restored to federal recognition through administrative action. AR at 1, 6 (DOI 2017 Decision at 1, 6).

## C.    PROCEDURAL HISTORY

The Koi Nation filed its Complaint asserting four claims, on August 23, 2017, seeking declaratory and injunctive relief, against DOI, as well as DOI's Secretary and Acting Assistant Secretary for Indian Affairs, in their official capacities (collectively, the "defendants"). Compl. at 1. The Koi Nation alleges, first, that it constitutes a tribe "restored to Federal recognition" under IGRA's restored lands exception, and that DOI "invalidly narrowed" the definition of "restored to Federal recognition" in promulgating 25 C.F.R. § 292.10(b) and applying this

regulation to the Koi Nation. *Id.* ¶¶ 82–98 (Count I). The tribe next claims that 25 C.F.R. § 292.10(b) is invalid because the regulation "unlawfully diminish[es] the Koi Nation's privileges and immunities relative to other federally recognized Indian tribes," in violation of 25 U.S.C. § 5123(f), the IRA's privileges and immunities clause. *Id.* ¶¶ 99–109 (Count II). Even if 25 C.F.R. § 292.10(b) is valid, the Koi Nation further claims that the government's application of this regulation to the tribe violates the IRA's privileges and immunities clause by "draw[ing] an arbitrary distinction between the Koi Nation and similarly situated Indian tribes, which is not based on the factual circumstances surrounding the Koi Nation's relationship with the United States, but is instead based upon the date the Defendants promulgated the Part 292 Regulations." *Id.* ¶¶ 110–16 (Count III). Finally, the Koi Nation claims that DOI's "conclusion regarding the Koi Nation's status under § 292.10 was arbitrary, capricious, and not in accordance with the law" under the APA. *Id.* ¶¶ 117–24 (Count IV).

To remedy these alleged violations, the Koi Nation seeks to set aside DOI's 2017 Decision and a declaration that the tribe "qualifies as an Indian tribe 'restored to federal recognition' under IGRA, pursuant to 25 U.S.C. § 2719," Compl. ¶¶ 1, 4, as well as invalidation of a subsection of the implementing regulation, 25 C.F.R. § 292.10(b), to the extent that the regulation excludes from eligibility for IGRA's restored lands exception tribes administratively determined to be recognized outside the formal Part 83 Federal acknowledgement process, Compl. ¶ 2; *see also* Pl.'s Mem. at 11; Pl.'s Opp'n at 9–13.[8]

After certifying the AR, *see* Notice of Lodging AR, ECF No. 12; Joint Status Report and Proposed Briefing Schedule, ECF No. 13 (notifying the Court that the parties agreed to the

_____

[8] Thus, the Koi Nation "do[es] not seek a new 25 C.F.R. § 292.10 rulemaking" altogether. Pl.'s Mem. at 32. Nor does the tribe seek to remove the eligibility criteria set out in "[t]he specific subsections (a), (b) and (c) in Section 292.10," *id.*, but only to expand the regulation's scope, without diminishing the current criteria.

contents of the AR, as supplemented by the Koi Nation), the parties filed their cross-motions for summary judgment, which are now ripe for resolution.

## II.   LEGAL STANDARD

### A.   SUMMARY JUDGMENT

Pursuant to Federal Rule of Civil Procedure 56, summary judgment may be granted when the court finds, based on the pleadings, depositions, affidavits, and other factual materials in the record, "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a), (c); *see also Tolan v. Cotton*, 572 U.S. 650, 656–57 (2014) (per curiam); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986).  "A genuine issue of material fact exists if the evidence, 'viewed in a light most favorable to the nonmoving party,' could support a reasonable jury's verdict for the non-moving party." *Muwekma*, 708 F.3d at 215 (quoting *McCready v. Nicholson*, 465 F.3d 1, 7 (D.C. Cir. 2006)).

In APA cases such as this one, involving cross-motions for summary judgment, "the district judge sits as an appellate tribunal.  The 'entire case' on review is a question of law."  *Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1083 (D.C. Cir. 2001) (footnote omitted) (collecting cases).  Thus, this Court need not and ought not engage in lengthy fact finding, since "[g]enerally speaking, district courts reviewing agency action under the APA's arbitrary and capricious standard do not resolve factual issues, but operate instead as appellate courts resolving legal questions."  *James Madison Ltd. v. Ludwig*, 82 F.3d 1085, 1096 (D.C. Cir. 1996); *see also Lacson v. U.S. Dep't of Homeland Sec.*, 726 F.3d 170, 171 (D.C. Cir. 2013) (noting in an APA case that "determining the facts is generally the agency's responsibility, not ours").  As a general rule, judicial review is limited to the administrative record, since "[i]t is black-letter administrative law that in an [APA] case, a reviewing court should have before it neither more nor less information than did the agency when it made its decision."  *CTS Corp. v. EPA*, 759

F.3d 52, 64 (D.C. Cir. 2014) (internal quotation marks and citation omitted); *see also* 5 U.S.C. § 706 ("[T]he court shall review the whole record or those parts of it cited by a party . . . ."); *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 743 (1985) (noting that when applying arbitrary and capricious standard under the APA, "[t]he focal point for judicial review should be the administrative record already in existence . . . ." (quoting *Camp v. Pitts*, 411 U.S. 138, 142 (1973))).

### B.   ADMINISTRATIVE PROCEDURE ACT

Under the APA, a reviewing court must set aside a challenged agency action that is found to be, *inter alia*, "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A); "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," *id.* § 706(2)(C); or "without observance of procedure required by law," *id.* § 706(2)(D); *see also Otis Elevator Co. v. Sec'y of Labor*, 762 F.3d 116, 120–21 (D.C. Cir. 2014) (citing *Fabi Constr. Co. v. Sec'y of Labor*, 370 F.3d 29, 33 (D.C. Cir. 2004)). The arbitrary or capricious provision, under § 706(2)(A), "is a catchall, picking up administrative misconduct not covered by the other more specific paragraphs" of the APA. *Ass'n of Data Processing Serv. Orgs., Inc. v. Bd. of Governors of Fed. Reserve Sys.*, 745 F.2d 677, 683 (D.C. Cir. 1984) (Scalia, J.).

To pass arbitrary and capricious muster, "the agency must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.* ("*State Farm*"), 463 U.S. 29, 43 (1983) (internal quotation marks and citation omitted). As the D.C. Circuit has explained, a party challenging an agency action as arbitrary and capricious "must show the agency action is not a product of reasoned decisionmaking." *Van Hollen, Jr. v. FEC*, 811 F.3d 486, 495 (D.C. Cir. 2016). "This is 'a heavy burden,' since *State Farm* entails a

'very deferential scope of review' that forbids a court from 'substitut[ing] its judgment for that of the agency.'" *Id.* (quoting *Transmission Access Policy Study Grp. v. FERC*, 225 F.3d 667, 714 (D.C. Cir. 2000)); *see also Judulang v. Holder*, 565 U.S. 42, 52–53 (2011) (same); *Fogo De Chao (Holdings) Inc. v. U.S. Dep't of Homeland Sec.*, 769 F.3d 1127, 1135 (D.C. Cir. 2014) (same). Particularly when "an agency has acted in an area in which it has 'special expertise,' the court must be particularly deferential to [the agency's] determinations." *Sara Lee Corp. v. Am. Bakers Ass'n Ret. Plan*, 512 F. Supp. 2d 32, 37 (D.D.C. 2007) (quoting *Bldg. & Constr. Trades Dep't, AFL-CIO v. Brock*, 838 F.2d 1258, 1266 (D.C. Cir. 1988)). That said, "courts retain a role, and an important one, in ensuring that agencies have engaged in reasoned decisionmaking." *Judulang*, 565 U.S. at 53. Simply put, "the agency must explain why it decided to act as it did." *Butte Cty. v. Hogen*, 613 F.3d 190, 194 (D.C. Cir. 2010).

The D.C. Circuit has summarized the circumstances under which an agency action would normally be "arbitrary and capricious" to include "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Pharm. Research & Mfrs. of Am. v. FTC*, 790 F.3d 198, 209 (D.C. Cir. 2015) (quoting *State Farm*, 463 U.S. at 43). Thus, when an agency "has failed to provide a reasoned explanation, or where the record belies the agency's conclusion, [the court] must undo its action." *Cty. of L.A. v. Shalala,* 192 F.3d 1005, 1021 (D.C. Cir. 1999) (quoting *BellSouth Corp. v. FCC*, 162 F.3d 1215, 1222 (D.C. Cir. 1999)); *see also Select Specialty Hosp.-Bloomington, Inc. v. Burwell*, 757 F.3d 308, 312 (D.C. Cir. 2014) (noting that when "an agency's failure to state its reasoning or to adopt an intelligible decisional standard is [ ] glaring [ ] we can declare

with confidence that the agency action was arbitrary and capricious" (quoting *Checkosky v. SEC*, 23 F.3d 452, 463 (D.C. Cir. 1994))); *Amerijet Int'l, Inc. v. Pistole*, 753 F.3d 1343, 1350 (D.C. Cir. 2014) ("[A] fundamental requirement of administrative law is that an agency set forth its reasons for decision; an agency's failure to do so constitutes arbitrary and capricious agency action." (internal quotation marks omitted)). "[C]onclusory statements will not do; an agency's statement must be one of *reasoning*." *Amerijet Int'l*, 753 F.3d at 1350 (emphasis in original) (internal quotation marks omitted).

## III. DISCUSSION

The Koi Nation contends that the defendants violated the APA, as alleged in Count IV of the Complaint, by (1) invalidly narrowing IGRA's restored lands exception in 25 C.F.R. § 292.10(b), which consequently was improperly applied to the tribe, Compl. ¶¶ 82–98, 117; (2) treating the Koi Nation differently than similarly situated tribes, contrary to 25 U.S.C. § 5123(f)'s prohibition against diminishing the tribe's privileges and immunities relative to other federally recognized tribes, *id.* ¶¶ 99–116, 117; and (3) insufficiently explaining DOI's interpretation of the restored lands exception, *id.* ¶¶ 104, 108, 117. *See* Pl.'s Opp'n at 9 (clarifying that all claims are brought under the APA).[9] Before turning to the merits of the Koi Nation's claims, the defendants' threshold jurisdictional challenges to these claims as not ripe and untimely under the applicable statute of limitations are addressed.

---

[9] The Koi Nation also argues that DOI's waiver of the Part 83 Federal acknowledgment process for the tribe amounted to recognition "under the ambit of" 25 C.F.R. § 83, qualifying the tribe for the restored lands exception based on 25 C.F.R. § 292.10(b), which defines restored tribes to include tribes that obtained "[r]ecognition through the administrative Federal Acknowledgment Process under § 83.8 of this chapter." *See* Pl.'s Opp'n at 7, 21–23; *see also* Compl. ¶¶ 117–24 (Count IV). This argument need not be addressed because the parties' cross-motions for summary judgment are decided on other grounds.

## A.     THE KOI NATION'S CLAIMS ARE RIPE FOR JUDICIAL REVIEW

Defendants' ripeness challenge is addressed first because "[r]ipeness is a justiciability doctrine that is drawn both from Article III limitations on judicial power and from prudential reasons for refusing to exercise jurisdiction." *La. Pub. Serv. Comm'n v. FERC*, 522 F.3d 378, 397 (D.C. Cir. 2008) (internal quotation marks and citation omitted). The defendants argue briefly, in a total of two paragraphs, that the Koi Nation's claims are "unripe" because, as a landless tribe, "Interior cannot determine whether the 'restored lands' exception applies until a Tribe obtains a specific parcel of land and seeks to have that land taken into trust for gaming." Defs.' Reply at 3 n.1; *see also* Defs.' Opp'n at 14 (stating the Koi Nation's request to be declared a restored tribe is "unripe" because the tribe "lacks land"). In other words, the defendants have turned the justiciability of the Koi Nation's claims into a chicken and egg puzzle, in which the tribe would be required to obtain a parcel of land before the tribe's claim to restored federally recognized status would be ripe for consideration. Setting land ownership as a prerequisite for the ripeness of a claim for a judicial resolution of a dispute over DOI's decision on the tribe's status is both untenable and incorrect, as demonstrated by DOI's own handling of the Koi Nation's 2014 request.

DOI's 2017 Decision shows the flaw in the defendants' ripeness argument that DOI "cannot determine" whether the restored lands exception applies to the Koi Nation until the tribe obtains a parcel of land. DOI states in this decision that, "I regret to inform you that in applying the regulations to your factual submission, I have determined that the Tribe doesn't satisfy the regulatory requirements to constitute a 'restored tribe,' pursuant to 292.10(b)," and "[a]lthough the Tribe has not submitted a fee-to-trust request for gaming purposes pursuant to IGRA's 'restored lands' exception, based on my determination today if the Tribe did submit such an application I would have no alternative but to deny it." AR at 1–2. The decision concludes,

"This decision constitutes a final agency action under the Administrative Procedure Act." *Id.* at 2.

In short, even while landless, the Koi Nation received DOI's final decision denying "restored tribe" status, demonstrating that DOI can determine whether the restored lands exception applies to a landless tribe. The fact that DOI has already made a final determination, applying the Part 292 regulations to the Koi Nation and concluding IGRA's restored lands exception is not available to the tribe, renders the Koi Nation's challenge to this decision ripe. *See Nat'l Park Hosp. Ass'n v. Dep't of Interior*, 538 U.S. 803, 808 (2003) (noting an agency action is "'ripe' for judicial review under the APA" on occurrence of "some concrete action applying the regulation to the claimant's situation in a fashion that harms or threatens to harm him" (quoting *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 891 (1990)). The defendants' ripeness challenge is rejected.

### B. THE KOI NATION'S CLAIMS ARE TIMELY UNDER THE APPLICABLE STATUTE OF LIMITATIONS

The parties agree that the applicable statute of limitations is six years, under 28 U.S.C. § 2401(a), and that the Koi Nation's APA challenges to DOI's application of 25 C.F.R. § 292.10(b) to the tribe, in Count IV, to the DOI 2017 Decision are timely. *See* Defs.' Opp'n at 11–14 (arguing only that plaintiff's "facial" challenges, described in "Count I" and "Count II," are untimely because of the six-year limitation period in 28 U.S.C. § 2401(a), but not disputing the timeliness of the Koi Nation's other claims); Pl.'s Opp'n at 10–13 (asserting that the as-applied challenges were brought within statutory time limits under 28 U.S.C. § 2401(a)); *see also Nat'l Ass'n of Mfrs. v. Dep't of Def.*, 138 S. Ct. 617, 626–27 (2018) (explaining that actions "governed by the APA . . . generally must be filed within six years after the claim accrues" pursuant to 28 U.S.C. § 2401(a)); *Mendoza v. Perez*, 754 F.3d 1002, 1018 (D.C. Cir. 2014)

("Unless another statute provides otherwise, civil claims against the United States—including those brought pursuant to the APA—are subject to the statute of limitations contained in 28 U.S.C.§ 2401 . . . ."). The defendants, however, claim that the Koi Nation's "facial challenges" to the regulation, 25 C.F.R. § 292.10(b), are untimely because the six-year statute of limitations began to run on those claims in 2008 and, therefore, that this Court lacks jurisdiction over the claims described in Counts I and II. *See* Defs.' Opp'n at 11; *see also Washington All. of Tech. Workers v. United States Dep't of Homeland Sec.*, 892 F.3d 332, 345 n.4 (D.C. Cir. 2018) ("Section 2401(a)'is a jurisdictional condition attached to the government's waiver of sovereign immunity.'" (quoting *Spannaus v. DOJ*, 824 F.2d 52, 55 (D.C. Cir. 1987))); *Muwekma*, 708 F.3d at 218 ("The court lacks subject matter jurisdiction to hear a claim barred by section 2401(a).").

The predicate for this untimeliness argument is the defendants' characterization as "facial challenges" the claims that 25 C.F.R. § 292.10(b) invalidly narrowed IGRA's statutory term of "restored to Federal recognition," s*ee* Defs.' Opp'n at 12, and that this regulation unlawfully diminishes the privileges and immunities of recognized tribes relative to other recognized tribes, in violation of the IRA, s*ee id.* The defendants contend that the six-year statute of limitations for these claims began to accrue in 2008 because (1) the Part 292 regulations were adopted and published in that year; and (2) by 2008, the Koi Nation knew or should have known that the Part 292 regulations would exclude the tribe from the definition of a tribe "restored to Federal recognition" under IGRA. *See id.* at 12–14. Each of defendants' statute of limitations arguments fails.

### 1. Accrual from Adoption and Publication of the Part 292 Regulations

According to the defendants, 28 U.S.C. § 2401(a)'s six-year limitations period bars the Koi Nation's facial challenges because those claims accrued when DOI adopted and published the Part 292 regulations on May 20, 2008, more than nine years before the Koi Nation filed the

instant Complaint, on August 23, 2017.  *See* Defs.' Opp'n at 11, 13.  The defendants are correct

that, ordinarily, "[t]he 'right of action first accrues on the date of the final agency action,'" and

promulgation of a rule is "unquestionably final agency action."  *Washington All. of Tech.*

*Workers*, 892 F.3d at 342 (quoting *Harris v. FAA*, 353 F.3d 1006, 1010 (D.C. Cir. 2004)).  Thus,

the "six-year window to directly challenge the statutory authority" for the rule starts to run at the

time the rule was published.  *See id.*; *see also Weaver v. Fed. Motor Carrier Safety Admin.*, 744

F.3d 142, 145 (D.C. Cir. 2014) ("Where Congress imposes a statute of limitations on challenges

to a regulation, running from a regulation's issuance, facial challenges to the rule or the

procedures by which it was promulgated are barred.").

Nonetheless, the D.C. Circuit has explained that an agency's regulations "may be

attacked in two ways once the statutory limitations period has expired."  *NLRB Union v. Fed.*

*Labor Relations Auth.*, 834 F.2d 191, 195 (D.C. Cir. 1987).  "First, a party who possesses

standing may challenge regulations directly on the ground that the issuing agency acted in excess

of its statutory authority in promulgating them."  *Id.*  "The second method of obtaining judicial

review of agency regulations once the limitations period has run is to petition the agency for

amendment or rescission of the regulations and then to appeal the agency's decision."  *Id.*

D.C. Circuit "case law makes it clear" that the first method is an "established, narrow

exception to the statutory time limit" for challenges to regulations that conflict with the statute

from which an agency's authority derives.  *Genuine Parts Co. v. EPA*, 890 F.3d 304, 315–16

(D.C. Cir. 2018) (citing *NLRB Union*, 834 F.2d at 195 and its progeny).  "When an agency seeks

to apply the rule" after the six-year limitation period, "those affected may challenge that

application on the ground that it conflicts with the statute from which its authority derives, . . . at

least where the statute does not expressly preclude such a challenge."  *See Weaver*, 744 F.3d at

145 (internal quotation marks and citations omitted); *accord Citizens for Responsibility & Ethics in Washington v. FEC*, 904 F.3d 1014, 1018 (D.C. Cir. 2018) (quoting *Weaver*, 744 F.3d at 145). Thus, the Koi Nation appropriately relies on *NLRB Union*, 834 F.2d 191, *Functional Music, Inc. v. FCC*, 274 F.2d 543 (D.C. Cir. 1958), and their progeny, as support for the tribe's position that, even after the six-year limitation period lapses from the adoption of a rule, a plaintiff "may 'challenge regulations directly on the grounds that the issuing agency acted in excess of its statutory authority in promulgating them' where the agency has applied the regulation to the plaintiff." *See, e.g.*, Pl.'s Opp'n at 10–11 (quoting *NLRB Union*, 834 F.2d at 191).

The defendants rely on *Alaska v. U.S. Department of Agriculture*, 772 F.3d 899 (D.C. Cir. 2014), and *P & V Enterprises v. U.S. Army Corps of Engineers*, 516 F.3d 1021 (D.C. Cir. 2008), to bolster their argument that the statute of limitations for the Koi Nation's challenges to 25 C.F.R. § 292.10(b) accrued six years after the regulation was adopted and published. Defs.' Opp'n at 11–12. Neither case, however, precludes the Koi Nation's reliance on the D.C. Circuit's well-settled exception to 28 U.S.C. § 2401(a)'s time limit for those affected by an agency's application of a regulation. For example, in *Alaska v. U.S. Department of Agriculture*, while the D.C. Circuit found timely the plaintiff's cause of action filed in 2011, because the claim did not accrue until "six years from the time of [the challenged] rule's reinstatement in 2006," 772 F.3d at 900, this case did not implicate the exception to the six-year time limit for a party affected by an agency's application of a regulation. Indeed, the D.C. Circuit acknowledged possible circumstances when "a legal challenge to a regulation may be filed considerably after the initial expiration of [the six-year] period." *Id.* Likewise, in *P&V Enterprises*, the D.C. Circuit recognized that even if a "facial challenge" to a rule is "untimely," that "does not immunize the rule from all challenge: If [an agency] applies the rule to [the plaintiff] . . ., then

32

[the plaintiff] would be able to challenge the rule notwithstanding that the limitations period has run." 516 F.3d at 1026. That is precisely the circumstance in which the Koi Nation finds itself here.[10]

Accordingly, since the instant action involves DOI's application of 25 C.F.R. § 292.10(b) to the Koi Nation in the agency's 2017 Decision, the six-year limitations period in 28 U.S.C. § 2401(a) does not bar the tribe's claims.

### 2.      Accrual from Prior Opportunities to Challenge 25 C.F.R. § 292.10(b)

The defendants raise, in the alternative, the argument that since the Koi Nation had notice and opportunities to raise the same challenges to the Part 292 regulations made here between 2008, when the Part 292 regulations were promulgated, and 2014, six years from that date, the instant claims should be time-barred. As support, the defendants contend that the Koi Nation's facial challenges accrued when the tribe "knew or should have known" about the material facts giving rise to the challenges to 25 C.F.R. § 292.10(b). *See* Defs.' Opp'n at 11. Similarly, the defendants claim that the exception permitting review of a rule after the six-year time limit for parties affected by a rule's application, is not available "[i]f a party could question a rule's validity at the time of promulgation." Defs.' Reply at 2–3. In the defendants' view, the cases recognizing that exception to the limitations period merely stand for the proposition that a litigant should have "an opportunity to question [a rule's] validity," but this exception is "inapposite because Plaintiff challenges Section 292.10's application in the very manner that Plaintiff anticipated in 2008." *Id.* at 4.

---

[10]      The defendants' reliance on *Hire Order Ltd. v. Marianos,* 698 F.3d 168 (4th Cir. 2012), *see* Defs.' Reply at 3, is equally unavailing and, further, not binding on this Court. The Fourth Circuit in that case concluded that the statute of limitations ran from the time an agency published a regulation, explaining that *Functional Music*'s exception to the statute of limitations, for those affected by an agency's application of a rule, did not apply because the agency had not applied a rule to the plaintiffs. *Hire Order Ltd.*, 698 F.3d at 170. By contrast, DOI indisputably applied 25 C.F.R. § 292.10(b) to the Koi Nation in the agency's 2017 Decision.

As a factual basis for this contention that the Koi Nation by 2008 should have known, and in fact knew, the Part 292 regulations excluded the Koi Nation from the definition of a tribe "restored to Federal recognition" under IGRA, and that the tribe had the opportunity then to directly challenge 25 C.F.R. § 292.10(b) as contrary to IGRA and the IRA, the defendants point to (1) the tribe's submission of timely comments on the draft regulations recognizing that the tribe would not be eligible for the restored lands exception, Defs.' Opp'n at 12 (citing AR at 445–56 (Koi 2007 Comments)), and that the proposed regulations "unfairly limit[ed] [recognition through] executive action to recognition gained through the Federal Acknowledgment Process," *id*. (alterations in original) (quoting AR at 451 (Koi 2007 Comments)); and (2) the NIGC's disapproval in 2008 of the Koi Nation's proposed gaming ordinance, which sought a determination that the tribe was a restored tribe under IGRA's restored lands exception, Defs.' Opp'n at 14 (citing AR at 393–416 (NIGC 2008 Decision 1–23)). Thus, according to the defendants, based on these examples and others, the Koi Nation was aware in 2008 that the tribe did not qualify for IGRA's restored lands exception and could have raised its instant challenges then. *Id*. at 14.

Without contesting these facts, *see* Pl.'s Opp'n at 12, the Koi Nation disputes that the tribe had an opportunity to make the same challenges in 2008, because the tribe did not believe the challenges were ripe in 2008, absent any final agency action until the DOI 2017 Decision, *see id.* at 13. The parties do not identify any case law suggesting that a litigant's assessment of ripeness affects when § 2401(a)'s limitations period begins to run. To the contrary, "petitioners who delay filing requests for review on their own assessment of [justiciability] do so at the risk of finding their claims time-barred." *Eagle–Picher Indus., Inc. v. U.S. EPA*, 759 F.2d 905, 909 (D.C. Cir. 1985). Rather, "the appropriate time for a judicial determination of the ripeness of an

issue is within the prescribed statutory period for review." *Id.* Therefore, the parties' dispute about whether the Koi Nation properly believed the tribe's claims were ripe in 2008 is irrelevant to the applicability of the § 2401(a) limitations period.

In any event, the defendants' statute of limitations argument, based on the Koi Nation's prior notice and opportunities to challenge 25 C.F.R. § 292.10(b), fails under binding D.C. Circuit precedent. Indeed, the D.C. Circuit has "frequently said that a party against whom a rule is applied may, at the time of application, pursue substantive objections to the rule, including claims that an agency lacked the statutory authority to adopt the rule, even where the petitioner had notice and opportunity to bring a direct challenge within statutory time limits." *Indep. Cmty. Bankers of Am. v. Bd. of Governors of Fed. Reserve Sys.*, 195 F.3d 28, 34 (D.C. Cir. 1999) (citing *Graceba Total Commc'ns, Inc. v. FCC*, 115 F.3d 1038, 1040–41 (D.C. Cir. 1997); *Pub. Citizen v. NRC*, 901 F.2d 147, 152 & n. 1 (D.C. Cir. 1990); *NLRB Union*, 834 F.2d at 195; *Montana v. Clark*, 749 F.2d 740, 744 n.8 (D.C. Cir. 1984); *Functional Music*, 274 F.2d at 546); *see also Weaver*, 744 F.3d at 145–46 ("We have . . . despite want of a prior timely attack, considered the validity of rules that an agency applied . . . ." (citing cases)).

Without addressing *Independent Community Bankers of America* or many of its progeny, the defendants make a cursory attempt to distinguish *NextWave Personal Communications, Inc. v. FCC*, 254 F.3d 130 (D.C. Cir. 2001), *see* Defs.' Reply at 5 n.3, which case reiterates that prior notice and opportunity to bring a direct challenge to a rule within the statutory time limit does not prevent a party from bringing that challenge when the rule is applied against the party. In *NextWave*, the D.C. Circuit considered when the statute of limitations began to run on a company's challenge to a public notice by the Federal Communications Commission ("FCC") announcing cancellation of the company's licenses, which had been cancelled automatically at

an earlier date. *NextWave*, 254 F.3d at 141. The court ruled that the limitations period did not begin to run until the FCC issued the public notice, thereby eliminating any doubt that the automatic cancellation policy applied to the company's licenses. *Id.* at 142. In so doing, the D.C. Circuit rejected arguments that the company should have challenged the automatic cancellation of its licenses at an earlier date based on prior notices and opportunities to do so, because "even if NextWave could have challenged the automatic cancellation policy at an earlier date, . . . the company remained free to do so" once the policy had been applied to it. *Id.* at 141. Contrary to the defendants' argument that *NextWave* turned on the FCC's authority to suspend the limitations period, Defs.' Reply at 5 n.3, this case merely applied well-settled precedent that prior notice and opportunity to bring a direct challenge to a rule does not preclude a party from bringing that challenge when the agency makes a final determination about application of a rule against the party.

None of the cases cited by the defendants, for the proposition that the as-applied exception to the statute of limitations is constrained to circumstances where a litigant lacked a prior opportunity to challenge the regulation at issue, actually expresses such a condition but instead more broadly sanction challenges such as the Koi Nation's outside the limitations period. *See* Defs.' Reply at 4 (citing *Genuine Parts Co.*, 890 F.3d at 316 ("Our case law makes it clear that '[a]n agency's regulations may be attacked . . . once the statutory limitations period has expired . . . on the ground that the issuing agency acted in excess of its statutory authority in promulgating them.'" (quoting *NLRB Union*, 834 F.2d at 195)); *P & V Enters.*, 516 F.3d at 1026 ("[O]ur conclusion that P & V's facial challenge to the 1986 rule is untimely does not immunize the rule from all challenge: If the Corps applies the rule to P & V's property, or denies its petition to amend or rescind the rule, then P & V would be able to challenge the rule

notwithstanding that the limitations period has run."); *Cellular Telecomms. & Internet Ass'n v. FCC*, 330 F.3d 502, 509 (D.C. Cir. 2003) ("When the . . . enforcement date arrives, if the Commission in fact enforces the regulation against petitioners, then petitioners may be able to challenge the underlying regulation as applied to them."); *NLRB Union*, 834 F.2d at 195 ("[A] party who possesses standing may challenge regulations directly on the ground that the issuing agency acted in excess of its statutory authority in promulgating them. A challenge of this sort might be raised, for example, by way of defense in an enforcement proceeding.")).

The fact that the Koi Nation was on notice, during the notice-and-comment process for the Section 20 Final Rule and at the time of the 2008 NIGC decision, that the tribe could be found ineligible for the restored lands exception does not foreclose the tribe from challenging the pertinent regulations under the APA now, under the exception to the statute of limitations for parties affected by an agency's application of a rule. Indeed, *Montana v. Clark*, 749 F.2d 740 (D.C. Cir. 1984), on which defendants rely, *see* Defs.' Reply at 3, undercuts their argument otherwise. In *Clark*, the D.C. Circuit explained, "where, as here, the petitioner challenges the *substantive* validity of a rule, failure to exercise a prior opportunity to challenge the regulation ordinarily will not preclude review." 749 F.2d at 744 n.8 (emphasis in original) (citing, *inter alia*, *Functional Music*, 274 F.2d at 543).[11]

In sum, although 25 C.F.R. § 292.10(b) was promulgated on May 20, 2008, more than six years ago, the Koi Nation filed its Complaint in this action on August 23, 2017, well within six years after DOI's 2017 Decision, a final agency action applying 25 C.F.R. § 292.10(b) to the

---

[11] The defendants' reliance on Federal Circuit cases to contend the Koi Nation's claims accrued when the tribe knew or should have known of the material facts giving rise to its claims, are neither binding nor persuasive, since these cases do not discuss the statute of limitations under § 2401(a) or otherwise as applied to APA claims. *See* Defs.' Opp'n at 11 (citing *Wolfchild v. United States*, 731 F.3d 1280, 1291 (Fed. Cir. 2013) (considering the statute of limitations under the Indian Trust Accounting Statute and 28 U.S.C. § 2501, which provides a six-year limitations period for claims filed in the United States Court of Federal Claims), and *Menominee Tribe of Indians v. United States*, 726 F.2d 718, 721 (Fed. Cir. 1984) (discussing statute of limitations under 28 U.S.C. § 2501)).

tribe. *See Mendoza*, 754 F.3d at 1020 ("The plaintiffs properly filed their claims within six years of the final agency action. The claims are not barred by the statute of limitations.").

Accordingly, the Koi Nation's claims challenging 25 C.F.R. § 292.10(b) as conflicting with the prescribed limits on DOI's authority in IGRA and the IRA, are not time-barred by the six-year statute of limitations under 28 U.S.C. § 2401(a).

### C. THE CHALLENGED REGULATION'S IMPLEMENTATION OF IGRA'S RESTORED LANDS EXCEPTION

The Koi Nation contends that the challenged regulation, 25 C.F.R. § 292.10(b), "invalidly narrowed" the phrase "restored to Federal recognition" in IGRA's restored lands exception such that the regulation is "not in accordance with the law." *See* Pl.'s Mem. at 21, 32 (citing 5 U.S.C. § 706(2)(A)); Compl. ¶¶ 82–98, 117 (Count IV). DOI counters that the phrase "restored to Federal recognition" is sufficiently ambiguous to permit the agency's interpretation that the status of tribes, such as the Koi Nation, for which federal recognition never legally terminated, cannot be "restored" administratively because those tribes never lost their recognized status in the first place, notwithstanding the tribe's actual treatment as terminated by the U.S. government. *See* Defs.' Opp'n at 15.

As explained in more detail below, the Court agrees with the Koi Nation that the phrase "restored to Federal recognition" in IGRA's restored lands exception, under 25 U.S.C. § 2719(b)(1)(B)(iii), is unambiguous as applied to the Koi Nation, which had been *de facto* terminated until DOI formally corrected its mistake and reinstated, or restored, the tribe to the Federal Register list of federally recognized tribes. As a result, DOI's administrative definition of "restored to Federal recognition," set out in 25 C.F.R. § 292.10(b), is invalid, particularly as applied to the Koi Nation because the regulation narrows IGRA's statutory language to exclude the tribe from being considered "restored to Federal recognition," contrary to the plain language

38

of the statute.  Furthermore, even if the phrase "restored to Federal recognition" were ambiguous in the circumstances presented here, any deference to which DOI's interpretation may otherwise be entitled is muted by the Indian canon of construction, which counsels that statutory ambiguities are to be resolved in favor of Indians.

### 1. "Restored to Federal Recognition" Is Unambiguous As Applied to the Koi Nation

Regardless of whether *Chevron* deference or the Indian canon of construction applies, the law is well-settled that under *Chevron*, a court must first determine "whether Congress has directly addressed the precise question at issue," before assessing whether the agency's interpretation of a statute was reasonable.  *Mayo Found. for Med. Educ. & Research v. United States*, 562 U.S. 44, 52 (2011); *see also South Carolina v. Catawba Indian Tribe, Inc.*, 476 U.S. 498, 506 (1986) ("The canon of construction regarding the resolution of ambiguities in favor of Indians . . . does not permit reliance on ambiguities that do not exist; nor does it permit disregard of the clearly expressed intent of Congress.").  The precise question at issue here is whether IGRA's Section 20 restored lands exception applies to a tribe that was mistakenly treated by the federal government as terminated for decades, with reaffirmation of the tribe's recognized status occurring outside the Part 83 Federal acknowledgment process, when the agency corrected its own administrative error.

To discern whether Congress has addressed this precise question, "traditional tools of statutory construction" are used.  *Humane Soc'y of United States v. Zinke*, 865 F.3d 585, 595 (D.C. Cir. 2017) (quoting *Chevron, U.S.A., Inc. v. NRDC*, 467 U.S. 837, 843 n.9 (1984)); *see also City of Roseville*, 348 F.3d at 1032 (applying the Indian canon of construction, but first reviewing IGRA's language, structure, legislative history, and purpose to determine whether certain land taken into trust unambiguously qualified as the "restoration of lands" for purposes of

IGRA's restored lands exception).  These tools include evaluation of the statute's text, structure, legislative history, and purpose.  *See Loving v. IRS*, 742 F.3d 1013, 1016 (D.C. Cir. 2014).

At the outset, the "language at issue" is examined to determine whether it "has a plain and unambiguous meaning with regard to the particular dispute in [this] case."  *United States v. Villanueva–Sotelo*, 515 F.3d 1234, 1237 (D.C. Cir. 2008) (quoting *Robinson v. Shell Oil Co.*, 519 U.S. 337, 340 (1997)).  If such an unambiguous meaning is apparent, the "inquiry ends and [the court must] apply the statute's plain language."  *Id.*; *see also United States v. Cordova*, 806 F.3d 1085, 1099 (D.C. Cir. 2015) ("In determining the 'plainness or ambiguity of statutory language' we refer to 'the language itself, the specific context in which that language is used, and the broader context of the statute as a whole.'" (quoting *United States v. Wilson*, 290 F.3d 347, 353 (D.C. Cir. 2002))).

As to the operative phrase "restored to Federal recognition," as used in IGRA's restored lands exception, 25 U.S.C. § 2719(b)(1)(B)(iii), the D.C. Circuit has explained "[w]hile IGRA offers no definition of 'restore,' the common use of the term is 'to put back into a former or proper position.'"  *TOMAC, Taxpayers of Michigan Against Casinos v. Norton* ("*TOMAC*"), 433 F.3d 852, 865 (D.C. Cir. 2006) (quoting WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1936 (3d ed. 1993)); *see also City of Roseville*, 348 F.3d at 1027 (explaining that the term "restored land" in IGRA's restored lands exception could mean "to 'bring [it] back to an original state'" or alternatively "encompass[] the concept of . . . restitution for past wrongs"); *Grand Traverse Band of Ottawa & Chippewa Indians v. Office of U.S. Att'y. for W. Div. of Mich.* ("*Grand Traverse*"), 369 F.3d 960, 967 (6th Cir. 2004) ("The district court appropriately looked to the dictionary definitions of 'restore' and 'restoration,' which include the following meanings: to give back, return, make restitution, reinstatement, renewal, and reestablishment.").

Here, DOI's reaffirmation in 2000 that the Koi Nation was federally recognized put the tribe "back into a former or proper position," *TOMAC*, 433 F.3d at 865 (internal quotation marks and citations omitted), as the term "restored" is commonly used. DOI stated, when reaffirming the Koi Nation's recognized status, that the agency's denial of the tribe's "rightful existence" had been an "egregious oversight," AR at 293 (DOI 2000 Recognition Memo at 4), and that the reaffirmation "corrected" an "administrative error by the [BIA] . . . in the initial failure to place the tribe[] on the Federal Register list of entities recognized . . . to receive services," *id.* Thus, DOI returned the Koi Nation to its "proper" place as a recognized tribe, remedying the agency's improper treatment of the tribe as terminated. *TOMAC*, 433 F.3d at 865.

Likewise, the Koi Nation's reaffirmation returned the tribe to its "former" place, *id.*, prior to the "administrative error" denying the tribe's recognized status, AR at 293 (DOI 2000 Recognition Memo at 4). Indeed, DOI directed BIA to take "appropriate action," such that the Koi Nation would be included on the Federal Register list of federally recognized tribes and thus eligible to receive services from BIA. AR at 291 (DOI 2000 Recognition Letter). The tribe's reaffirmation as federally recognized thus resulted in "bringing the Tribe within the umbrella of federal services and benefits extended to other federally recognized tribes." *TOMAC*, 433 F.3d at 865. Hence, "[t]here can be no real doubt" that the Koi Nation's reaffirmation "restored" the tribe "to federal recognition for purposes of § 20 of IGRA," within the plain meaning of the operative phrase in the restored lands exception. *Id.* at 866.

The defendants skip over this plain meaning of "restored to Federal recognition" to argue that, putting aside how the federal government erroneously treated the Koi Nation, the tribe never lost its "legal status" as a federally recognized tribe, and thus never needed this status to be restored. *See* Defs.' Opp'n at 23–24 (citing DOI's 2000 Recognition Memo, which asserted that

the tribe was "never administratively terminated nor were [its] relations with the United States broken," AR at 460 (DOI 2000 Recognition Memo at 4); that the "government-to-government relationship with the United States was never terminated," *id.*; and that the Lower Lake Act "did not contain a provision to cause the loss of an Indian's legal status as an Indian," *id.* at 462 (DOI 2000 Recognition Memo at 6), and "did not terminate" the Koi Nation, *id.*). While the crux of the parties' dispute here is over whether DOI's regulation, 25 C.F.R. § 292.10(b), invalidly limits the meaning of "restored to Federal recognition" to a single administrative method for reaffirming federally recognized status—thereby limiting the scope of the restored lands exception—the defendants side-step the issue entirely by focusing on whether the Koi Nation was terminated in the first place. In other words, the defendants' interpretation of the statutory restored lands exception treats as irrelevant the federal government's erroneous treatment of a tribe as having lost federally recognized status, along with the loss of the concomitant benefits, by construing this as not amounting to a termination of status. Based on this same reasoning, DOI found that the Koi Nation was not required, or even eligible, to seek administrative restoration of its federally recognized status using the Part 83 regulatory Federal acknowledgment process. AR at 460 (DOI 2000 Recognition Memo at 4).

Regulatory consistency does not make this position correct, however. The agency's "past mistake," and correction of that error through reaffirmation of the Koi Nation, does not "excuse the agency's current missteps" because "[i]n administrative law, as elsewhere, two wrongs do not make a right." *See Am. Wild Horse Pres. Campaign v. Perdue*, 873 F.3d 914, 928 (D.C. Cir. 2017). Indeed, courts "cannot condone" correction of one error only to permit "commitment of another." *Id.* (quoting *Gray v. Mississippi*, 481 U.S. 648, 663 (1987)).

In addition, this blinkered construction of IGRA's Section 20 restored lands exception ignores the reality experienced by the Koi Nation, and binding precedent makes clear and better policy requires that reality controls. By contrast to the agency's focus on a tribe's technical legal status, which conveniently ignores any erroneous positions taken by the federal government, courts have looked to the reality of how a tribe is treated to determine whether federally recognized status was lost and the need for restoration triggered.

For example, in *TOMAC*, the D.C. Circuit considered whether the Pokagon Band of Potawatomi Indians ("Pokagon Band") was a tribe "restored to Federal recognition" under IGRA. 433 F.3d at 864. In that case, the Pokagon Band, like the Koi Nation here, had for years been recognized by the federal government, *id.* at 854, but, in 1935, the Band was administratively—and mistakenly—terminated by DOI, based in part on the "misguided assumption" that the tribe's recognition required residence on trust lands held in common for the Band, *id.* at 855–56 (internal quotation marks omitted) (quoting H.R. REP. NO. 103-620, at 5 (1994) and citing S. REP. NO. 103-266, at 3–4 (1994)). For decades thereafter, like the Koi Nation, the Pokagon Band unsuccessfully made "numerous attempts to reclaim its recognition" but remained "administratively terminated," due to "faulty and inconsistent administrative decisions," and, as a result, the tribe was "denied services and benefits," contrary to the intent of "the Congress, federal Indian law and the trust responsibility of the United States." *Id.* at 854–56 (international quotation marks and citations omitted). Noting that "Congress was not responsible" for the Pokagon Band's termination, the D.C. Circuit found that this tribe "was nevertheless terminated for all intents and purposes due to faulty and inconsistent administrative decisions," *id.* at 865 (internal quotation marks and citations omitted), causing the Band to be denied the benefits accruing to other federally recognized tribes, *id.*

Here, similarly, even though Congress did not terminate the Koi Nation's federally

recognized status through the Lower Lake Act, the tribe was for all intents and purposes treated

as terminated due to faulty administrative decisions that incorrectly assumed the Lower Lake Act

terminated the tribe. Just as the D.C. Circuit had no trouble finding the Pokagon Band's status

terminated, the circumstances surrounding the treatment of the Koi Nation leads inexorably to

the same conclusion. *See id.*; *see also Muwekma*, 708 F.3d at 219 (citing as evidence that

Muwekma Ohlone Tribe had lost recognized status the fact that the tribe "was not on [DOI's] list

of recognized Indian tribes nor was it receiving any services or benefits from the government").[12]

Likewise, in a case cited approvingly by the D.C. Circuit in *TOMAC*, 433 F.3d at 865

(citing *Grand Traverse*, 369 F.3d at 970), the Sixth Circuit considered the situation of the Grand

Traverse Band of Ottawa and Chippewa Indians ("Grand Traverse Band"), which had federally

recognized status for almost a century until, in 1872, the Secretary administratively severed the

government-to-government relationship by treating the tribe as terminated based on a misreading

of a treaty that merely dissolved the joinder of the Grand Traverse Band with another tribe,

without affecting the Grand Traverse Band's tribal status. *Grand Traverse*, 369 F.3d at 961 &

n.2. The Grand Traverse Band tried for decades to regain federally recognized status and

---

[12] The D.C. Circuit previously considered a portion of the Koi Nation's history in *Muwekma*. There, the Muwekma Ohlone Tribe ("Muwekma") claimed recognition without having to use the Part 83 Federal acknowledgment process, just like the Koi Nation, for which the Part 83 process had been waived and recognition reaffirmed outside that process. *Muwekma*, 708 F.3d at 215. In rejecting this claim that Muwekma was similarly situated to the Koi Nation, the D.C. Circuit found that unlike the Koi Nation, Muwekma was not "federally recognized after 1927," *id.*, whereas the U.S. government had "interactions" with the Koi Nation, as a tribe, for "decades" past 1927, *id.* at 216, well after passage of the IRA in 1934, when DOI began conducting recognition proceedings to determine if a tribe should be recognized and receive benefits under the statute, *id.* at 211. In particular, the court noted that the federal government (1) "held land in trust" for the Koi Nation until 1956; and (2) "considered including [the Koi Nation] on the list of federally-recognized tribes" in 1980, *id.* at 214. Consequently, the D.C. Circuit held that DOI did not act arbitrarily in distinguishing, under the agency's "broad authority" to make "exceptions" to the Part 83 Federal acknowledgment process under 25 C.F.R. § 1.2, between the Koi Nation and Muwekma. *Id.* at 216. The D.C. Circuit, however, had no occasion to decide whether the federal government's mistaken denial of federal services and benefits to the Koi Nation after 1956 amounted to termination of the tribe, or whether the Koi Nation qualified for IGRA's restored lands exception. *See generally id.*

ultimately succeeded, in 1980, when the Secretary acknowledged the band through the Federal acknowledgment process. *Id.* at 962.[13] The Sixth Circuit ruled that the Grand Traverse Band was a tribe "restored to Federal recognition," based on the plain language of that phrase, because of the tribe's "history of governmental recognition, withdrawal of recognition, and then reinstatement of recognition." *Id.* at 967. In so doing, the Sixth Circuit rejected the argument that federally recognized status can only be extinguished by congressional, and not administrative, action, and expressly held that a tribe can lose recognition when the federal government improperly treats the tribe as terminated. *Id.* at 968. Specifically, the Sixth Circuit explained, "because the executive branch of the government *illegally* acted as if the [tribe's] recognition had been terminated, as evidenced by its refusal to carry out any trust obligations," the Grand Traverse Band had been *de facto* terminated and subsequently restored to federal recognition administratively under Part 83. *Id.* at 968, 970 (emphasis in original).

Here, the Koi Nation likewise was *de facto* terminated. As the defendants concede, the federal government treated the Koi Nation "as if it had been terminated from approximately the time of the Lower Lake Act's enactment" in 1956. AR at 3 (DOI 2017 Decision at 3). For decades, BIA repeatedly referred to the Koi Nation's status as a tribe whose federal recognition had been terminated, including in the 1970s, when BIA listed the Koi Nation as "terminated" pursuant to the Lower Lake Act, *see* AR at 89–90, 93–94 (BIA 1975 Law Enforcement Manual at 1–2, 60–61); in the 1980s, when BIA declined to include the Koi Nation on the Federal Register list of federally recognized tribes, *see* AR at 377–79 (BIA 1980 Memo); and, in 1995,

---

[13] By contrast to the Grand Traverse Band, the defendants denied to the Koi Nation the availability of the Federal acknowledgement process set out in DOI's Part 83 regulations to qualify for IGRA's Section 20 restored lands exception, because the Part 83 "acknowledgment regulation does not apply to Indian tribes whose government-to-government relationship was never severed." *See* Defs.' Reply at 14 (quoting AR at 460 (DOI 2000 Recognition Memo at 4)).

when BIA denied the Koi Nation's application for tribal government grant funding because the Koi Nation did "not appear in the February 16, 1995 Federal Register List of Indian entities recognized and eligible to receive services from" BIA, *see* AR at 95 (DOI 1995 Letter). The Koi Nation's original federal recognition, *de facto* termination, and reinstatement of recognition through reaffirmation by DOI's correction of the agency's long-standing, internal error, thus fits squarely within the plain meaning a tribe "restored to Federal recognition" under IGRA. *See* 25 U.S.C. § 2719(b)(1)(B)(iii).[14]

In addition to the plain meaning of the restored lands exception, two aspects of IGRA's structure indicate Congress's intent to include tribes like the Koi Nation, which were improperly treated as terminated and subsequently reaffirmed outside the Part 83 process, as tribes restored to federal recognition. First, "the syntax of" the restored lands exception, "which discusses not simply the restoration of the lands themselves, but their restoration 'for an Indian tribe,' fits more comfortably with the concept of restitution," *City of Roseville*, 348 F.3d at 1027, for decades of

---

[14] By contrast to the D.C. and Sixth Circuits, the Ninth Circuit found that the phrase "restored to Federal recognition" in the restored lands exception was ambiguous as applied to the Ione Band of Miwok Indians ("Ione Band"), which had been treated as terminated until DOI "changed its mind about the Band's 'recognized' status," *Cty. of Amador v. U.S. Dep't of the Interior*, 872 F.3d 1012, 1018 (9th Cir. 2017), and, in 1994, "'reaffirmed' the Band's status as a recognized tribe and directed that the Band be included on the list of recognized tribes published by Interior, [such that] the Band was effectively recognized without having to go through the Part 83 process," *id.* at 1028. Notwithstanding the similar circumstances between the Koi Nation and the Ione Band, DOI decided, in 2006, in response to the Ione Band's "fee-to-trust" application, that the 1994 reaffirmation "amounts to a restoration of the Band's status as a recognized Band," *id.* at 1019 (quoting DOI's 2006 Determination Regarding the Ione Band's Status as a Restored Tribe under IGRA), and in 2012, concluded that the latter Band "qualified as a 'restored tribe,'" *id.* at 1029, subject to the grandfather clause, in 25 C.F.R. § 292.26(b), exempting the Ione Band from compliance with the Part 292 regulations to be eligible for IGRA's restored lands exception, *id.* at 1030. In fact, in *Cty. of Amador*, DOI did not dispute that the Ione Band was a restored tribe or that the tribe fell within the scope of the grandfather provision, *id.* at 1029–30, and, ironically, contested the plaintiff's position that IGRA's restored lands exception clearly excluded "those tribes administratively restored to recognition outside the Part 83 process," *id.* at 1030–31. Despite finding the restored land exception language ambiguous, because "Congress used the undefined term 'restored,'" *id.*, the Ninth Circuit's reasoning is helpful to the Koi Nation here. Specifically, the *Cty. of Amador* court concluded in favor of the Ione Band and DOI—and consistent with the Koi Nation's position in this case—that, under the restored lands exception, "a tribe could be 'restored' to Federal recognition outside the Part 83 process, at least in certain circumstances," *id.*, noting that even if the List Act "suggests that a non-Part-83-administrative 'recognition' is not a recognition at all . . . the Band was re-recognized *before* the effective date of the" List Act, and Congress's intention in the 1994 List Act "sheds no light on what Congress meant in 1988 when IGRA was passed," *id.* at 1030 n.17 (emphasis in original).

improper treatment as a terminated tribe.  Second, Congress could have explicitly limited tribes "restored to Federal recognition" to those tribes recognized in a particular way, as reflected in the "initial reservation" exception to IGRA's prohibition on gaming on after-acquired lands, which immediately precedes the restored lands exception in Section 20.  *See* 25 U.S.C. § 2719 (b)(1)(B)(ii).  Congress limited the availability of that "initial reservation" exception to tribes that achieved recognition through the "Federal acknowledgment process."  *See id.* ("Subsection (a) will not apply when . . . lands are taken into trust as part of . . . the initial reservation of an Indian tribe *acknowledged . . . under the Federal acknowledgment process*." (emphasis added)).  Congress could have used similar language in the restored lands exception to limit the methods of recognition that would permit a tribe to be considered as "restored," but no such limiting language was used.  *See Cty. of Amador*, 872 F.3d at 1030 ("[I]f Congress wanted to exclude those tribes that were administratively re-recognized outside the Part 83 process, it could have done so by explicitly referring to that process, as it did in the exception immediately preceding the restored lands exception.").  Instead, Congress used the term "restored" without limitation, presumably knowing that some tribes had been recognized outside the Part 83 process.  *See Interstate Commerce Comm'n v. Texas*, 479 U.S. 450, 458 (1987) (presuming that Congress, in enacting a statute regarding the regulation of railroads, "was aware of the [implementing agency's] consistent practice" of regulating railroads in a certain way).

Even if the statute's language were not dispositive, "other indicia of [legislative] intent" further demonstrate that Congress intended to include tribes like the Koi Nation in the restored lands exception.  *Villanueva–Sotelo*, 515 F.3d at 1237 (citing *Staples v. United States*, 511 U.S. 600, 605 (1994)).  Each of "the exceptions in IGRA § 20(b)(1)(B) serve purposes of their own, ensuring that tribes lacking reservations when IGRA was enacted are not disadvantaged relative

to more established ones." *City of Roseville*, 348 F.3d at 1030. The restored lands exception "compensates [a] Tribe not only for what it lost by the act of termination, but also for opportunities lost in the interim." *Id.* at 1029. Thus, Congress intended for the restored lands exception "to be read broadly," *id.* at 1032, in service of IGRA's overall goal of "promoting tribal economic development and self-sufficiency," *id.* at 1030.

DOI's narrow interpretation of the restored lands exception would bar a tribe, such as the Koi Nation, which until reaffirmation was mistakenly treated as terminated, both from eligibility to participate in the Part 83 Federal acknowledgment process and from eligibility for the Section 20 exception as a "restored" tribe outside the Part 83 process. Such exclusion of the Koi Nation would only compound the legacy of the agency's mistreatment by continuing to deny the tribe the benefits that tribes not subject to incorrect termination were able to seek during the Koi Nation's period of mistreatment. This result would also frustrate the exception's purpose by leaving this landless tribe when IGRA was enacted severely disadvantaged relative to established tribes that never lost their federal recognition and the concomitant benefits of such status. DOI's interpretation fails to compensate the Koi Nation for lost opportunities caused by the federal government's improper treatment of the tribe as terminated, which treatment prevented the tribe from acquiring lands in trust by the time Congress enacted IGRA in 1988, *see* AR at 3 (DOI 2017 Decision at 3), the precise problem that the restored lands exception aims to remedy.

For all of these reasons, the Court concludes that the Koi Nation is a tribe "restored to Federal recognition" within the meaning of IGRA's Section 20 restored lands exception, based on DOI's *de facto* termination and subsequent reaffirmation of the tribe's recognized status, even though that reaffirmation occurred without congressional action or through the Federal acknowledgement process set out in Part 83.

## 2.     *Chevron* Deference in Indian Law

Even assuming the statute were ambiguous as applied to the Koi Nation's circumstances, the Indian canon of construction would counsel resolving that ambiguity in favor of the Koi Nation.  When presented with an ambiguous statute, the analysis ordinarily would shift to *Chevron* step two, where "the question for the court is whether the agency's answer is based on a permissible construction of the statute," *City of Arlington v. FCC*, 569 U.S. 290, 296 (2013) (quoting *Chevron*, 467 U.S. at 843), and "if so, defer to it," *Confederated Tribes v. Jewell*, 830 F.3d 552, 558 (D.C. Cir. 2016).[15]  In assessing whether the agency's statutory interpretation is a "'permissible' and 'reasonable' view of the Congress's intent," the Court "look[s] to what the agency said at the time of the rulemaking—not to its lawyers' post-hoc rationalizations." *Council for Urological Interests v. Burwell*, 790 F.3d 212, 222 (D.C. Cir. 2015) (quoting *Chevron*, 467 U.S. at 843–44).  The defendants thus rely on *Chevron* deference to urge adoption of DOI's definition of tribes "restored to Federal recognition" as "reasonably" excluding tribes, such as the Koi Nation, "who were never terminated and therefore could not be restored."  Defs.' Opp'n at 15.

In cases involving American Indians, however, the law is well-settled that "statutes are to be construed liberally in favor of the Indians, with ambiguous provisions interpreted to their benefit."  *Montana v. Blackfeet Tribe of Indians*, 471 U.S. 759, 766 (1985); *see also Cobell v. Salazar*, 573 F.3d 808, 812 (D.C. Cir. 2009).  Over time, the D.C. Circuit has clarified the relationship between *Chevron* deference and the Indian canon of construction when an agency

---

[15]     Recent Supreme Court cases suggest a retreat from *Chevron*, but the Supreme Court has not abandoned the framework.  *SAS Inst., Inc. v. Iancu*, 138 S.Ct. 1348, 1358 (2018) ("[W]hether *Chevron* should remain is a question we may leave for another day."); *see also Pereira v. Sessions*, 138 S.Ct. 2105, 2121 (2018) (Kennedy, J., concurring) ("[I]t seems necessary and appropriate to reconsider, in an appropriate case, the premises that underlie *Chevron* and how courts have implemented that decision.").

and tribe disagree about the proper interpretation of an ambiguous statute. *See Cobell*, 573 F.3d at 812. Initially, the D.C. Circuit explained, "[i]f there is any ambiguity as to the [statute], the [statute] *must* be construed in favor of the Indians," while still giving "careful consideration" to the agency's interpretation but not deferring to it. *Muscogee (Creek) Nation v. Hodel*, 851 F.2d 1439, 1445 & n.8 (D.C. Cir. 1988). More recently, the D.C. Circuit has clarified that *Chevron* deference "does not disappear from the process of reviewing an agency's interpretation of those statutes it is trusted to administer for the benefit of the Indians, although that deference applies with muted effect," and "the Indians' benefit remains paramount." *Cobell*, 573 F.3d at 812. Thus, *Chevron* deference may be "trumped by the requirement that statutes are to be construed liberally in favor of the Indians, with ambiguous provisions interpreted to their benefit." *Id.* "[W]here Congress has entrusted to the agency the duty of applying, and therefore interpreting, a statutory duty owed to the Indians," as is the case here, "[a court] cannot ignore the responsibility of the agency for careful stewardship of limited government resources." *Id.*

"This departure from the *Chevron* norm arises from the fact that the rule of liberally construing statutes to the benefit of the Indians arises not from the ordinary exegesis, but from principles of equitable obligations and normative rules of behavior, applicable to the trust relationship between the United States and the Native American people." *Cal. Valley Miwok Tribe v. United States*, 515 F.3d 1262, 1266 n.7 (D.C. Cir. 2008) (internal quotation marks and citations omitted); *see also Blackfeet Tribe of Indians,* 471 U.S. at 766 (explaining that the Indian canon of construction is "rooted in the unique trust relationship between the United States and the Indians." (quoting *Oneida Cty. v. Oneida Indian Nation*, 470 U.S. 226, 247 (1985)).

The Indian canon of construction "applies only to statutes that are both ambiguous and passed for the benefit of Indian tribes." *Ho-Chunk, Inc. v. Sessions*, 894 F.3d 365, 369 n.4 (D.C.

Cir. 2018). The D.C. Circuit has on two occasions reasoned that the Indian canon of construction applies when interpreting IGRA's Section 20(b) exceptions to its prohibition against gaming on lands acquired after 1988, one of which concerned the restored lands exception. *See Citizens Exposing Truth About Casinos v. Kempthorne* ("*CETAC*"), 492 F.3d 460, 471 (D.C. Cir. 2007) (interpreting IGRA's "initial reservation" exception and applying the Indian canon of construction); *City of Roseville*, 348 F.3d at 1032 (interpreting IGRA's "restored lands" exception and applying the Indian canon of construction, "were there any remaining doubt" about Congress's intent).

Despite this binding precedent, the defendants rely on two cases to posit that *Chevron* deference must be applied here in lieu of the Indian canon of construction. *See* Defs.'Opp'n at 15 (citing *CETAC*, 492 F.3d at 465 and *Oregon v. Norton*, 271 F. Supp. 2d 1270, 1277 (D. Or. 2003)). Unlike here, however, the agency's interpretation of IGRA's exceptions at issue in those cases did not conflict with the interests of Indian tribes. For example, the D.C. Circuit in *CETAC* concluded that the Secretary's interpretation of IGRA's initial reservation exception, 25 U.S.C. § 2719(b)(1)(B)(ii), was "due deference under *Chevron*" and "consistent with the Indian canon of statutory construction," since "IGRA is designed to promote the economic viability of Indian Tribes," so "the Indian canon of statutory construction requires the court to resolve any doubt in favor of the Band." 492 F.3d at 471. *Oregon v. Norton* is not binding, but it, too, recognized, when assessing the Secretary's interpretation of the restored lands exception, that "[i]n reviewing an agency's interpretation of a statute governing Indian tribes, the court must also consider canons of construction relevant to Indian law." 271 F. Supp. 2d at 1275. Although *Oregon v. Norton* applied *Chevron* deference, before accepting the agency's interpretation, the court "consider[ed] the applicable Indian law canon of construction in reviewing the Secretary's

interpretation of the restored lands exception" and did not "discern any detriment to Native Americans arising from" the Secretary's construction of IGRA's restored lands exception. *Id.* at 1278. These cases thus stand for the proposition that the Indian canon of construction is not substituted for *Chevron* deference when "the Secretary's proposed interpretation does not run against any Indian tribe . . . [and] actually advances the trust relationship between the United States and the Native American people." *Cal. Valley Miwok Tribe*, 515 F.3d at 1266 n.7 (internal quotation marks and citations omitted). In those circumstances, "adherence to *Chevron* is consistent with the customary Indian-law canon of construction." *Id.*

The defendants next switch tactics to argue that, to the extent the Indian canon of construction applies here to require an interpretation beneficial to Indian tribes, deference should still be given to the agency's interpretation since "[a]n interpretation of the restored lands exception that would benefit this particular tribe, by allowing unlimited use of restored land for gaming purposes, would not necessarily benefit other tribes also engaged in gaming. It might well work to their disadvantage." Defs.' Opp'n at 21. This argument suffers from several flaws.

First, this argument is predicated on the exaggerated notion that including the Koi Nation as a tribe "restored to Federal recognition" would allow "unlimited use of restored land for gaming purposes." *Id.* This premise is simply incorrect. A determination that the Koi Nation is a restored tribe is merely a first step since gaming under the restored lands exception also requires the Secretary to take land into trust, which is based on a number of factors. *See CETAC*, 492 F.3d at 469 (explaining that it is incorrect to suggest "that a newly recognized tribe may select any piece of land for its casino site" under IGRA's initial reservation exception because, "under the IRA, the land must still be acquired in trust by the Secretary whose determination is based on a number of factors").

Second, the defendants' conclusory argument fails to identify any evidence suggesting that other tribes would be harmed if the restored lands exception covers those tribes mistakenly treated as terminated and then reaffirmed administratively outside of the Part 83 Federal acknowledgment process. Indeed, the defendants have not disputed the Koi Nation's claim that it "is the only tribe" that was not federally recognized when IGRA was passed, subsequently reaffirmed, and then left without a determination that the tribe is "restored" for purposes of IGRA. Pl.'s Mem. at 25. The purported detrimental impact of one additional tribe potentially being able to game on "restored lands," if any are acquired, on other tribes is highly speculative and falls far short of showing any impact at all, let alone one that is detrimental to Indian tribes generally.

Finally, the D.C. Circuit has recognized that, by enacting IGRA, "Congress's overarching intent was 'in large part to provide a statutory basis for the operation of gaming by Indian tribes as a means of promoting tribal economic development, self-sufficiency, and strong tribal governments . . . and to do so to ensure that the Indian tribe is the primary beneficiary of the gaming operation." *CETAC*, 492 F.3d at 468 (internal quotation marks and citations omitted). This "primary purpose . . . is evident as well from the inclusion of several exceptions to the gaming prohibition on after-acquired lands in order to allow newly acknowledged or restored tribes to engage in gaming on par with other tribes." *Id.* As discussed above, *see supra* Section III.C.1, the defendants' interpretation would frustrate these purposes and, by this measure, be adverse to the interests of Indian tribes. Thus, the defendants' contention that accounting for the half-century of mistaken treatment of the Koi Nation, by affording this landless tribe the benefits of IGRA's economic development goals through Section 20(b)'s restored lands exception, would be detrimental to tribes generally, strains credulity. Accordingly, even if the statute were

ambiguous as to whether the Koi Nation is a tribe "restored to Federal recognition," the Indian canon of construction would resolve that ambiguity in favor of the Koi Nation.

***

DOI's regulation, 25 C.F.R. § 292.10(b), which restricts tribes administratively "restored to Federal recognition," to those obtaining Federally recognized status through the Part 83 Federal acknowledgement process, is invalid as applied to the Koi Nation, based on the plain meaning of IGRA's language, and in the alternative, based on the Indian canon of construction. The Koi Nation is a tribe "restored to Federal recognition" under 25 U.S.C. § 2719(b)(1)(B)(iii), and DOI may not apply 25 C.F.R. § 292.10(b) to exclude tribes like the Koi Nation, for which federally recognized status was mistakenly treated as terminated, with concomitant loss of opportunities to obtain land as established tribes, and then correctly reaffirmed administratively outside of the Part 83 Federal acknowledgment process. Accordingly, the DOI 2017 Decision applying 25 C.F.R. § 292.10(b) to exclude the Koi Nation from being considered a restored tribe is invalid and vacated. *See Sugar Cane Growers Co-op. of Fla. v. Veneman*, 289 F.3d 89, 97 (D.C. Cir. 2002) ("Normally when an Agency . . . clearly violates the APA we would vacate its action . . . ."). In addition, since the challenged regulation, 25 C.F.R. § 292.10(b), fails to account for this plain meaning of IGRA's restored lands exception, this subsection of the regulation is invalid.

### D. SIMILARLY SITUATED TRIBES

Alternatively, the Koi Nation claims that 25 C.F.R. § 292.10(b), and the DOI 2017 Decision's application of 25 C.F.R. § 292.10(b) to the tribe, are not in accordance with the law, contrary to 25 U.S.C. § 5123(f)'s privileges and immunities clause by treating the Koi Nation differently than similarly situated tribes. Pl.'s Opp'n at 15–18; Compl. ¶¶ 99–116, 117 (Count

IV).[16]  The defendants offer two responses to this alternative argument: first, that the "privileges and immunities" referenced in § 5123(f) are inapplicable to gaming rights under IGRA; and, second, that the Koi Nation is not similarly situated to other tribes, which have been restored to federal recognition under IGRA.  Defs.' Reply at 7, 11, 15.  The defendants' responses do not persuasively defeat the Koi Nation's claim of violation of its statutory privileges and immunities, under 25 U.S.C. § 5123(f), leading to the conclusion that the DOI 2017 Decision applying 25 C.F.R. § 292.10(b) to exclude the Koi Nation from being considered a restored tribe, is invalid and must be vacated.

### 1.  25 U.S.C. § 5123(f) Applies to IGRA

Section 5123(f) prohibits federal agencies from promulgating "any" regulations or making "any" decisions, pursuant to the IRA "or any other" Act of Congress, "with respect to a federally recognized Indian tribe that classifies, enhances, or diminishes the privileges and immunities available to the Indian tribe relative to other federally recognized tribes by virtue of their status as Indian tribes."  As a threshold point, the defendants argue briefly, in two footnotes, that gaming rights under IGRA do not fall within the "the privileges and immunities available to the Indian tribe," 25 U.S.C. § 5123(f), and instead this statutory provision covers only "tribes' powers of self-governance," such as how Indian tribes may organize themselves and adopt tribal constitutions and bylaws, Defs.' Opp'n at 26 n.10; *see also* Defs.' Reply at 7 n.4.

---

[16]     The Koi Nation also claims that DOI violated the Equal Protection Clause of the U.S. Constitution through the agency's disparate treatment of the tribe as compared to similarly situated recognized tribes.  Pl.'s Mem. at 45 n.6.  This allegation is not in the Koi Nation's Complaint, *see* Compl., and therefore is not properly raised on summary judgment.  *See Sloan ex rel Juergens v. Urban Title Servs., Inc.*, 652 F. Supp. 2d 51, 62 (D.D.C. 2009) (explaining a "[p]laintiff cannot amend her complaint" to add a new basis for violation "by merely . . . filing a motion for summary judgment"); *see also DSMC, Inc. v. Convera Corp.*, 479 F. Supp. 2d 68, 84 (D.D.C. 2007) (rejecting a plaintiff's attempts to broaden claims and thereby amend the complaint through the plaintiff's opposition to the defendant's motion for summary judgment).  Thus, this claim will not be further considered.

The defendants' argument that the "privileges and immunities" referenced in § 5123(f) are limited to certain "powers of self-governance," Defs.' Opp'n at 26 n.10, is incorrect. First, the defendants offer no textual support for this narrow reading of the plain language of the statute. *See generally* Defs.' Opp'n; Defs.' Reply. That text, to the contrary, makes § 5123(f) applicable to "any" agency regulation or decision, pursuant to the IRA or "any other Act of Congress," and without limiting the "privileges and immunities" protection to particular powers of self-governance as the defendants urge. *See Akiachak Native Cmty. v. Jewell* ("*Akiachak I*"), 995 F. Supp. 2d 1, 5 (D.D.C. 2013), *vacated as moot sub nom.*, *Akiachak Native Cmty. v. U.S. Dep't of Interior* ("*Akiachak II*"), 827 F.3d 100 (D.C. Cir. 2016) (explaining that 25 U.S.C. § 476(g), which is now codified at § 5123(g) and contains identical language to § 5123(f) except that it applies to regulations and decisions issued before the 1994 IRA amendments, "does more than prohibit the Secretary from distinguishing between 'historic' and 'created' tribes . . . , although that may have been Congress's chief purpose in enacting it").[17]

In addition, gaming activities on Indian lands under IGRA's restored lands exception certainly are "privileges . . . available to the Indian tribe" by virtue of a tribe's status as a recognized Indian tribe. 25 U.S.C. § 5123(f). IGRA's congressional findings confirm this privilege, stating that "Indian tribes have the exclusive right to regulate gaming activity on Indian lands if the gaming activity is not specifically prohibited by" law. *Id.* § 2701(5); *see also id.* § 2702(1) (stating that purpose of IGRA is "to provide a statutory basis for the operation of gaming by Indian tribes as a means of promoting tribal economic development, self-sufficiency,

---

[17] The defendants incorrectly contend that the district court's decision in *Akiachak I* has no precedential value and may not even be cited because it was vacated by the D.C. Circuit, having become moot by the time of the appeal. Defs.' Opp'n at 29 n.12 (citing *Akiachak II*, 827 F.3d at 115). When vacating *Akiachak I* as moot, the D.C. Circuit did not address § 476(g), *see Akiachak II*, 827 F.3d at 101–15, and thus the persuasiveness of this portion of the decision remains both appropriate for consideration and citation. *See Action All. of Senior Citizens of Greater Phila. v. Sullivan*, 930 F.2d 77, 83 (D.C. Cir. 1991) (explaining that it is permissible to cite vacated decisions as persuasive authority when those decisions were vacated for reasons unrelated to the merits).

and strong tribal governments"). Gaming on tribal lands pursuant to the restored lands exception is an example of such gaming not prohibited by federal law.

Second, the legislative history on which defendants rely further undermines the defendants' narrow reading of § 5123(f). Specifically, the defendants cherry-pick statements by Senator Inouye, a co-sponsor of the 1994 amendments to the IRA, discussing one purpose of those amendments to reject DOI's policy of distinguishing some tribes as "created" under the IRA and lacking certain inherent powers of self-government, in contrast to other "historic" tribes that predated the IRA. Defs.' Reply at 7 n.4 (quoting 140 CONG. REC. S6144, S6147 (statement of Sen. Inouye)).[18] At the same time, Senator Inouye further explained that the 1994 amendments served the broader goal of making "clear" that "it is and has always been Federal law and policy that Indian tribes recognized by the Federal Government stand on an equal footing to each other and to the Federal Government." 140 CONG. REC. at S6147 (statement of Sen. Inouye). "[E]ach federally recognized Indian tribe has the same governmental status as other federally recognized tribes by virtue of their status as Indian tribes with a government-to-government relationship with the United States." *Id.* Accordingly, "[e]ach federally recognized Indian tribe is entitled to the same privileges and immunities as other federally recognized tribes and has the right to exercise the same inherent and delegated authorities. This is true without regard to the manner in which the Indian tribe became recognized by the United States or whether it has chosen to organize under the IRA." *Id.*

---

[18] The defendants cite an Eighth Circuit decision to bolster the argument that § 5123(f) concerns only "the authority and procedures whereby an Indian tribe may organize itself and adopt a tribal constitution and bylaws." Defs.' Opp'n at 26 n.10 (internal quotation marks omitted) (quoting *Twin Cities Chippewa Tribal Council v. Minn. Chippewa Tribe*, 370 F.2d 529, 531 (8th Cir. 1967)). That case is neither binding nor relevant, since the decision does not address § 5123(f)'s scope or meaning, having been decided almost thirty years before Congress amended the IRA in 1994 to include § 5123(f)'s privileges and immunities clause.

The defendants simply ignore statements by the legislation's other co-sponsor, Senator McCain, who explained "[t]he recognition of an Indian tribe by the Federal Government is . . . the recognition that there is a sovereign entity with governmental authority." *Id.* at S6146 (statement of Sen. McCain). Senator McCain noted that "[o]ver the years, the Federal Government has extended recognition to Indian tribes through treaties, executive orders, a course of dealing, decisions of the Federal courts, acts of Congress and administrative action," and "[r]egardless of the method by which recognition was extended, all Indian tribes enjoy the same relationship with the United States and exercise the same inherent authority." *Id.* The 1994 amendments, therefore, were "intended to address all instances where such categories or classifications of Indian tribes have been applied and any statutory basis which may have been used to establish, ratify or implement the categories or classifications." *Id.* at S6147 (statement of Sen. McCain). The legislative history thus speaks to the breadth of the privileges and immunities intended to be afforded to tribes as sovereigns, without any such limitation to tribal self-governance, as suggested by the defendants.

In short, the defendants' threshold arguments that § 5123(f) is inapplicable to IGRA fail.

## 2. The Koi Nation Is Similarly Situated to the Grand Traverse Band and Ione Band

Contrary to the defendants' contention that the Koi Nation is not similarly situated to other tribes deemed restored to federal recognition under IGRA, the Koi Nation points to two tribes, the Grand Traverse Band and the Ione Band, as examples of how "the Part 292 Regulations diminish the privileges available to the Koi Nation under IGRA relative to the privileges available to other federally recognized Indian tribes that have suffered from *de facto*

termination by the Executive Branch." Pl.'s Opp'n at 15–18.[19]  According to the Koi Nation, the

DOI 2017 Decision's application of 25 C.F.R. § 292.10(b) to the tribe violates 25 U.S.C. §

5123(f) by denying the Koi Nation "restored" status, notwithstanding that the tribe is similarly

situated to the Grand Traverse Band and the Ione Band, both of which have been found to be

"restored" for purposes of IGRA.  *See* Pl.'s Opp'n at 16.

The defendants do not dispute that § 5123(f) prohibits disparate treatment between

similarly situated recognized tribes.  *See generally* Defs.' Opp'n; Defs.' Reply.  The two tribes

identified by the Koi Nation as similarly situated share significant salient historical facts with the

Koi Nation.  The Grand Traverse Band after a period of recognition, was mistakenly treated as

terminated for decades and then "restored," for purposes of IGRA's restored lands exception,

when the federal government recognized the tribe again, through the Part 83 Federal

acknowledgment process.  *Grand Traverse*, 369 F.3d at 961–62, 972.  The Ione Band, a

recognized tribe that the federal government treated as terminated, became restored to federal

recognition when DOI reaffirmed this tribe's status, outside the Part 83 Federal acknowledgment

process, and directed BIA to include the Ione Band on the Federal Register list of federally

recognized tribes, so that the Ione Band was eligible to receive the federal services and benefits

afforded to recognized Indian tribes.  *Cty. of Amador*, 872 F.3d at 1018, 1028.  Based on this

historical record, the Koi Nation asserts that, just like the Grand Traverse Band and the Ione

---

[19]     The Koi Nation initially claimed DOI's promulgation of 25 C.F.R. § 292.10(b), and the agency's
application of this regulation in the DOI 2017 Decision to the Koi Nation, resulted in the tribe being treated
differently "than other federally recognized tribes," because § 5123(f) prohibits "making distinctions among those
Indian tribes that have attained federal recognition." *See* Pl.'s Mem. at 25 (quoting *United Houma Nation v. Babbitt*,
No. CIV. A. 96-2095, 1997 WL 403425, at *7 (D.D.C. July 8, 1997)).   The defendants responded that the agency
could not have violated § 5123(f) by classifying only some recognized tribes as "restored," because IGRA's restored
lands exception requires the agency to determine which subset of recognized tribes qualify as tribes "restored to
Federal recognition," 25 U.S.C. § 2719(b)(1)(B)(iii).  Defs.' Opp'n at 26.  These arguments need not be addressed
because the Koi Nation clarified in its opposition that the tribe is not claiming all recognized tribes have an equal
right to be classified as a "restored" tribe under IGRA's restored lands exception.  Pl.'s Opp'n at 15.

Band, it was recognized, treated as terminated, and then recognized again, and, more particularly, just like the Ione Band, the Koi Nation's federally recognized status occurred through reaffirmation by DOI rather than through the Part 83 Federal acknowledgment process.

The defendants try to distinguish the histories of both comparator tribes. According to the defendants, unlike the Koi Nation, the Grand Traverse Band re-attained recognition through the Part 83 Federal acknowledgment process and thus satisfies the Part 292 criteria to be considered "restored" under IGRA. *See* 25 C.F.R. § 292.10(b). Of course, the Koi Nation tried to invoke, but was denied access to, the Part 83 Federal acknowledgment process. *See* AR at 293 (DOI 2000 Recognition Memo at 4). Nevertheless, in the defendants' view, differential treatment of the tribes is warranted because the Koi Nation's recognition was reaffirmed through a waiver of the Part 83 Federal acknowledgment process, which waiver was premised on DOI's finding in 2000 that the tribe's government-to-government relationship never terminated. *Id.*

The defendants' myopic focus on the different means by which the Koi Nation and the Grand Traverse Band achieved restoration of their federally recognized status overlooks the similarities in how both tribes lost that status. As the Sixth Circuit explained with respect to the Grand Traverse Band, "[t]here is no dispute that only Congress had the *legal right* to terminate" the Grand Traverse Band's recognized status, but the federal government severed the government-to-government relationship with the tribe when the executive branch "acted as if" the Grand Traverse Band's recognition had been terminated, denying the tribe federal services for over a century. *Grand Traverse*, 369 F.3d at 968 (emphasis in original). The Koi Nation's recognized status was *de facto* terminated in the same way, due to the federal government's mistaken treatment of the tribe as terminated. To the extent that DOI views the Koi Nation's

recognized status as never actually terminated, the Grand Traverse Band is in precisely the same position, but nevertheless was afforded the Part 83 process.

DOI's reaffirmation of the recognized status of both the Koi Nation and the Grand Traverse Band, after years of mistaken terminated treatment, through different administrative methods does not lessen that similarity. Therefore, treating the Koi Nation differently due to DOI's reaffirmation of the tribe's status, rather than under the Part 83 Federal acknowledgment process, violates 25 U.S.C. § 5123(f)'s prohibition against treating similarly situated recognized tribes differently. Indeed, treating the Koi Nation differently than the Grand Traverse Band because of the method by which the latter tribe regained recognition runs contrary to the purpose of § 5123(f)'s enactment, which was to prevent distinctions amongst tribes based on how they came to be recognized. *See* 140 Cong. Rec. at S6147 (Statement of co-sponsor Sen. Inouye) (proposing the 1994 IRA amendments because "[e]ach federally recognized Indian tribe is entitled to the same privileges and immunities . . . without regard to the manner in which the Indian tribe became recognized by the United States or whether it has chosen to organize under the IRA"); *see also id.* (Statement of co-sponsor Sen. McCain) (explaining that purpose of 1994 IRA amendments was to clarify that "[r]egardless of the method by which recognition was extended, all Indian tribes enjoy the same relationship with the United States and exercise the same inherent authority").

As to the Ione Band, the defendants conceded in the DOI 2017 Decision "the only distinction" between the Koi Nation and the Ione Band was that the latter was grandfathered into the restored lands exception, under 25 C.F.R. § 292.26(b), having received a formal determination that the tribe was restored prior to 2008, whereas the Koi Nation did not. *See* AR at 6 n.46 (DOI 2017 Decision at 6 n.46) ("[T]he Department has taken the position, and

continues to defend it in litigation, that, in the absence of Part 292.10(b), a reaffirmed tribe could be restored for purposes of IGRA. . . . The only distinction is that Ione received an Indian lands determination from the Department prior to the promulgation of Part 292, thus it was 'grandfathered in' under 25 C.F.R. § 292.26." (citation omitted)); *see also* AR at 2 n.6 (DOI 2017 Decision at 2 n.6) ("The Department is aware of only one other tribe," the Ione Band, "that has a similar history of the Department clearly stating that a tribe is terminated and reaffirmed through action by the Assistant Secretary."). This distinction between the two tribes is troubling given the relevant history: just as DOI denied the Koi Nation access to the Part 83 Federal acknowledgment process, DOI ignored the Koi Nation's request in 2006, prior to the 2008 promulgation of the Part 292 regulations, for a formal determination as to the tribe's restored status.

To be precise, the Koi Nation's request for a restored tribe determination, *see* AR at 500–01 (Koi Mar. 29, 2006 Request Letter at 1–2), occurred the same year that the Ione Band received DOI's confirmation of the tribe's status as restored. Yet, the defendants failed to find the Koi Nation restored at that time, or even to respond at all. *See* Pl.'s Mem. at 18; Pl.'s Opp'n at 6; Defs.' Reply at 2. The defendants attempt to explain away the agency's inaction on the Koi Nation's 2006 request, by claiming the Ione Band, in contrast, had identified a "specific parcel of land" to receive a "restored tribe" determination. *See* Defs.' Reply at 11. This is unconvincing and appears to be a post-hoc explanation. *Accord Council for Urological Interests*, 790 F.3d at 222 (noting that reasonableness of agency's interpretation depends on "what the agency said at the time of the rulemaking—not to its lawyers' post-hoc rationalizations"). DOI never told the Koi Nation in response to the tribe's 2006 request that identification of land was necessary for a

determination of restored status, nor did DOI offer such reasoning in the challenged DOI 2017 Decision.

In any event, the defendants fail to identify why the specification of land is relevant to whether a tribe is "restored to Federal recognition" under 25 U.S.C. § 2719(b)(1)(B)(iii). Indeed, DOI's 2012 Ione Band Record of Decision, which supplied the basis for grandfathering the Ione Band into the restored lands exception, evaluated the "restored tribe" and "restored land" inquiries independently. *See* AR at 303 (DOI 2012 Ione Band Record of Decision at 49) ("In order to conduct gaming on the land, not only must the Tribe be considered a restored tribe within the meaning of IGRA, but the land being acquired must also be considered restored lands.").

As a last gasp argument, the defendants note that an agency may change implementation of an ambiguous statute in certain circumstances. *See* Defs.' Reply at 16. Even if correct, this does not excuse DOI's implementation of an interpretation of IGRA's restored lands exception in a manner that violates § 5123(f), which prohibits the agency from promulgating "any" regulation or making "any" decision "with respect to a federally recognized Indian tribe" that diminishes the tribe's privileges "relative to other federally recognized tribes by virtue of their status as Indian tribes." The DOI 2017 Decision admits that 25 C.F.R. § 292.10(b) is the only reason for distinguishing between the Koi Nation and the Ione Band, *see* AR at 6 n.46 (DOI 2017 Decision at 6 n.46), running afoul of § 5123(f)'s prohibition against promulgating "any" regulation that diminishes the privileges and immunities available to an Indian tribe, relative to other federally recognized Indian tribes.[20]

---

[20] The defendants caution that creating a class of restored tribes for the Grand Traverse Band, the Ione Band, and the Koi Nation would grant superior gaming rights for these tribes, in violation of 25 U.S.C. § 5123(f). Defs.' Reply at 6. Since the Grand Traverse Band and Ione Band are already deemed restored, the defendants' concern

Thus, DOI's application of 25 C.F.R. § 292.10(b) to the Koi Nation in the DOI 2017 Decision, to exclude the Koi Nation from being considered a restored tribe, is invalid under § 5123(f) and therefore vacated.

### E. SUFFICIENCY OF DOI'S EXPLANATION FOR EXCLUDING REAFFIRMED TRIBES FROM THE RESTORED LANDS EXCEPTION

Even if DOI's interpretation of IGRA's restored lands exception were permissible, the Koi Nation argues that in promulgating the challenged regulation, 25 C.F.R. § 292.10(b), DOI failed adequately to explain the change in the interpretation of a tribe "restored to Federal recognition" under IGRA, 25 U.S.C. § 2719(b)(1)(B)(iii). Pl.'s Opp'n at 18–20; *see also* Compl. ¶¶ 104, 108, 117 (Count IV).[21] "Agencies are free to change their existing policies as long as they provide a reasoned explanation for the change." *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2125 (2016). When an agency changes an existing position, the agency "need not always provide a more detailed justification than what would suffice for a new policy created on a blank slate." *Id.* at 2125–26 (internal quotation marks omitted) (quoting *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009)). An "'[u]nexplained inconsistency' in agency policy," however, "is a reason for 'holding an interpretation to be an arbitrary and capricious change.'" *Id.* (alteration in original) (quoting *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*,

---

about including the Koi Nation as a restored tribe, pursuant to § 5123(f)'s privileges and immunities clause, appears over-blown since this new class of purportedly "preferred" tribes is a class that already exists. Moreover, the defendants' characterization ignores the central purpose of the restored lands exception to create parity among recognized tribes by "help[ing] to ensure 'that tribes lacking reservations when [the statute] was enacted are not disadvantaged relative to more established ones.'" *Chaudhuri*, 887 F.3d at 503 (quoting *City of Roseville*, 348 F.3d at 1030).

[21] Relatedly, the Koi Nation claims that the explanation in DOI's 2017 Decision is arbitrary and capricious, in violation of the APA. Compl. ¶¶ 1–116, 117, 124 (Count IV). As support for this claim, the Koi Nation argues the challenged decision should be vacated for: (1) failing adequately to consider the tribe's treatment as terminated for a half-century, Pl.'s Mem. at 22–23 (citing *State Farm*, 463 U.S. at 43); (2) relying on irrelevant factors, such as the mechanism by which the Koi Nation attained recognition again, Pl.'s Mem. at 23 (citing *Lubow v. U.S. Dep't of State*, 783 F.3d 877, 887 (D.C. Cir. 2015)); and (3) treating the Koi Nation differently than similarly situated tribes, *id.* (citing *Muwekma*, 708 F.3d at 216). This claim has merit, for the reasons discussed *supra* in Parts III.C–E, but need not be resolved here since the case is decided on alternative grounds.

545 U.S. 967, 981 (2005)). "An arbitrary and capricious regulation of this sort is itself unlawful and receives no *Chevron* deference." *Id.* at 2126.

Here, the defendants concede that DOI's interpretation of the restored lands exception changed upon the agency's promulgation of 25 C.F.R. § 292.10(b), by excluding tribes, for which recognized status was reaffirmed by the agency outside of the Part 83 Federal acknowledgment process, from being considered "restored," when these tribes had previously been eligible for coverage under the exception. Defs.' Reply at 12. In the Final Rule for 25 C.F.R. § 292, DOI provided two reasons for this policy change, *see supra* Section I.B.5, but neither withstands close scrutiny nor justifies excluding the Koi Nation from IGRA's Section 20 restored lands exception.

DOI's first reason is that at the time of IGRA's enactment in 1988, the Part 83 regulations had already been in effect since 1978 to provide a uniform administrative, rather than ad hoc, procedure for federal recognition of tribes. 73 Fed. Reg. at 29363 (Section 20 Final Rule). "Congress clearly understood the part 83 process because it created an exception [in IGRA] for tribes acknowledged through the part 83 process." *Id.* Due to the extant Part 83 Federal acknowledgment process and this process's purpose, DOI "believe[d] that in 1988 Congress did not intend to include within the restored tribe exception these pre-1979 ad hoc determination[s]." *Id.* Even if DOI's reasoning were correct about "pre-1979 ad hoc determinations" of recognized status not being covered by IGRA's restored lands exception, the Koi Nation's recognized status was reaffirmed much later, in 2000, AR at 293 (DOI 2000 Recognition Memo at 4), after the tribe's effort to be included on the Federal Register list of federally recognized tribes was denied in 1980, AR at 377–79 (BIA 1980 Memo).

In any event, DOI's conclusion that Congress when enacting IGRA sought, without any textual reference or express limitation in Section 20's restored lands exception, to exclude tribes recognized outside the Part 83 Federal acknowledgment process, simply because that process was extant at the time of IGRA's enactment, takes a leap too far. As already noted, *see supra* Section III.C.1, Congress was perfectly capable of limiting a Section 20 exception to tribes administratively recognized only in the Part 83 process and did so in another exception, *see* 25 U.S.C. § 2719(b)(1)(B)(ii), but not in the restored lands exception.

DOI's second reason for the policy change to exclude from IGRA's restored lands exception any tribe administratively recognized outside the Part 83 Federal acknowledgment process fares no better. This second reason relied on a single congressional finding in the 1994 List Act that referenced "only the part 83 procedures as the process for administrative recognition." 73 Fed. Reg. at 29363 (Section 20 Final Rule) (citing 25 U.S.C. § 5130 notes). While acknowledging that "past reaffirmations . . . were done to correct particular errors," DOI concluded that "[o]mitting any other avenues of administrative acknowledgment is consistent with the notes accompanying the List Act that reference only the part 83 regulatory process as the applicable administrative process." 73 Fed. Reg. at 29363 (Section 20 Final Rule). This conclusion, however, fails to address why the List Act, enacted in 1994, bears on Congress's intent in 1988 when IGRA was enacted. *See Cty. of Amador*, 872 F.3d at 1030 n.17 ("Congress' intention in 1994 sheds no light on what Congress meant in 1988 when IGRA was passed."); *see also Friends of Earth, Inc. v. EPA*, 446 F.3d 140, 147 (D.C. Cir. 2006) ("[T]he views of a subsequent Congress form a hazardous basis for inferring the intent of an earlier one." (internal quotation marks omitted) (quoting *United States v. Price*, 361 U.S. 304, 313 (1960))). Although the Secretary could reasonably view IGRA and the IRA "in tandem" because IGRA was enacted

"against the backdrop of" the IRA, *see CETAC*, 492 F.3d at 469, IGRA's 1988 enactment was not against the backdrop of the 1994 List Act, and DOI offered no reason in the Final Rule for looking to that statute when interpreting IGRA's restored lands exception.

Moreover, DOI's exclusion from the restored lands exception of tribes that had their recognized status reaffirmed by the agency outside the Part 83 Federal acknowledgment process in order "to correct particular errors," 73 Fed. Reg. at 29363 (Section 20 Final Rule), runs counter to policies articulated in other congressional findings for, and the actual text of, the List Act. Among the List Act's eight congressional findings, are findings that emphasize the statute's ultimate goal of maintaining an "accurate, regularly updated, and regularly published" list of federally recognized tribes, regardless of how those tribes came to be recognized, because the Federal Register list "is used by the various departments and agencies of the United States to determine the eligibility of certain groups to receive services from the United States." 25 U.S.C. § 5130 notes (Congressional Findings ¶ 7); *see also id*. (Congressional Findings ¶ 8) (stating the Federal Register list of federally recognized tribes "should reflect all of the federally recognized Indian tribes in the United States which are eligible for the special programs and services provided by the United States to Indians because of their status as Indians"). This stress on accuracy carries over to the text of the List Act, which directs the DOI Secretary to publish regularly the Federal Register List of "all Indian tribes" which are "recognize[d] . . . because of their status as Indians." *Id*. § 5131(a).

Thus, every effort by DOI to identify, correctly and promptly, federally recognized tribes, whether through the Part 83 process or though administrative correction of the agency's erroneous treatment of a tribe outside that process, promotes the expressed purpose, goals and efficacy of the List Act. In fact, DOI's correction, in 2000, of the agency's erroneous treatment

of the Koi Nation's status through the agency's waiver of the Part 83 process and reaffirmation

of the tribe's recognized status, "was intended to rectify a past wrong, without litigation or

utilizing the Part 83 acknowledgement process," AR at 6 (DOI 2017 Decision at 6), and provided

a prompt correction of the Federal Register list of federally recognized tribes with the addition of

the Koi Nation.  Encouraging DOI to correct its own mistakes and thereby avoid the

comparatively lengthy alternative methods of federal recognition, through congressional action,

court order predicated on litigation, or the Part 83 administrative process, is wholly consistent

with the over-arching goals of the List Act, and more sensible public policy than discouraging

such agency self-correction.

By contrast, excluding from the restored lands exception reaffirmed tribes, such as the

Koi Nation, that had been incorrectly left off the Federal Register list of federally recognized

tribes, penalizes such tribes, discouraging them from seeking correction of agency errors

regarding evaluation of a tribe's status outside the Part 83 process, and thereby undermines the

strong public policy interests reflected in the List Act to have DOI strive for correct and accurate

decision-making with respect to federally recognized tribes.  In this way, the defendants'

position here is antithetical to the purpose animating the List Act of maintaining an accurate, up-

to-date list of federally recognized tribes.

DOI's gaps in reasoning for the agency's interpretation of the restored lands exception,

which purported to make the exception harmonious with the List Act, renders the agency's

explanation for 25 C.F.R. § 292.10(b) arbitrary and capricious and the challenged regulation

itself invalid.  Additionally, the DOI 2017 Decision applying 25 C.F.R. § 292.10(b), based on

DOI's insufficiently explained policy of excluding from IGRA's restored lands exception tribes,

such as the Koi Nation, with federally recognized status reaffirmed by the agency outside the Part 83 Federal acknowledgment process, is invalid and, accordingly, vacated.

## IV.     CONCLUSION

For the foregoing reasons, the Koi Nation's Motion for Summary Judgment, ECF No. 14 is granted, and the defendants' Cross-Motion for Summary Judgment, ECF No. 15, is denied. An Order consistent with this Memorandum Opinion will be entered contemporaneously.


Date: January 16, 2019

_____
BERYL A. HOWELL
Chief Judge